FILED

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL THOMAS GORMAN,

              Petitioner

vs-

IVAN D. CLAY

Warden, Sierra Conservation Center,

              Respondent

No. C 07-2883 MJJ (PR)

**AMENDED
PETITION FOR A WRIT
OF HABEAS CORPUS**

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS

MICHAEL THOMAS GORMAN
T80924
3-T-246
Sierra Conservation Center
5150 O'Brynes Ferry Road
Jamestown, California 95327
*In pro se*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

AMENDED PETITION FOR A WRIT OF HABEAS CORPUS . . . . . . . . 1

    A.      Information about Conviction and Sentence . . . . . . . . . . . . . 1

    B.      Grounds for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             Claim 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             Claim 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

             Claim 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

             Claim 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS . . . . . . . . . . . . . . . . . . . 7

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

STATEMENT OF THE LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

I:      THE JURY WAS GIVEN A FELONY MURDER INSTRUCTION,
       CALJIC No. 8.27, THAT ALLOWED IT TO CONVICT WITHOUT
       FINDING ANY LOGICAL NEXUS BETWEEN THE KILLING AND
       THE UNDERLYING FELONY, VIOLATING PETITIONER'S
       RIGHT TO DUE PROCESS AND RIGHT TO HAVE EVERY
       ELEMENT OF THE CRIME PROVED BEYOND A REASONABLE
       DOUBT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    1.      Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

i

Case 4:07-cv-02883-SBA   Document 10   Filed 03/20/2008   Page 3 of 57

2.   The felony murder instruction allowed the jury to convict solely on the basis of a temporal, rather than logical, connection between the felony and the killing . . . . . . . . . . . . . . . . . . . . 19

3.   It was federal constitutional error to give CALJIC No. 8.27 because the instruction allowed a conviction without requiring the jury to find each element of felony murder proven beyond a reasonable doubt . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

   a.   A logical nexus between the underlying felony and the subsequent killing is a constitutionally necessary element of felony murder because the underlying felony substitutes for homicidal mens rea . . . . . . . . . . . . . . 23

   b.   CALJIC No. 8.27, as it was then written, allowed the jury to convict without finding a logical nexus between the underlying felony and the subsequent killing . . . 28

3.   Petitioner is entitled to review under the *Chapman v. California* harmless error standard because the California Court of Appeal never performed such an analysis on the effect of CALJIC No. 8.27. Even under the more forgiving standard of *Brecht*, however, giving CALJIC No. 8.27 created a substantial and injurious effect on the jury's verdict . . . . . . . . . . . . . . . . . . 29

II:  THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BY ADMITTING HIGHLY PREJUDICIAL AND WHOLLY IRRELEVANT EVIDENCE OF HIS USE OF RACIAL SLURS TO REFER TO THE VICTIM . . . . . . . . . . . . . . . . . . . . . 32

   1.   The trial court admitted evidence of Petitioner's use of racial slurs to describe the victim despite the fact that such evidence had no probative value whatsoever . . . . . . . . . . . . . . . . . . . 32

   2.   The admission of the racial slurs violated Petitioner's right to due process . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

ii

3.    Petitioner is entitled to review under the *Chapman* harmless error standard because the California Court of Appeal did not acknowledge the admission of the inflammatory evidence as a federal constitutional violation. Even under the more forgiving standard of *Brecht*, however, the admission of the inflammatory evidence created a substantial and injurious effect on the jury's verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

III:   PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY TRIAL COUNSEL'S FAILURE TO OBJECT TO THE ADMISSION OF HIS UN-MIRANDIZED STATEMENTS MADE IN POLICE CUSTODY
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1.    Trial counsel failed to object to the admission of un-Mirandized statements Petitioner made while in police custody . . . . . . 36

2.    The failure to object to the admission of these statements denied Petitioner his Sixth Amendment right to effective assistance of counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

3.    The denial of effective assistance created a substantial and injurious effect on the outcome of Petitioner's case . . . . . . 38

IV:    PETITIONER'S SENTENCE FOR BURGLARY WAS AGGRAVATED ON THE BASIS OF FACTS NOT FOUND BEYOND A REASONABLE DOUBT BY A JURY, IN VIOLATION OF *CUNNINGHAM v. CALIFORNIA* . . . . . . . . . . . . . . . . . . . . . . 40

1.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2.    The trial court aggravated Petitioner's burglary sentence on the basis of facts not found beyond a reasonable doubt by a jury
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

3.    The aggravation of Petitioner's sentence on the basis of factors not proved beyond a reasonable doubt to a jury violated the Sixth Amendment under the Supreme Court's decision in *Cunningham v. California* . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

4.    Petitioner is entitled to review under the *Chapman* harmless error standard because the California Court of Appeal was barred from finding the use of inappropriate aggravating factors to be a federal constitutional violation. Even under the more forgiving standard of *Brecht*, however, the use of these aggravating facts created a substantial and injurious effect on the jury's verdict ................................. 43

CONCLUSION ........................................... 47

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Almendarez-Torres v. United States*
    523 U.S. 224 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Apprendi v. New Jersey*
    530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 45, 46, 48

*Bains v. Cambra*
    204 F.3d 964 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . 30, 34, 45

*Boyde v. California*
    494 U.S. 370 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Brecht v. Abrahamson*
    507 U.S. 619 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Chapman v. California*
    386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Cunningham v. California*, No. 05-6551
    549 U.S. ___ [___ S.Ct. ____] (2007) . . . . . . . . . . . 3, 40, 42, 44, 45

*Fry v. Pliler*
    2006 U.S. App. LEXIS 2694 [cert. granted, 75 U.S.L.W.
    3311 (U.S. Dec. 7, 2006) (No. 06-5247)] . . . . . . . . . . . . . . . . 30, 34

*In re Winship*
    397 U.S. 358 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 26

*Middleton v. McNeil*
    541 U.S. 433 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Morissette v. United States*
    342 U.S. 246 (1952) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Oregon v. Mathiason*
    429 U.S. 492 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

v

*Payne v. Tennessee*
  501 U.S. 808 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sandstrom v. Montana*
  442 U.S. 510 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24, 25

*Speiser v. Randall*
  357 U.S. 513 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Starr v. Lockhart*
  23 F.3d 1280 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Strickland v. Washington*
  466 U.S. 668 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

## STATE CASES

*Commonwealth v. Waters*
  491 Pa. 85 (Pa. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Black*
  35 Cal. 4th 1238 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 43

*People v. Black*
  41 Cal.4th 799 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*People v. Cavitt*
  33 Cal. 4th 187 (2004) . . . . . . . . . . . . . . . . . . . . . 17, 20, 21, 26, 28, 29

*People v. Kimble*
  44 Cal. 3d 480 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*People v. Lewis*
  444 N.Y.S.2d 1003 (N.Y.Ct.Sup. 1981) . . . . . . . . . . . . . . . . . . . . 27

*People v. Quartermain*
  16 Cal. 4th 600 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*People v. Sandoval*
  41 Cal.4th 825 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## FEDERAL CONSTITUTIONAL PROVISIONS AND STATUTES

### United States Constitution

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Fourteenth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

### United States Code

28 U.S.C. § 2254 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATE STATUTES

### California Penal Code

§ 187 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9
§ 189 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
§ 459 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9
§ 12022(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Ark. Code Ann., tit. 5, § l0-102(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Conn. Gen. Stat. Ann., tit. 53a, § 54c . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Del. Rev. Code, tit. 11, §§ 635(2), 636(2) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

N.D. Code Ann., tit. 12.1, § 16-01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Or. Rev. Stat., Pen. Code, §163.115(l) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Tex. Pen. Code Ann., § 19.02(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## OTHER AUTHORITIES

**California Jury Instructions, Criminal**

No. 3.00 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
No. 3.01 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
No. 8.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
No. 8.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Nelson Roth and Scott Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads,* 70 Cornell Law Review 446 (1985)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

James Tomkovicz, *The Endurance of the Felony Murder Rule: A Study of the Forces That Shape Our Criminal Law,* 15 Wash & Lee L. Rev. 1429 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

MICHAEL THOMAS GORMAN
T80924
3-T-246
Sierra Conservation Center
5150 O'Brynes Ferry Road
Jamestown, California 95327
*In pro se*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **MICHAEL THOMAS GORMAN,** | **No. C 07-2883 MJJ (PR)** |
| **Petitioner** | |
| | **AMENDED** |
| **-vs-** | **PETITION FOR A WRIT** |
| | **OF HABEAS CORPUS** |
| **IVAN D. CLAY** | |
| **Warden, Sierra Conservation Center[1],** | |
| **Respondent** | |

_____/

## AMENDED PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner, Michael Thomas Gorman, alleges:

## A. **Information about Conviction and Sentence**

---

[1]Matthew C. Kramer, Warden, Folsom State Prison, was originally designated Respondent in this writ. However, petitioner has been transferred to Sierra Conservation Center, where Ivan D. Clay is Warden.

1

1. Petitioner is challenging the following sentence:

(a) The judgment of the California Superior Court for the County of Humboldt;

(b) in Case No. CR011617CS;

(c) entered on December 9, 2002, for a term of 25 years to life (Pen. Code, § 187), with a consecutive term of three years (Pen. Code, § 459).

(d) which petitioner is now serving his sentence in Folsom State Prison, California.

2. Petitioner was given this sentence for the following crimes: first degree murder (Cal. Pen. Code, § 187), second degree burglary (Cal. Pen. Code, § 459).

3. Petitioner was arraigned and had a preliminary hearing.

4. Petitioner pleaded not guilty.

5. Petitioner had a jury trial.

6. Petitioner did testify at his trial.

7. Petitioner had court-appointed attorneys at all proceedings from arraignment through and including appeal;

8. Petitioner appealed his conviction in a timely manner

(a) to the California Court of Appeal, First Appellate District, Division Two, Case No. A102310, which, on January 27, 2005,

2

affirmed the convictions but remanded for resentencing on the burglary conviction, by the Opinion, a copy of which is attached hereto as Exhibit A (*Gorman I*). Both petitioner and respondent filed timely Petitions for Review in the California Supreme Court. On April 27, 2005, the Court granted Respondent's Petition for Review and denied that of Petitioner. On September 7, 2005, the Court transferred the case back to the First District with the instruction to vacate its decision and reconsider the cause in light of *People v. Black*, 35 Cal.4th 1238 (2005). On December 21, 2005, the First District vacated its previous decision, upholding Petitioner's sentence in the Opinion attached as Exhibit B (*Gorman II*). On January 30, 2006, petitioner filed a second Petition for Review in the California Supreme Court. On March 15, 2006, the Court denied the petition. Petitioner filed this writ of habeas corpus on June 13, 2007 and asked that this Court stay the proceeding while he further litigated in the California courts his fourth argument, that the upper term burglary sentence violated the United States Supreme Court's then recent decision in *Cunningham v. California*, 127 S. Ct. 856, 871 (2007). On July 30, 2007, this Court issued an Order Granting Motion for Stay; Instructions for Clerk, instructing petitioner to file a motion to reopen this action within 30 days of the California Supreme Court's decision rejecting his *Cunningham* claim,

3

accompanied by the amended petition with his newly exhausted claim. Petitioner has done so: On June 1, 2007, the First District granted petitioner's motion to recall the remittitur in *Gorman II* in light of *Cunningham*. On December 4, 2007, the Court of Appeal again affirmed petitioner's conviction in the Opinion attached as Exhibit C (*Gorman III*). On January 4, 2008, petitioner filed a third Petition for Review in the California Supreme Court. On February 13, 2008, the Court denied the petition.

(b) The grounds on which petitioner appealed the convictions were the same as those he is raising in this petition.

**B. Grounds for Relief**

Petitioner alleges here only the general nature of the grounds for relief. He is attaching hereto a Memorandum of Points and Authorities in which he gives a more complete statement of the supporting facts and some legal authority, and he incorporates the Memorandum herein by reference.

**Claim 1**: Petitioner was found guilty of felony murder in violation of his right to due process under the United States Constitution and his right to have each element of his offense proved beyond a reasonable doubt in that the jury instruction on felony murder, CALJIC No. 8.27 (1998 rev.) (6th ed. 1996), allowed the jury to reach a conviction without finding any logical nexus between the killing and the underlying felony.

4

**Claim 2**: In violation of petitioner's right to due process, the trial court admitted highly prejudicial and wholly irrelevant evidence of petitioner's use of racial slurs to describe the victim.

**Claim 3:** Petitioner's Sixth Amendment right to effective assistance of counsel was violated by trial counsel's failure to object to the admission of a tape recording made while petitioner was in police custody.

**Claim 4:** Petitioner's sentence for burglary was aggravated on the basis of facts not found beyond a reasonable doubt by a jury, in violation of the Sixth Amendment.

**WHEREFORE,** petitioner prays that this Court:

1.    Order respondent to file and serve a certified copy of the record on appeal and show cause why petitioner is not entitled to the relief sought;

2.    After full consideration of the issues raised in the petition, vacate the judgment and sentence imposed upon petitioner or, in the alternative,

3.    Permit discovery and an evidentiary hearing at which petitioner may offer proof concerning the allegations in this petition; and

4.    Grant such other and further relief as may be appropriate grant petitioner the relief to which he may be entitled in this proceeding.

Dated: 3-14-08

Michael Thomas Gorman
Petitioner

6

# IN THE UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **M I C H A E L   T H O M A S GORMAN,**<br><br>   **Petitioner,**<br><br>   v.<br><br>**IVAN D. CLAY Warden, Sierra Conservation Center**<br>   **Respondent.** | No. _____<br><br>**(28 U.S.C. § 2254)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

### INTRODUCTION

Michael Thomas Gorman, a California state prisoner serving a sentence of 25-years-to-life with a consecutive three year sentence, submits this memorandum in support of his accompanying Petition for a Writ of Habeas Corpus (28 U.S.C. § 2254). Petitioner was convicted of felony murder and burglary on the basis of events in which he played only a marginal role. The California Court of Appeal affirmed those convictions and the California Supreme Court denied review. By this petition, petitioner seeks relief for four constitutional errors that created a substantial and injurious effect on the

7

outcome of his case.

1.    **A defective instruction on felony murder**, CALJIC No. 8.27, which
      was subsequently changed by the state of California, allowed the jury
      to convict petitioner without finding any logical nexus between his
      actions and the killing that subsequently occurred.  This instruction
      violated petitioner's right to due process and right to have every
      element of the charged offense proved beyond a reasonable doubt.

2.    The **admission of highly prejudicial and irrelevant evidence** that
      petitioner had used a racial epithet to refer to the victim denied
      petitioner's right to due process.

3.    Petitioner's **right to effective assistance of counsel was denied** by
      trial counsel's failure to object to the admission of damaging, un-
      Mirdandized statements made while he was in police custody.

4.    Petitioner's **burglary sentence was aggravated, in violation of the
      Sixth Amendment**, on the basis of factors not found beyond a
      reasonable doubt by a jury.

## STATEMENT OF THE CASE

Petitioner Michael Thomas GORMAN was charged by an information filed July 16, 2001, in the Humboldt County Superior Court with the following offenses, all committed in the late night of April 2, 2001 and the early morning of April 3.

Count 1: First degree murder (Pen. Code, § 187), and the use of a knife in the commission of a felony (Pen. Code, § 12022(b));

Count 2: Burglary (Pen. Code, § 459);

Petitioner was represented by Humboldt County Conflict Counsel Edward Shrock.

Trial of the substantive offenses was by jury.

On November 6, 2002, the prosecution amended the information to charge petitioner with felony murder.

On December 9, 2002, the jury found petitioner guilty as charged. (CT 365-366.)

On January 24, 2003, the court sentenced petitioner to a term of 25 years to life. (CT 405.) Additionally, the court imposed a consecutive term of three years for the burglary conviction. (CT 405.)

Petitioner filed a timely notice of appeal on January 27, 2003. (CT 409)

9

## STATEMENT OF THE FACTS

This petition stems from the events surrounding the murder of Bruce James in Eureka's Broadway Motel in the early morning of April 3, 2001. James was fatally stabbed by Michael Lane during an encounter in Room 2 of the motel a few minutes after Lane and Lane's wife, Florence Laurel Anderson, entered the room.

Petitioner was not present when James was killed. However, he had told Lane and Anderson about James a few hours earlier, on the evening of April 2. On the afternoon of that day, petitioner had been in the apartment of a drug dealer, Shawn Harrison. (RT 295.) Harrison told petitioner that he had sold methamphetamine to a man in a motel room, and that the man, whose name was James, also wanted a prostitute and had a lot of money. (RT 751.) Harrison and petitioner then had a discussion "in a joking manner" about "ripping this guy off." according to a mutual acquaintance who was also in Harrison's apartment. (RT 434.) The acquaintance said the discussion "wasn't serious." (RT 434.)

Later that evening, petitioner arrived at the apartment of another acquaintance, Amber LaDue, where he met Lane and Anderson. (RT 749.) Petitioner asked Anderson, who often worked as a prostitute, whether she was in the mood to be a hooker. (RT 749.) He told Anderson and Lane about James' desire to get a prostitute. Petitioner suggested that Anderson and Lane

10

could get money from James by acting as middlemen for a bogus drug transaction, taking money to buy more drugs, but never returning with the drugs. (RT 297.) As part of the plan, Anderson might also engage in sex with James, both to earn additional money and to distract him from Lane's failure to return with the drugs. (RT 299.) Petitioner told Lane and Anderson that he wanted some of the money that Anderson would obtain from James, because he brought the idea of the job to her, but he did not specify any particular amount. (RT 299.)

Shortly after midnight on April 3, Anderson, Lane and petitioner woke up LaDue. (RT 1129.) Lane asked to borrow a knife from her, explaining that they needed protection, and LaDue gave him a knife with a serrated blade. (RT 1130.) Anderson asked to borrow a bat, but LaDue did not have one. (RT 1131.) Petitioner was in the room but said nothing during this exchange. (RT 1132, RT 767.) LaDue testified that Anderson and Lane told her that petitioner was "sending them on a mission." (RT 1132.) Anderson, Lane and petitioner then left, and LaDue went back to sleep.

Lane testified that he, Anderson and petitioner walked to the Broadway Motel, where petitioner entered room 3 and visited Kelly Eyerley, a friend. (RT 767.) Lane and Anderson knocked on the door of room 2, telling James that they had been sent by Shawn Harrison, the man who had sold James methamphetamine the previous afternoon. (RT 768.) James, who appeared

11

to be drunk, let Lane and Anderson into his room. (RT 770-771.) Anderson discussed having sex with James for money. (RT 772.) Lane went into the bathroom of the motel room for her protection. (RT 773.) He felt he needed to protect her, he testified, because James was black. (RT 774.) While in the bathroom, Lane testified, he heard Anderson scream, and when he opened the door he saw James beating her. (RT 792.) Lane then stabbed James five or six times, killing him. (RT 803.) He stabbed James, he said, because he became upset when he saw him hitting Anderson. (RT 802.)

LaDue said that about 20 minutes after she had given Lane the knife, she was re-awakened by the sound of petitioner, who was walking around the apartment and saying that something was wrong. (RT 1132.) Petitioner said Anderson and Lane had not returned from the Broadway Motel. (RT 1132.) LaDue went back to sleep. (RT 1133.)

Lane and Anderson returned to LaDue's apartment being gone for roughly 35 minutes. (RT 805.) Lane told petitioner that he had killed James. (RT 806.) On hearing this, petitioner appeared to be "shocked," Lane said. (RT 806.) Lane said petitioner asked "where the money was at." (RT 810). Lane told him that he hadn't gotten any money. (RT 810.) Lane told police that petitioner wanted to return to the hotel room to get James' money, but Lane later testified that he had lied about this. (RT 806.) In fact, Lane testified, he forced petitioner to return to the motel with him because Lane was

12

"pissed" about the fact that "everything went bad." (RT 806.) Petitioner told police that Lane's behavior in these moments was "crazed," and that he was afraid of being stabbed by him. (RT 303.) Petitioner therefore agreed to return to the motel with Lane and Anderson, first calling Harrison and telling Harrison to meet the group at the motel. (RT 306.)

Upon arriving back at the motel, Lane ripped the screen off the bathroom window and climbed inside James' room. (RT 834.) He then let Harrison, Anderson and petitioner in through the front door. (RT 834.) Once inside, petitioner helped to flip over the mattress on the bed. (RT 834.) Lane and Anderson went through James' pockets, with Lane taking his wallet, a religious medallion, and his tennis shoes. (RT 834.) Lane said that he gave one of James' credit cards to petitioner. (RT 835.) However, petitioner told police that he did not know who ended up with the credit card. (RT 331.)

LaDue testified that Lane and Anderson woke her up around noon on April 3, requesting a ride. (RT 1133.) She saw Lane using newspaper to wrap up the knife she had given him the previous night. (RT 1134.) LaDue gave Lane and Anderson a ride to a jetty, where Lane threw the knife in the ocean. (RT 904.) Lane told LaDue that he had gone to the motel to rob a man and had killed him. (RT 1140.) LaDue then took them to a wooded area, where they burned the clothes that Lane and Anderson had been wearing during the night. (RT 904, 906, 1139 - 1144.)

13

LaDue testified that she told the police on April 12, 2001, a week and a half after the events, that some things that occurred the night of the incident were a "fucking blur." (RT 1197.)

Troy Russell[2] was another methamphetamine user who was also the former brother-in-law of Shawn Harrison. (RT 1027, 1030.) He saw petitioner together with Harrison a couple of days after the killing. (RT 1034.) Russell said petitioner appeared to be worried about what had happened at the motel. (RT 1034.) Petitioner told him that he and others had gone to take money from "this black guy" at the motel, that the guy had been stabbed and that all he got was a credit card and some money. (RT 1035.) Russell did not remember the exact amount of the money, but he believed petitioner said it was $20. (RT 1035.) Russell said petitioner told him he had been in the next motel room with his friend Kelly when he heard a loud ruckus. (RT 1038.) Petitioner and Harrison, according to Russell's testimony, were both making light of the fact the victim was black, stating that he was "just another dead nigger, porch monkey, dead moon cricket, something like that." (RT 1042.) Russell acknowledged that he did not like petitioner. (RT 1052, 1073.)

About a week after the incident, Eureka Police Detective Dave Parris

---

[2] Russell, who had an extensive criminal record, was granted immunity for more than 30 uncharged robberies he committed with Shawn Harrison in exchange for his testimony against petitioner. (RT 1051 - 1057; 1068.) He pleaded guilty the day he testified to a misdemeanor car theft. (RT 1065.)

14

left word with petitioner's family that he wanted to speak to him about James'
death and on April 11, 2003, petitioner voluntarily arrived at the Eureka police
department where he was interviewed by Parris and another officer. (RT 280 -
286.) Petitioner initially told the officers a version of the events on the night
of the incident that he later agreed was not true, but officers then confronted
him what they believed were the falsehoods in his statement. (RT 292.)

Immediately after being confronted in this manner, petitioner told
police he was "scared to death." (RT 293.) The police replied that petitioner
was "digging [himself] deep" and that "you need to sit here and tell us the
truth." (RT 293.) Believing that by speaking he could "guarantee protection
for my family," petitioner continued to talk with police about the events of
April 3. (RT 294.) In all, the interview lasted about an hour. ( *See* RT 285,
noting start time of 1:37 p.m. and RT 336, noting concluding time of 2:32
p.m.) At the conclusion of this interview, petitioner was allowed to leave the
station. (RT 349.) However, police immediately drove to petitioner's home
and arrested him there. (RT 349.)

15

## STATEMENT OF THE LAW

I:     **THE JURY WAS GIVEN A FELONY MURDER INSTRUCTION, CALJIC No. 8.27, THAT ALLOWED IT TO CONVICT WITHOUT FINDING ANY LOGICAL NEXUS BETWEEN THE KILLING AND THE UNDERLYING FELONY, VIOLATING PETITIONER'S RIGHT TO DUE PROCESS AND RIGHT TO HAVE EVERY ELEMENT OF THE CRIME PROVED BEYOND A REASONABLE DOUBT.**

### 1.     Introduction

The jury convicted petitioner on the basis of a felony murder instruction that did not afford him due process – an instruction that has since been changed by the state of California. That instruction, CALJIC No. 8.27 (1998 rev.) (6th ed. 1996), was California's standard instruction for accomplice liability for felony murder.[3] By its plain text, the instruction allowed the jury to convict petitioner for any murder carried out by a person "engaged in the commission" of a burglary, whether or not the killing was logically related to that burglary. On the basis of this language, the jury was allowed to convict petitioner without finding any connection whatsoever between his actions and

---

[3] CALJIC 8.27 First degree Felony-Murder-Aider and Abettor was given as follows: If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental. (CT 342; RT 1478.)

16

the subsequent murder.

While petitioner's direct appeal was pending, the California Supreme Court decided *People v. Cavitt*, 33 Cal. 4th 187 (2004). In *Cavitt*, the Court concluded that a felony murder conviction must be based on "a logical nexus between the felony and the homicide beyond a mere coincidence of time or place." *Id.* at 201. The Court nevertheless went on to conclude that CALJIC No. 8.27 as it was then worded (and as it had been worded in petitioner's case) could "adequately appris[e] the jury of the need" for this nexus to be demonstrated. *Id.* However, Justice Werdegar wrote separately to state her belief that CALJIC No. 8.27 did not capture this essential relationship, or did so in a manner "too subtle to be apprehended by the ordinary juror." *Id.* at 211 (Werdegar, J., concurring). Justice Chin also wrote separately to emphasize that the instruction could "be improved" by making the need for the logical nexus more explicit. *Id.* at 213 (Chin., J., concurring). Soon after *Cavitt* was decided, precisely this change was made to CALJIC No. 8.27, with the wording of the instruction modified to reflect the need for a "causal and a temporal relationship between the underlying felony and the act resulting in death."[4]

---

[4] The instruction now reads: "Before a nonkiller may be found guilty of murder pursuant to the felony murder rule, there must be a causal and a temporal relationship between the underlying felony and the act resulting in death. The causal relationship requires some logical connection between the

17

Petitioner fell into the structural legal defect that necessitated the modification of CALJIC No. 8.27. He was prosecuted under an extremely aggressive reading of the felony murder rule, one that treated a discussion of low level fraud as the moral equivalent of intentionally killing a human being – regardless of the actual facts surrounding the killing. He was convicted and sentenced to 25 years to life in prison based on actions that had only a tenuous connection to the murder of the victim because the jury was never told that it needed to find a logical nexus between the felony and the killing. The causal link, which is at the heart of the rationale underlying the felony murder rule, was simply not something the jury was asked to weigh, and certainly not something it found beyond a reasonable doubt.

The constitutional defects of this instruction should properly be analyzed under the standard of *Chapman v. California*, 386 U.S. 18 (1967), because the errors that were made in petitioner's case have never been evaluated on the *Chapman* standard. On that standard, the instruction can not be shown to have been harmless beyond a reasonable doubt. However, even if the error is analyzed under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), it should still be the basis for relief because it produced a substantial and

---

killing and the underlying felony beyond mere coincidence of time and place. The temporal relationship requires that the felony and the killing be part of one continuous transaction."

18

injurious effect in determining the jury's verdict. Petitioner received a sentence that is grossly inequitable in comparison to the low-level crime he actually committed, and the basis of this sentence was federal constitutional error. Therefore, he is entitled to relief from this court.

## 2. The felony murder instruction allowed the jury to convict solely on the basis of a temporal, rather than logical, connection between the felony and the killing.

The trial court gave the jury three instructions on the "aiding and abetting" theory of felony murder: CALJIC No. 3.00, CALJIC NO. 3.01, and CALJIC No. 8.27. The first of these, CALJIC No. 300, describes the persons who are considered "principals" of a crime, while CALJIC No. 301 defines aiding and abetting and CALJIC No. 8.27 describes the elements of the felony murder theory of aiding and abetting. The court also gave the jury CALJIC No. 8.26, which describes the elements of the "conspiracy" theory of felony murder.[5]

The instruction that the jury was given on the aiding and abetting theory of felony murder, CALJIC No. 8.27, allowed it to convict petitioner purely on

---

[5] CALJIC No. 8.26 states: "If a number of persons conspire together to commit (Penal Code § 189 felony), and if the life of another person is taken by one or more of them in the perpetration of, or an attempt to commit that crime, and if the killing is done in furtherance of the common design and to further that common purpose, or is the natural and probable consequence of the pursuit of that purpose, all of the co-conspirators are equally guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."

19

the basis of a spacial and temporal coincidence between the felony and the killing. The instruction asked the jury to consider whether a person was killed while individuals were "engaged in the commission" of a felony, but contained no language suggesting that the killing needed to relate to the felony. As a result, the jury could ignore the attenuated nature of the connection between petitioner's actions and the killing of James. It was enough, under the then-existing language of CALJIC No. 8.27, simply for the jury to find that petitioner had encouraged the commission of a felony and that another person had killed during the time he was carrying out that felony. A mere coincidence of time and place could substitute for a logical connection between acts.

The California Supreme Court, in *Cavitt*, concluded that such a coincidence of time and place could not, by itself, justify a felony murder conviction. Instead, "proof of a logical nexus" needed to be weighed by the jury. 33 Cal.4th at 201. The Court referred repeatedly to a hypothetical situation, suggested by Professor Norval Morris in a 1956 law review article, of a burglar "who happens to spy a lifelong enemy through the window of the house and fires a fatal shot." *Id.* at 203. Such a person, the Court concluded, may have committed a killing while the burglary was taking place "but cannot be said to have been 'engaged in the commission' of [that crime] at the time the shot was fired." *Id.* In the case of the burglar's actions, the Court noted, there were no "objective facts that connect the act resulting in death to the

20

felony." *Id.* at 205. The central inquiry for the *Cavitt* court, then, was evidentiary, with the link between the commission of the felony and the subsequent death depending on the presence of "objective fac[t]." Yet by the very language of CALJIC No. 8.27, the jury was allowed to convict without the consideration of such facts. The instruction would have allowed the conviction of a person who encouraged the burglar in Professor Morris' hypothetical, just as it allowed the conviction of petitioner, even though objective facts tying together the underlying felony and the subsequent killing were not something the jury was asked to consider.

*Cavitt* upheld the validity of CALJIC No. 8.27 against the backdrop of extraordinarily robust evidence tying together the actions of the killing and non-killing parties. In *Cavitt*, the step-daughter of the victim invited her boyfriend and his friend to carry out a burglary in her home as a way of humiliating the victim. The boys were let into the home by the step-daughter, at which point they bound, gagged and beat the victim. The step-daughter and the boys then ransacked the home, stealing money, jewelry, cameras and guns. To conceal her involvement in each stage of the plot, the boys then pretended to bind the stepdaughter before leaving the home. At some point during or shortly after the robbery, the victim suffocated. The evidence of a logical nexus between the robbery and the killing under these circumstances, the Court concluded, was amply demonstrated.

21

Petitioner's case is dramatically different. Petitioner did not participate in either the robbery *or* the killing of James and no intention of encouraging behavior that he believed to be dangerous. He proposed nothing more to Lane and Anderson than an act of prostitution and a bogus drug deal, and he was shocked to learn that James had been harmed, much less killed, in the course of what he believed was an effort to defraud him. While petitioner's actions were no doubt unwise and even foolish, the equities of his case do not support committing him to prison for a term that might well last the rest of his life. Petitioner is entitled to a remedy for this inequitable result because it was obtained in violation of clearly established federal law.

**3.      It was federal constitutional error to give CALJIC No. 8.27 because the instruction allowed a conviction without requiring the jury to find each element of felony murder proven beyond a reasonable doubt.**

It is a quintessential denial of due process under the United States Constitution to issue jury instructions that permit a defendant to be convicted without proof of every element of the offense. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004); *Sandstrom v. Montana*, 442 U.S. 510, 520-521 (1979); *In re Winship* 397 U.S. 358 (1970). Defective language in an instruction that improperly "reliev[es] the State of the burden of proof" requires reversal. *Sandstrom*, 442 U.S. at 521.

The language of CALJIC No. 8.27, as it was given to the jury in

22

petitioner's case, permitted the jury to convict without finding that each element of felony murder had been proved beyond a reasonable doubt. Specifically, the instruction relieved the state of the burden of proving an essential element of felony murder: a logical nexus between the underlying felony and the subsequent killing. The instruction thereby denied petitioner's right to due process in violation of clearly established federal law.

> **a.    A logical nexus between the underlying felony and the subsequent killing is a constitutionally necessary element of felony murder because the underlying felony substitutes for homicidal mens rea.**

The doctrine of felony murder typically allows homicidal mens rea to be demonstrated by an individual's actions in committing another, non-homicidal felony that ultimately leads to the killing. Nelson Roth and Scott Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L. Rev. 446, 456 (1985). An individual convicted under a felony murder statute need not be shown to have had an intent to kill because the intent to commit the underlying felony under the circumstances in which it occurred is thought to substitute for the mens rea for murder. *Id.* at 460. The justifications for this rule, traditionally, include both the desire to deter individuals from killing during the commission of felonies and the desire to hold individuals accountable for the probable consequences of risky criminal behavior, even if they did not intend for those consequences to occur. James

23

Tomkovicz, *The Endurance of the Felony Murder Rule: A Study of the Forces That Shape Our Criminal Law*, 15 Wash & Lee L. Rev 1429, 1448 (1994). By making a potential murder sentence hinge on the commission of such a crime, felony murder laws are thought to "sen[d] an unmistakably stern and punitive message to felons." *Id.* at 1463.

The felony murder doctrine's very forcefulness, however, also makes it constitutionally problematic in situations such as petitioner's case, where a state does not require a jury to find any proof of a *connection* between the underlying felony and the commission of the subsequent murder. Under such circumstances, the intent to engage in a comparatively minor offense may create a conclusive presumption of the presence of intent to commit homicide. A defendant is entirely barred from challenging such a presumption, because the jury is allowed to assume its existence rather than being asked to make a judgment based on objective facts.    No evidence of attenuation, no consideration of mitigating factors will make a difference to the verdict. The defendant is simply deemed as having been a willing, intentional killer, even if he had no role in the killing and no connection to it whatsoever.

This conclusive presumption, which substitutes for the mental state necessary to commit an extremely serious offense, " 'conflict[s] with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime.' " *Sandstrom,* 442 U.S. at

24

522, quoting *Morissette v. United States*, 342 U.S. 246, 275 (1952). In *Sandstrom*, the Supreme Court struck down a jury instruction stating that "[the] law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513. That instruction had been used to convict the defendant, Sandstrom, of murdering a woman whom he had confessed to unintentionally killing. The trial court ignored Sandstrom's objections that the problematic instruction allowed the jurors to infer homicidal mens rea from the simple fact that he had caused the death of the victim. *Id.* In reversing Sandstrom's conviction, the Court noted that, because of the faulty jury instruction, "[t]he State was . . . not forced to prove 'beyond a reasonable doubt . . . every fact necessary to constitute the crime . . . charged,' " in violation of Sandstrom's right to due process. *Id.* at 523, quoting *In re Winship*, 397 U.S. at 364.

The rationale of *Sandstrom*, prohibiting homicidal mens rea from being conclusively established solely on the basis of having killed the victim, applies a fortiori to petitioner's situation, in which homicidal mens rea was established solely on the basis of having conspired to commit burglary. As in *Sandstrom*, it was a violation of due process for a jury instruction wholly to relieve the prosecution of its burden to prove an element of the offense. Instead, the jury should have been required to find proof of that element: some sort of logical nexus, supported by objective facts, between petitioner's criminal acts and the

25

subsequent killing.

California errs in suggesting that the nexus between the underlying felony and the subsequent kiling is "not an element" of felony murder but rather a "clarification of the scope of an element." See *Cavitt*, 33 Cal. 4th at 203. This characterization, which derives from its holding in *People v. Kimble*, 44 Cal.3d 480 (1988), effects a semantic whitewash of the fundamental legal reality. In the felony murder context, homicidal mens rea is *wholly absent* in the absence of evidence of a logical nexus between crime and killing. To say that such a nexus is "not an element" suggests that such a nexus does not need to proved beyond a reasonable doubt, a characterization which is simply wrong. "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. at 364.

Other states are quite explicit that the jury must find proof of a logical nexus between the underlying crime and the subsequent killing, and the requirement of such a link is a part of long-established common law tradition. *See Commonwealth v. Waters*, 491 Pa. 85 (Pa. 1980) (holding that "the *common design* to commit the underlying felony must exist when the act of slaying occurs in order to establish an accomplice's liability for felony-murder" and rejecting the position that the killing "need only have occurred during the

26

perpetration or commission of a felony"); *People v. Lewis*, 444 N.Y.S.2d 1003, 1004 (N.Y.Ct.Sup. 1981) (emphasizing that killing must occur "in furtherance" of the underlying crime); *accord* Ark. Code Ann., tit. 5, § 10-102(a)(1); Conn. Gen. Stat. Ann., tit. 53a, § 54c; Del. Rev. Code, tit. 11, §§ 635(2), 636(2); N.D. Code Ann., tit. 12.1, § 16-01, subd. 1.c; Or. Rev. Stat., Pen. Code, § 163.115(l)(b); Tex. Pen. Code Ann., § 19.02(b)(3). A logical nexus between the underlying felony and the subsequent killing, in short, is widely understood to be a critical and longstanding element of felony murder.

California does not have the power to define the crime of homicide in a manner that wholly eliminates the need to show this logical nexus. States, it is certainly true, have considerable power to specify the substance of crimes – a power that does not implicate due process concerns unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Speiser v. Randall*, 357 U.S. 513, 523 (1958). Where, however, a state attempts to define away the historically essential link between the act of killing and a culpable mental state, due process is unquestionably imperiled.

27

> **b.    CALJIC No. 8.27, as it was then written, allowed the jury to convict without finding a logical nexus between the underlying felony and the subsequent killing.**

The language of CALJIC No. 8.27, as it was given in petitioner's trial, did not require the jury to find any logical nexus whatsoever between the underlying felony and the subsequent killing. Instead, as discussed in 2, *supra*, the instruction's reference to a killing that took place "in the commission" of a burglary allowed the jury to convict solely on the basis of a temporal and spacial coincidence between the felony and the killing. The "objective facts" tying together those events, which the California Supreme Court in *Cavitt* claimed were essential for the jury to evaluate, were in fact irrelevant to a conviction under the actual language of the instruction. *Cavitt*, 33 Cal.4th at 203.

Because the instruction was defective, the jury was allowed to presume petitioner had homicidal intent purely on the basis of his having conspired to commit burglary. Evidence illustrating the tenuous nature of the link between the felony and the killing was rendered wholly irrelevant. California thereby violated petitioner's due process right to the presumption of innocence and to have each element of his offense proved beyond a reasonable doubt.

It was no accident that the language of CALJIC No. 8.27 was changed after *Cavitt* to reflect the need for the jury to find a logical nexus between the

28

killing and the underlying felony. Despite the *Cavitt* majority's conclusions

that the old language of the instruction adequately conveyed the need to find

such a nexus, Justice Werdegar's concurrence more accurately stated the

reality: The language was far "too subtle to be apprehended by the ordinary

juror." *Id.* at 211 (Werdegar, J., concurring). Any reasonable juror reading the

text of CALJIC No. 8.27, as it was then written, would not have believed he

or she needed to find a logical nexus between the felony and the subsequent

killing.

> **3.    Petitioner is entitled to review under the *Chapman v.
> California* harmless error standard because the California
> Court of Appeal never performed such an analysis on the
> effect of CALJIC No. 8.27. Even under the more forgiving
> standard of *Brecht*, however, giving CALJIC No. 8.27
> created a substantial and injurious effect on the jury's
> verdict.**

Because the flawed language of CALJIC No. 8.27 violated petitioner's

right to due process under the United States Constitution and because this

violation was never assessed under *Chapman v. California*, 386 U.S. 18

(1967), the instructional error should be reviewed under the *Chapman* standard

for harmless error.[6] As other circuits have noted, the comity considerations

---

[6]    The First District Court of Appeal did not apply *Chapman* to
petitioner's case. Instead, the court concluded that it was bound by *Cavitt* to
find CALJIC No. 8.27 to have adequately apprised the jury of a need to find
a logical nexus. Exhibit B, 10-11. The court then conducted a review under
*Boyde v. California*, 494 U.S. 370 (1990) to determine whether, in the event
the instruction were ambiguous, such ambiguity would have constituted a

29

underlying the use of the *Brecht* standard have no application in a case where the state court has never applied *Chapman*. *See, e.g., Starr v. Lockhart*, 23 F.3d 1280, 1292 (8th Cir. 1994) (applying *Brecht* standard on habeas review where state court did not acknowledge constitutional violation). Petitioner acknowledges that the Ninth Circuit has rejected this position in *Bains v. Cambra*, 204 F.3d 964, 976 (9th Cir. 2000). However, the United States Supreme Court has granted certiorari on the propriety of applying *Brecht* under such circumstances. *Fry v. Pliler*, 2006 U.S. App. LEXIS 2694, cert. granted, 75 U.S.L.W. 3311 (U.S. Dec. 7, 2006) (No. 06-5247).

Even if this court applies the more forgiving standard of *Brecht*, however, petitioner is entitled to relief because the state's constitutional errors created a substantial and injurious effect on the resolution of his case. By its plain language, CALJIC No. 8.27 allowed the jury to ignore what was unquestionably petitioner's strongest defense to the charge of felony murder: that the logical connection between his own actions and Lane's murder of James was highly attenuated. The instruction allowed the jury to toss aside a wealth of objective detail that undercut such a connection – including the fact

---

constitutional violation. *Id.* at 11. Concluding that no constitutional violation would have occurred in any event under the *Boyde* standard, the court did not perform any harmless error analysis. *Id.* Therefore, assuming this court differs with that conclusion and does find a constitutional violation, petitioner is entitled to an initial review under the *Chapman* standard for assessing the harm of that violation.

that petitioner was not present during the murder, the fact that petitioner was shocked to hear of the murder, the fact that the actual killer harbored deep racial animosity toward African-Americans such as the victim, and the fact that petitioner took no money from the victim. None of these facts mattered, because the logical nexus element was entirely absent from the instruction. All the jury was asked to consider was a temporal and physical coincidence: a conspiracy to commit burglary and a killing that took place "in the commission" of that burglary.

If CALJIC No. 8.27 had been given in the language that is now used in California, it is likely the jury would have decided petitioner's case differently. Instead of being able to conclusively presume the existence of homicidal intent on the basis of conspiracy to commit burglary, the jury would have needed to consider whether there were objective facts establishing a logical connection between the killing of James and petitioner's actual actions. This link was the greatest weakness in the prosecution's case. It was therefore particularly devastating to petitioner that CALJIC No. 8.27 relieved the prosecution of the burden of proving this element of the offense. Based on this substantial and injurious effect on the jury's decision, and in light of the deeply inequitable outcome in his case, petitioner is entitled to relief from this court.

31

## II:    THE TRIAL COURT VIOLATED PETITIONER'S RIGHT TO DUE PROCESS BY ADMITTING HIGHLY PREJUDICIAL AND WHOLLY IRRELEVANT EVIDENCE OF HIS USE OF RACIAL SLURS TO REFER TO THE VICTIM.

### 1.    The trial court admitted evidence of petitioner's use of racial slurs to describe the victim despite the fact that such evidence had no probative value whatsoever.

The trial court allowed the jury to hear evidence that petitioner had used highly inflammatory racial epithets to refer to the victim several days after the killing. Specifically, the court admitted the testimony of Troy Russell, who claimed to have heard petitioner saying that the victim was "just another dead nigger, porch monkey, dead moon cricket, something like that." (RT 1042.)

As the First District Court of Appeal noted, these epithets had essentially no probative value because "there is no evidence that appellant knew that [the victim] was Black until after his murder." Therefore, even assuming the comments reflected an actual sentiment of racial bias on petitioner's part, such bias should not have entered into the jury's determination of criminal culpability for the events leading up to the murder. However, the court concluded that "overall analysis" of the evidentiary issue supported the admission of the evidence, citing *People v. Quartermain*, 16 Cal.4th 600 (1997).   Exhibit B, 14.

This analysis made no attempt to grapple seriously with the implications of admitting this evidence in a case that had nothing to do with

32

racial bias. *Quartermain*, the case cited by the court, was a situation in which the killer was entirely familiar with the victim and was said to have "despised [him] for the color of his skin." *Id.* at 628. For that reason, such racism was "evidence of the defendant's prior attitude toward the victim, a relevant factor in deciding whether the murder was deliberate and premeditated." *Id.* No comparable claim could be made here. Petitioner's comments were simply irrelevant. They served no purpose other than to antagonize the jury. The First District Court of Appeal, in acknowledging that these comments had no probative value but wholly discounting their serious impact on the fact-finder, responded to this error in a manner clearly contrary to established federal law.

## 2. The admission of the racial slurs violated petitioner's right to due process.

Admission of deeply prejudicial and irrelevant evidence may violate a defendant's right to due process. *Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief").

Here, the admission of evidence of petitioner's use of racial epithets that had no relevance to the issues, and thus no probative value, violated the due process guarantee of the United States Constitution under the Fourteenth Amendment. Allowing the jury to hear such remarks created a risk – indeed,

33

a likelihood – that the jury would render a decision based on emotion and prejudice rather than on proof beyond a reasonable doubt that petitioner was guilty of the crimes he was charged with committing.

3.    **Petitioner is entitled to review under the *Chapman* harmless error standard because the California Court of Appeal did not acknowledge the admission of the inflammatory evidence as a federal constitutional violation. Even under the more forgiving standard of *Brecht*, however, the admission of the inflammatory evidence created a substantial and injurious effect on the jury's verdict.**

Because the admission of evidence suggesting petitioner had used racial epithets to describe the victim violated petitioner's right to due process under the United States Constitution and because the state court never assessed this error as a federal constitutional violation, petitioner is still entitled to review under the *Chapman* standard for harmless error.[7] Petitioner acknowledges that the Ninth Circuit has rejected this position in *Bains v. Cambra*, 204 F.3d 964, 976 (9th Cir. 2000). However, the United States Supreme Court has granted certiorari on this issue in *Fry v. Pliler*, 2006 U.S. App. LEXIS 2694, cert. granted, 75 U.S.L.W. 3311 (U.S. Dec. 7, 2006) (No. 06-5247).

_____

[7]    The First District Court of Appeal did not apply *Chapman* to petitioner's case. Instead, the court concluded that evidence of the use of racial slurs had been properly admitted. The court then noted that even if the evidence had been admitted improperly, it would reverse only in the case of a "manifest miscarriage of justice." Exhibit B, 14. When a defendant's right to due process has been violated, however, *Chapman* places the burden on the beneficiary of that violation to show that the error was "harmless beyond a reasonable doubt." 386 U.S. at 24.

34

Even under the more forgiving standard of *Brecht*, however, petitioner is entitled to relief because the admission of highly inflammatory and wholly irrelevant evidence unquestionably had a substantial and injurious effect on the outcome of petitioner's case. In a case such as petitioner's, as discussed in I, *supra*, the tenuous link between underlying criminal activity and the subsequent killing should have been very much at issue. The introduction of irrelevant evidence such as these comments was clearly improperly used by the prosecution to solidify that link in the minds of the jurors. The epithets allowed jurors to substitute responses based on emotion and distaste for the harder work of weighing objective facts related to the elements of the accusations. Had these comments been properly excluded, it is likely the jury's verdict would have been different.

35

**III:    PETITIONER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WAS DENIED BY TRIAL COUNSEL'S FAILURE TO OBJECT TO THE ADMISSION OF HIS UN-MIRANDIZED STATEMENTS MADE IN POLICE CUSTODY.**

**1.    Trial counsel failed to object to the admission of un-Mirandized statements petitioner made while in police custody.**

Petitioner's trial counsel failed to object to the admission of un-Mirandized statements petitioner made while he was in the custody of the Eureka Police Department on April 11, 2003. These statements included an array of incriminating remarks, including – most critically – the defendant's tentative agreement to the suggestion that he had told Lane and James to "rip . . . off" the victim. (RT 299.) The introduction of a tape recording of these remarks at trial unquestionably harmed petitioner's case and violated his privilege against self-incrimination.

Petitioner had not been formally arrested at the time these remarks were made, but he was subjected to a coercive environment and overwhelming psychological manipulation during the police interview. Petitioner told police detectives that he was "scared to death" while he conducted the interview. (RT 293.)   The police responded to this candid expression of terror by exacerbating it, telling petitioner that he was "digging [himself] deep" and informing him that "you need to sit here and tell us the truth."   (RT 293.) Petitioner agreed to continue because he believed that by doing so he could

36

"guarantee protection for my family," a misconception the police encouraged by telling him that they would "talk about that in the end." (RT 294.) This atmosphere of coercion lasted nearly an hour. *(See* RT 285, noting start time of 1:37 p.m. and RT 336, noting concluding time of 2:32 p.m.) Despite the absence of formal restraints, this atmosphere of pressure created "such a restriction on [petitioner's] freedom as to render him in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977), quotations omitted.

Because petitioner was effectively in police custody, he should have received a *Miranda* warning to dispel the risk that the inherently coercive custodial environment would produce unwilling self-incrimination. This was not done. Competent trial counsel should have objected to the statements that were obtained as a result of this omission.

The First District Court of Appeal, in reviewing petitioner's ineffective assistance claim, concluded that trial counsel chose not to object to the admission of this interview as a competent tactical choice. Exhibit B, 15. However, this analysis redefines "competence" in a way that effectively eviscerates the standard as a meaningful component of Sixth Amendment protection for defendants. No competent attorney would have willingly allowed the introduction of an hour-long tape recorded confession. To hold otherwise was a violation of clearly established federal law.

37

### 2.    The failure to object to the admission of these statements denied petitioner his Sixth Amendment right to effective assistance of counsel.

The Sixth Amendment right to counsel requires the "effective assistance" of such counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). Such assistance is only created through the participation of a defense attorney who "plays the role necessary to ensure that the trial is fair." *Id.* at 685.

When, as in petitioner's case, a trial attorney neglects to make even an attempt to suppress evidence that will clearly be extraordinarily damaging to a defendant, the strategic error is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Trial counsel in petitioner's case simply did not uphold the minimum standard of competence required under the United States Constitution. This failure rendered the assistance of counsel, such as it was, overwhelmingly ineffective.

### 3.    The denial of effective assistance created a substantial and injurious effect on the outcome of petitioner's case.

Trial counsel's failure to contest the admission of petitioner's confession created a substantial and injurious effect on the outcome of his case. Had trial counsel moved to suppress evidence taken in violation of petitioner's Fifth Amendment rights, it is likely both the trial court would have

38

granted the motion and that the jury's verdict would have been different. Instead, the centerpiece of the state's felony murder case was allowed to be supplied through petitioner's own words, in a recording made while he was admittedly "scared to death." (RT 293.) No competent attorney would have allowed this outcome without challenging the constitutionality of the state's evidence, and the result of trial counsel's critical failure is reflected in the 25-to-life sentence that petitioner is now serving.

## IV:   PETITIONER'S SENTENCE FOR BURGLARY WAS AGGRAVATED ON THE BASIS OF FACTS NOT FOUND BEYOND A REASONABLE DOUBT BY A JURY, IN VIOLATION OF *CUNNINGHAM v. CALIFORNIA*.

### 1.    Introduction

The Supreme Court held in *Cunningham v. California*, 127 S.Ct. 856, 871 (2007), that California's Determinate Sentencing Law (DSL) violated the right to a jury trial and proof beyond a reasonable doubt, by allowing judges to conduct fact-finding on aggravating factors used to impose an upper term sentence.

In calculating petitioner's sentence for burglary, the trial court explicitly relied on aggravating factors that were not found by a jury. (Exhibit D, Sentencing Transcript, 1789.) As discussed below, the court's imposition of the aggravated term was unauthorized under *Cunningham* and in violation of the Sixth Amendment, because petitioner was entitled to a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings (in California: the middle term) by proof beyond a reasonable doubt.

### 2.    The trial court aggravated petitioner's burglary sentence on the basis of facts not found beyond a reasonable doubt by a jury.

At sentencing, the trial court noted both that it was imposing sentence "pursuant to the factors that are set forth" in the probation report and that it

40

was relying "in particular" on three factors mentioned in that report.  Exhibit D, 1789.  Those "particular" factors were:

1)      Petitioner's prior convictions were numerous and serious;

2)      Petitioner was on a grant of felony probation at the time of the current offense;

3)      Petitioner's prior performance on probation was unsatisfactory.

In addition to the factors explicitly cited by the court, the probation report also referred to  the following aggravating circumstances:

4)      The burglary involved a high degree of callousness because appellant and the others returned to the location of the victim;

5)      Petitioner induced others, including Sean Harrison, to return to the scene of the murder and to burglarize it in search of valuables;

6)      The manner in which the crime was carried out revealed planning, if not sophistication or professionalism, as traveling to the victim's location required time and was not done on the spur of the moment;

7)      Petitioner had engaged in violent conduct revealing that he was a danger to society.  (CT 386.)

None of these factors was found beyond a reasonable doubt by a jury, or admitted by petitioner.

41

On the basis of these factors, the court imposed the high (or "aggravated") term of three years for petitioner's burglary conviction. Exhibit D, 1789.

3.     **The aggravation of petitioner's sentence on the basis of factors not proved beyond a reasonable doubt to a jury violated the Sixth Amendment under the Supreme Court's decision in *Cunningham v. California*.**

The aggravation of petitioner's burglary sentence violated the Sixth Amendment because none of the judicial findings used to aggravate were admitted by petitioner or found true by a jury. Petitioner was entitled to, but denied, a jury determination of those additional facts exposing him to the possibility of a sentence greater than the maximum allowed by a jury's findings and by proof beyond a reasonable doubt. This denial "cannot withstand measurement against our Sixth Amendment precedent." *Cunningham, supra*, at p. 871.

Only the first of the aggravating factors cited by the court – the simple fact of petitioner's prior convictions – is a fact that falls within the exception, set forth in *Almendarez-Torres v. United States* 523 U.S. 224 (1998), to the general rule that a jury must find proof of facts that increase criminal penalties beyond the prescribed statutory maximum. The other six factors, including the two additional factors explicitly cited by the court, are beyond the narrow scope of the *Almendarez-Torres* exception. *Cunningham, supra*, at p. 868.

42

(noting that the "bright-line" rule that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum" must be proved to a jury beyond a reasonable doubt "except for a prior conviction" (quoting *Apprendi v. New Jersey*, 530 U.S. 466 (2000)).

> **4.     Petitioner is entitled to review under the *Chapman* harmless error standard because the California Court of Appeal was barred from finding the use of inappropriate aggravating factors to be a federal constitutional violation. Even under the more forgiving standard of *Brecht*, however, the use of these aggravating facts created a substantial and injurious effect on the jury's verdict.**

The trial court's use of inappropriate aggravating factors should be assessed under the *Chapman* standard for harmless error. The application of the appropriate harmless error standard is particularly critical in assessing this sentencing mistake because the First District initially applied *Chapman* and *agreed* with petitioner that he had a claim of possible prejudice due to *Apprendi* error. *See* Exhibit A, 19 ("we cannot conclude on the record in this case that it is not reasonably probable that the judge would have chosen a lesser sentence if he had considered only the one valid aggravating factor"). The First District was forced to reverse that determination after the California Supreme Court's decision in *People v. Black*, 35 Cal.4th 1238 (2005)(*Black I*) (holding that California's DSL did not violate the principles of *Apprendi*). (Exhibit B, 17 ("*Black* is binding on this court").)

In its third and final opinion, the First District was again forced to find

43

no error in the imposition of the upper term in petitioner's case based on the

two post-*Cunningham* opinions of the California Supreme Court: *People v.

Black*, 41 Cal.4th 799 (2007) (*Black II*) and *People v. Sandoval*, 41 Cal.4th

825 (2007) (*Sandoval*).[8] Exhibit C, 16 -19. In *Black II*, the Court concluded

that the Sixth Amendment is not violated if, in a given case, (1) the only

*Cunningham* issue relates to the imposition of consecutive terms or (2) the

defendant challenges imposition of the upper term sentence but that term is

supported by an aggravating circumstance based upon defendant's prior

convictions. Furthermore, in *Black II*, the Court held that the numerosity and

increasing seriousness of the defendant's prior convictions were facts relating

to the defendant's recidivism that fell within the prior-conviction exception to

the right to a jury trial and proof beyond a reasonable doubt. However, none

of the California courts has yet explicitly addressed the status of other

recidivist factors, such as probation status at the time of the offense or prior

unsatisfactory performance on probation, factors found by the trial court in this

case. As a result, the First District's analysis under the *Chapman* standard was

---

[8]       The decision in *Sandoval* concluded that (1) in cases in which
the upper term was imposed in violation of the defendant's Sixth Amendment
rights, the sentence may be upheld if the reviewing court concludes that the
violation was harmless beyond a reasonable doubt, and (2) in cases that must
be remanded to the trial court for resentencing, the trial court has full
discretion to impose the lower, middle, or upper term.

effectively erased.

In the wake of *Cunningham*, it is clear that the First District's initial analysis of the sentencing decisions was correct all along: the use of multiple aggravating factors that were not found beyond a reasonable doubt by a jury *was* a Sixth Amendment violation and was appropriately evaluated under the *Chapman* standard. It would be inequitable, therefore, to insist that the more forgiving *Brecht* standard be applied at this stage of the analysis. The legal errors of the California Supreme Court in *Black* prevented petitioner from receiving the benefit of *Chapman* analysis. This court should not compound that mistake by using a harmless error analysis predicated on the assumption that a habeas petitioner has been through the *Chapman* gate already.

Petitioner acknowledges that the Ninth Circuit has rejected a related argument in *Bains v. Cambra*, 204 F.3d 964, 976 (9th Cir. 2000). However, the *Bains* court's rationale rested on the concern that "a state court conviction would be interfered with by a federal district court" and that "judicial decision-making costs would be greatly increased" by indecision as to the appropriate error standard. *Id.* at 977. Those concerns are simply not relevant here: Addressing the *Apprendi* error does not involve a challenge to petitioner's conviction, and application of the Chapman standard would involve nothing more than reinstating the reasoning of the court of appeal that was improperly struck down by *Black*.

Under either the *Chapman or* the *Brecht* standard, however, petitioner is entitled to relief because the *Apprendi* error in this case produced a substantial and injurious effect on his sentence. The court's use of six aggravating factors that were neither admitted by him nor found beyond a reasonable doubt by a jury unquestionably encouraged a harsher sentence than he might otherwise have received. This prejudice is clearly indicated not only by the court's suggestion that it was taking into account the "factors" listed in the "recommendation of the probation officer" (Exhibit D, 1789) but also by the court's extensive discussion of non-proven facts just moments before imposing the aggravated term. The court, in denying a motion to strike petitioner's murder conviction, the court declared that "the inferenc[e] I draw from the evidence" was that "[petitioner], in fact, was the planner of this operation" and "the person who orchestrated the whole procedure." Exhibit D, 1786. These conclusions, which were entirely the court's own and not supported by any finding by the jury, unquestionably produced a substantial and injurious effect on the court's sentencing decisions, in violation of the Sixth Amendment.

## CONCLUSION

Petitioner Michael Gorman is serving 25-to-life on the basis of having proposed a bogus drug deal. He admitted telling Lane and Anderson that they should "get some money for drugs" from James "and just not come back." (RT 298.) No doubt this proposal was dishonest, and even foolish. But only the constitutional errors of the California courts have allowed this momentary foolishness to justify a sentence typically reserved for society's most heinous criminals.

The language of CALJIC No. 8.27 violated petitioner's right to due process and his right to have each element of his offense proved beyond a reasonable doubt. By the plain words of the instruction, the jury was told that it need not find any link between Petitioner's crime and the subsequent killing other than a temporal and spacial coincidence. This instruction created a conclusive presumption of homicidal mens rea on the basis of relatively innocuous actions, turning the most difficult aspect of the state's case into a "fact" that no amount of objective data could counter. This was manifestly unconstitutional, as California has tacitly acknowledged by changing the problematic language of CALJIC No. 8.27 that was used in Petitioner's trial. For Petitioner, though, the damage is done. The equitable power of the federal courts is his only hope of responding to a sentence that vastly overpunishes his actions.

47

Petitioner's right to due process and to effective assistance of counsel were also violated by the admission of irrelevant, inflammatory evidence and by trial counsel's failure to object to the introduction of an un-Mirandized taped confession. These errors worked in concert with the flawed jury instruction, creating a trial that relieved the prosecution of its burden of proving the elements of its case and encouraged the jury to seek inappropriately vindictive outcomes.

Finally, Petitioner's burglary sentence was unquestionably enhanced as a result of *Apprendi/Cunningham* error in violation of the Sixth Amendment.

For all the foregoing reasons, the Petition for Writ of Habeas Corpus should be granted, and the judgment of the California court should be vacated.

Dated: 3-14-08                    Respectfully submitted,

Michael Thomas GORMAN,
PETITIONER

48

EXHIBIT A

FMTS

Filed 1/27/05

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | A102310 |
| v. | |
| MICHAEL THOMAS GORMAN, | (Humboldt County Super. Ct. No. CR011617CS) |
| Defendant and Appellant. | |

Appellant persuaded friends of his, a man and a woman, to gain entry to a stranger's motel room by offering him the woman's services as a prostitute. Their plan was that once inside the room, appellant's friends would obtain the victim's money either by robbery or by deception. While appellant's friends were in the motel room, one of them killed the victim. Appellant, his friends, and another man returned to the motel room after the victim's death and took the victim's money and belongings. A jury convicted appellant of felony murder and burglary.

On this appeal, appellant argues: (1) that the jury instructions on felony murder did not adequately advise the jury of the need for a causal connection between the felony and the killing; (2) that the trial judge abused his discretion in admitting evidence that appellant used a racial slur to refer to the victim after his death; (3) that appellant's trial counsel's failure to object to the admission of appellant's pretrial statement to the police constituted ineffective assistance of counsel; and (4) that in selecting the upper term on the burglary count and directing that appellant's sentences be served consecutively, the trial judge inappropriately relied on aggravating factors not found by a jury, in violation

1

of *Blakely v. Washington* (2004) __ U.S. __ [124 S.Ct. 2531] (*Blakely*). We reject all of these contentions except for the *Blakely* argument as to the selection of the upper term for burglary, and affirm the judgment except insofar as resentencing is required on the burglary conviction.

## FACTS AND PROCEDURAL BACKGROUND

On April 2, 2001,[1] appellant and his friend Rachael Lane paid a visit to a man they knew named Shawn Harrison who occasionally sold methamphetamine. Troy Russell, Harrison's former brother-in-law, was also visiting Harrison at the time. Harrison told his visitors that, earlier that day, he had sold some methamphetamine to a man (later identified as Bruce James) who was staying at a nearby motel; he added that the man appeared to have a lot of cash and was interested in obtaining the services of a prostitute. Russell and Harrison had committed robberies together before, and the group discussed the idea of taking James's money from him. Russell was not interested in the idea, but appellant asked Harrison for James's room number at the motel. According to Rachael Lane, the discussion about "ripping [James] off" was just a joke, and was not serious. Russell testified that he never heard appellant use the word "rob."

Later that evening, around 7:00 or 8:00 p.m., appellant and Rachael Lane went to the apartment of Amber Ladue, where they encountered Rachael Lane's brother, Michael Lane[2], and his girlfriend, Florence Laurel Anderson, who was a friend of Ladue's. Ladue lived not far from the motel where James was staying. Lane and Anderson were staying with their friend Gordon Combs in another apartment in the same building, and sometimes borrowed Ladue's apartment so they could have some privacy. Lane and Anderson asked appellant and Rachael Lane if they had any drugs,[3] and appellant

---

[1]    All further references to dates are to the year 2001 unless otherwise specified.

[2]    Michael Lane was also a friend of appellant's and was the actual perpetrator of the murder of which both he and appellant were convicted. He was also a principal witness for the prosecution at appellant's trial. For simplicity and clarity, we refer to Michael Lane as Lane, and to Rachael Lane by her full name.

[3]    Appellant, Rachael Lane, Russell, Lane, Anderson, Ladue, and Combs were all methamphetamine users at the time of these events.

2

responded by suggesting that they could obtain cash from James, either by fraudulently proposing to get drugs for him and keeping the money, or by offering him Anderson's services as a prostitute.

Lane did not want to feign a drug deal with James. Anderson was willing to act (or at least pose[4]) as a prostitute to get James's money, but Lane did not want her to do so. Nonetheless, Anderson and Lane agreed with appellant that the three of them would go to the motel, that Anderson would offer James her services as a prostitute, and that appellant would receive a share of whatever money Anderson and Lane could obtain from James, or of the drugs they would buy with it. Lane denied that they discussed robbing James.

Before going to the motel, either Lane or Anderson asked Ladue for a knife with which to protect themselves, and told Ladue that appellant was "sending them [Anderson and Lane] on a mission." Appellant was there when they did so, but did not say anything. Ladue gave Lane a knife, and then went to sleep.[5]

---

[4]    There was a conflict in the evidence as to whether Anderson had previously worked as a prostitute, and as to whether the plan was that she would really offer her services as such to James, or merely pretend to be willing to do so. Lane testified at trial that Anderson fairly frequently sold her services for drugs or for money to buy drugs, and that he had accompanied her, for her protection, on a few prior occasions when she had conducted such a transaction with a stranger. He had told the police at one point during their investigation that Anderson never worked as a prostitute while she was involved with him, but he testified at trial that this statement was true only in the sense that Anderson prostituted herself solely to obtain drugs (or money for drugs), and not as a regular occupation. In any event, there is substantial evidence in the record that Lane and Anderson gained entry to James's motel room by suggesting to him – whether truthfully or not – that Anderson was available as a prostitute. Appellant does not argue otherwise on this appeal.

[5]    There was a conflict in the testimony regarding whether Ladue was in her apartment when appellant, Lane, and Anderson discussed their plan. Lane testified that she arrived just as they were leaving. Ladue testified that she was in the apartment asleep, and they woke her up to ask for the knife.

Lane, Anderson, and appellant then walked together to the motel where James was staying. Lane and Anderson knocked on the door of James's room, telling him that "Shawn sent me," while appellant (as he had told Lane he planned to do) entered the room next door to James's in order to visit his friend Kelly Eyerley. It is undisputed that appellant was not in James's room during the ensuing events, and was not present when Lane killed James.

Lane testified as follows regarding the ensuing events. James appeared to be drunk when he came to the door to let him and Anderson into the room.[6] Lane and Anderson were surprised and upset to learn that James was Black, a piece of information that Harrison had not shared with appellant. Lane did not like or trust Black people, because his grandmother had been raped by a couple of Black men when she was young. Nonetheless, Anderson proceeded to offer James her sexual services for money. James accepted, but was unwilling to allow Lane to remain in the room to protect Anderson during the activity, so Lane went into the bathroom in order to remain nearby. Shortly thereafter, Lane heard Anderson scream, and emerged from the bathroom to see James beating her. Lane then "freaked out," and stabbed James at least five times, killing him. Lane and Anderson then left the motel without taking the only money they saw in James's room, which amounted to only $20. Anderson took James's cigarettes and lighter.

---

Ladue was, generally speaking, a problematic witness. She suffered from a number of mental disorders, for which she was taking numerous medications at the time she testified against appellant. She acknowledged that her recollection of the relevant events was hazy, and that she was "having problems keeping things straight" in her testimony. For example, although she testified at appellant's trial that she gave the knife to Lane, she admitted that when she testified at Lane and Anderson's trial, she had not remembered whether she gave it to Lane or Anderson. Ladue was originally charged as an accessory after the fact in connection with James's murder, but agreed to testify against Lane, Anderson, and appellant in exchange for immunity.

[6]    This testimony was corroborated by a forensic analysis showing that James had a blood-alcohol level of .26 when he died.

4

According to Ladue, appellant returned to Ladue's apartment alone, some 20 minutes after he had left for the motel.[7] Ladue testified that appellant told her he was worried that something had gone wrong, because Lane and Anderson had not yet returned. Shortly thereafter, Lane and Anderson arrived, awakening Rachael Lane, who had been asleep on Ladue's couch. Both Lane and Anderson were very upset, and Anderson was crying. Lane had a large knife, which he hid under a sofa cushion; he told appellant that he had killed James. Appellant appeared to Lane to be shocked upon hearing this, but he nonetheless asked where James's money was; Lane replied that he did not know.

Upon hearing that James had been killed, appellant called Harrison, at Lane's request, and asked him to come and see him. Appellant and Lane had an argument about whether they should return to the motel room. Rachael Lane testified that it might have been appellant who wanted to do so, but she was not sure. According to Lane, however, he was the one who persuaded appellant to go back.[8] Lane and Anderson were angry because they believed that appellant had set them up by telling them incorrectly that James had a lot of money, and by not telling them that he was Black.

Ultimately, Lane, Anderson, and appellant returned to the motel, accompanied by Harrison. Lane entered James's room by climbing in the bathroom window, and then opened the door to let in the others. Lane went through James's pockets and belongings and took his necklace, shoes, and wallet, and a small sum in cash. Appellant did not take

---

[7]    Lane also testified that he and Anderson returned to Ladue's separately from appellant. Rachael Lane testified that appellant, Lane, and Anderson all returned to Ladue's apartment together, but she also testified (as did Lane) that she had fallen asleep, and awoke again when they arrived.

[8]    Lane told the police shortly after James's death that it was appellant who had insisted they return to the motel, claiming James had $500 or $600 in his possession. In his trial testimony, however, Lane contended that he had been lying when he said this, in an effort to blame someone else for James's death. As discussed *post*, appellant told the police he had gone back to the motel at Lane's insistence because he was afraid of Lane at that point.

anything, but according to Lane, he helped Lane flip over the mattress, and either took James's credit card or accepted it from Lane.[9]

Later, in the early hours of the morning on April 3, Lane and Anderson went to Combs's apartment. Lane testified that he told Combs a version of the events that was consistent with his trial testimony, but he also admitted he might have told Combs (untruthfully, according to Lane's trial testimony) that they had gone to the motel to rob James. According to Combs, Lane not only told him that he had just killed a man at the motel, but also averred that he and Anderson had gone there to rob the man by having Anderson pose as a prostitute. Lane also told Combs that he had remarked to Anderson on the way to the motel that if things got out of hand, he might have to stab the intended robbery victim.

Ladue testified that around noon on April 3, she awoke and found Lane cleaning her knife, which he then wrapped in newspaper. Lane testified that he told Ladue that he had killed a man at the motel with Ladue's knife. Ladue testified that Lane also told her he had gone to the motel to rob the man. Ladue drove Lane and Anderson to a jetty or pier, where Lane threw the knife into the ocean, and then to a remote area in the woods, where Lane and Anderson burned their clothes.

James's body was discovered in his room by the motel housekeeper shortly after 10:00 a.m. on April 3. He had been stabbed four times in the back and once in the elbow, and had bled to death. His room had been ransacked, and there were signs of a forced entry through the bathroom window.

A day or two later, Russell encountered appellant again. By then, word of the killing at the motel had circulated in the area, and appellant appeared to Russell to be

---

[9]     Lane's testimony was inconsistent regarding how, or even whether, appellant obtained James's credit card. Russell testified that appellant told him he had the card, but Russell never actually saw appellant with it. Russell did see Harrison with the credit card, however; Harrison was holding it when he told Russell that he and appellant had bought gas for Russell's truck, which Harrison had borrowed to give appellant a ride. The prosecution introduced evidence that the credit card had been used to buy gas at a nearby gas station on the morning after James's death.

worried about what had happened. Russell testified that appellant told him he had gone to the motel with Lane and Anderson, but had gone into the room next door to visit Eyerley. Russell said appellant told him that he had heard sounds of a "loud ruckus" from the next room, and that Lane had ended up stabbing the victim during a struggle. Russell interpreted what appellant said as indicating that Lane and Anderson had robbed the victim, but appellant did not actually use the word "rob." Appellant complained to Russell that Lane and Anderson had only given him (or him and Harrison) a credit card and a small sum of money (about $20), and that he believed they were "holding out on him." Russell also testified that appellant and Harrison made racially derogatory remarks about the victim, referring to him as "just another dead nigger, porch monkey, dead cricket, something like that."[10]

On April 10, about a week after James was killed, a police detective interviewed Lane and Anderson, and learned from them that appellant had been involved in the events leading up to the killing. The police spoke with appellant's family and asked them to have appellant to call them. On April 11, appellant voluntarily went to the police station to be interviewed. Appellant was not given any *Miranda*[11] warnings prior to the interview. A tape recording of the interview was played to the jury at appellant's trial. Appellant's trial counsel did not object to the admission of the tape recording.

In his interview with the police, appellant initially told a story about the events that the police told him they knew was not true. The police then told appellant that Lane and Anderson had been arrested, and had told them appellant was not in the room when James was killed. Appellant then acknowledged that he had told Lane and Anderson about Harrison's report that James had a lot of money and wanted a prostitute. He also admitted that he had proposed to Lane and Anderson that they obtain James's money –

---

[10]    Russell acknowledged at trial that he did not like appellant. Russell had an extensive criminal record and had been granted immunity for as many as 30 uncharged robberies in exchange for his testimony. Lane testified he had never heard appellant use the word "nigger."

[11]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

either by promising to buy drugs with it and not returning, or by stealing it while Anderson distracted James with sex – and give appellant a share of the proceeds. He acknowledged going to the motel with Lane and Anderson, and spending a short time in Eyerley's room before returning to Ladue's apartment. He said he had not heard anything from James's room except a little bang on the wall, and that he had told Eyerley that Lane and Anderson were going to get James's money by pretending they would use it to buy drugs for him.

Appellant also acknowledged in the interview that after finding out that Lane had stabbed James, he went back to the motel with Lane at Lane's insistence; he averred that he was afraid Lane would stab him if he refused. Appellant explained that he called Harrison to accompany them to the motel, and that when they got there, he knocked on James's door but received no response. He said Lane and Anderson then went in through the window and let him and Harrison in through the door. Appellant contended he had only watched while Lane, Anderson, and Harrison rummaged through James's belongings and took his money, shoes, and jacket. Appellant vehemently denied having had any intent that the group would obtain James's money by any means other than pretending to use it to buy drugs for James.

Appellant, Lane, and Anderson were charged with murder and burglary. Appellant's trial was severed from that of Lane and Anderson,[12] and did not begin until October 22, 2002. In an amended information, appellant was charged with felony murder (Pen. Code, § 187, subd. (a)[13]) and second degree burglary (§§ 459; 460, subd. (b)). On December 9, 2002, the jury found appellant guilty on both counts.

On January 24, 2003, appellant was sentenced to an indeterminate term of 25 years to life on the murder conviction, and the upper term of three years on the burglary

---

[12]    Lane and Anderson were tried jointly, and both had been convicted by the time appellant's trial began. Their convictions were affirmed by Division Five of this court in separate unpublished opinions. (*People v. Lane* (Dec. 1, 2003, A099502); *People v. Anderson* (Dec. 19, 2003, A099476).)

[13]    All further unspecified references to statutes are to the Penal Code.

8

conviction, to be served consecutively to the indeterminate term. This timely appeal followed.

## DISCUSSION

### A. Jury Instructions on Felony Murder

With respect to the murder charge against appellant, the jury was instructed, based on CALJIC No. 8.27, that "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." In his opening brief on appeal, appellant argued that this instruction was erroneous because neither it nor any of the court's other instructions informed the jury that the killing had to be in furtherance of a common design or scheme on the part of appellant and the actual killer (i.e., Lane).

During the pendency of the appeal, however, the California Supreme Court decided *People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*), which "clarif[ied] a nonkiller's liability for a killing 'committed in the perpetration' of an inherently dangerous felony under Penal Code section 189's felony-murder rule. [Citation.]" (*Id.* at p. 193, fn. omitted.) In so doing, the court rejected the argument that liability for felony murder requires that the killing be in furtherance of a common design. Rather, the court held that "[t]he causal relationship [required by the felony-murder rule] is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit." (*Ibid.*) Thus, although the felony-murder rule does not make a nonkiller liable for "homicidal acts that are completely unrelated to the felony for which the parties have combined" (*id.* at p. 201), neither does "the felony-murder rule . . . require proof that the homicidal act furthered or facilitated the felony[; it requires] only that a logical nexus exist between the

9

two." (*Id.* at p. 203.) The court therefore rejected the contention that the jury instructions on felony murder given in *Cavitt* were "deficient merely because the 'in furtherance' phrasing was omitted." (*Ibid.*)

In keeping with this analysis, the court held that CALJIC No. 8.27, the source of the felony-murder instruction given in *Cavitt* as well as in the present case, "adequately apprise[s] the jury of the need for a logical nexus between the felonies and the homicide in this case. To convict, the jury necessarily found that 'the killing occurred during the commission or attempted commission of robbery or burglary' by 'one of several persons engaged in the commission' of those crimes. The first of these described a temporal connection between the crimes; the second described the logical nexus." (*Cavitt, supra,* 33 Cal.4th at p. 203, italics omitted.)

After the issuance of the Supreme Court's opinion in *Cavitt*, we requested supplemental briefs regarding its impact on the present case. In his supplemental briefs, appellant argues that, even under *Cavitt*, his felony-murder conviction was based on insufficient jury instructions. Specifically, he contends that the jury could have found that Lane's admitted racial animus toward James broke the causal link between the parties' shared plan to steal James's money and Lane's murder of James, and that the jury instructions did not adequately inform the jury that such a causal link was necessary. (See *Cavitt, supra,* 33 Cal.4th at pp. 210-212 (Werdegar, J., conc.) [concurring in result on basis of harmless error, but suggesting that felony-murder instructions be clarified "to clearly explain that murder complicity under the felony-murder rule requires not only a temporal relationship between commission of the felony and the killer's fatal act, but also a logical or causal one"]; *id.* at p. 213 (Chin, J., conc. [agreeing that existing instruction is adequate, but suggesting that courts should more clearly inform the jury of the need for a logical connection between the killing and the underlying felony].)

In *Cavitt*, however, the Supreme Court rejected a very similar contention that the causal link needed for felony murder was broken by the animus harbored toward the victim by the person whom the defendants *claimed* was the actual killer. Concededly, there is a factual difference between *Cavitt* and this case, in that here it is undisputed that

10

appellant was *not* the actual killer.  This difference has no bearing, however, on the degree of causal connection between the killing and the predicate felony.

As appellant's supplemental reply brief acknowledges, even if we were to hold that the felony-murder instructions given in this case were ambiguous, and might have been interpreted by the jury so as to be legally erroneous, we would still be obligated to inquire "whether there is a reasonable likelihood that the jury . . . applied the challenged instruction[s] in a way" that violated appellant's constitutional rights.  (*Boyde v. California* (1990) 494 U.S. 370, 380.)  On the record in this case, we find no such likelihood.

There was strong evidence of a causal connection, "beyond mere coincidence of time and place" (*Cavitt, supra*, 33 Cal.4th at p. 213 (Chin, J., conc.)), between the robbery or burglary[14] that appellant helped to plan, and the killing of James – who was the target of that felony – during the course of that crime.  Among other facts supporting this connection, perhaps the most telling is that appellant was present when Lane borrowed Ladue's knife to take with him to the motel, and raised no objection to his doing so.  The overall record simply does not permit us to discern a reasonable likelihood that the jury found James was killed solely because of Lane's racial animus, rather than because of any causal connection with the robbery or burglary, but nonetheless was misled by the instructions into finding appellant guilty of felony murder.

### B. Admission of Evidence of Appellant's Use of Racial Slurs

As already noted, Russell testified that after James was murdered, appellant used a highly inflammatory racial slur to refer to James.  Appellant's trial counsel objected to

---

[14]    There is some ambiguity in the record as to whether the plan in which appellant participated was that Lane and Anderson would rob James, or that they would gain entry to his motel room through the offer (real or feigned) of Anderson's services, and then steal his money without the use of force or fear.  Even the latter plan contemplated acts constituting burglary, however (see *People v. Nguyen* (1995) 40 Cal.App.4th 28, 30, 35 [entry into homes with owners' consent, with intent to steal property by giving worthless check in exchange for it, constituted burglary]), and thus constituted a factually sufficient basis for the jury's verdict of felony murder if the requisite causal connection was shown.  Appellant does not argue otherwise.

11

the admission of this evidence as more prejudicial than probative under Evidence Code section 352.[15] The trial judge was unwilling to instruct the witness to use another term in relating what appellant had said to him. The prosecutor argued, in effect, that appellant's overall admission to Russell was relevant to show appellant's guilt, and that his identification of the victim by race bolstered this by demonstrating that appellant was aware of the victim's identity. The trial judge agreed that because the statement was made in the context of a larger conversation in which appellant admitted to Russell that he had helped set up the robbery, it was relevant to the felony murder charge. He also reasoned that in the overall context of the case, appellant's isolated statement was unlikely to cause the jurors to have such a strong emotional reaction that they would not be able to decide the case fairly. Accordingly, he rejected appellant's section 352 argument.

Appellant now argues that this ruling was in error. He acknowledges that the applicable standard of review is abuse of discretion. (See, e.g., *People v. Coddington* (2000) 23 Cal.4th 529, 587, overruled on other grounds, *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Quartermain* (1997) 16 Cal.4th 600, 628 (*Quartermain*). He urges, however, that in this case the challenged evidence was so inflammatory, and so nearly irrelevant, that this standard was met, and that the error was so prejudicial as to require reversal.

Appellant relies primarily on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). In that case, the defendant was accused of nonviolent sexual offenses involving licking and fondling an incapacitated woman and a former consensual sexual partner. Under section 1108, which allows evidence of prior sex offenses in prosecutions for sex crimes, the trial court admitted evidence of a violent sexual offense committed by the defendant 23 years earlier. The Court of Appeal reversed, holding that the evidence should have been excluded under section 352 because it's extremely inflammatory nature outweighed its marginal relevance. (*Id.* at pp. 737-742.)

---

[15]    All references to statutes in this section of our opinion are to the Evidence Code.

In *Harris*, the court discussed five factors to be considered in weighing probative value against prejudicial effect under section 352, and found that all but one of them weighed heavily against admission. The challenged evidence was "inflammatory *in the extreme*" (*Harris, supra,* 60 Cal.App.4th at p. 738, italics in original); was likely to confuse the jury (*id.* at pp. 738-739); was very remote in time (23 years earlier) (*id.* at p. 739); and lacked any significant probative value on a disputed issue (*id.* at pp. 739-741). The only factor favoring admission was that the presentation of the evidence did not occupy much time. (*Id.* at pp. 739, 741.)

We find *Harris* distinguishable. In the present case, the challenged evidence, though certainly unfavorable, was nowhere near as inflammatory as the graphic testimony of the defendant's prior victim that was involved in *Harris*. It was not likely to confuse the jury, was closely connected in both time and substance to the crimes of which appellant was accused, and required even less time to present than the evidence at issue in *Harris*. Admittedly, its probative value was fairly negligible, even as part of the overall context of appellant's admissions to Russell, because the latter were essentially cumulative of Lane's extensive eyewitness testimony, as well as appellant's own statements to the police and the testimony of the other witnesses. Nonetheless, we are not persuaded that the section 352 calculus employed by *Harris* yields the same result in the present case.

More to the point is *Quartermain, supra,* 16 Cal.4th 600, on which respondent relies. In that case, the Supreme Court rejected a capital defendant's argument that the trial court erred in not excluding evidence of his use of racial epithets to refer to the murder victim during his interviews with police. (*Id.* at pp. 627-629.) The court reasoned that "the racial epithets were not so inflammatory that their probative value was substantially outweighed by their potential for undue prejudice," and that "[w]hile offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant," especially where "the racial epithets were only a small portion of the evidence," and "the prosecutor did not argue that [the] defendant should be convicted because he was a racist." (*Id.* at p. 628.)

13

There is one significant difference between this case and *Quartermain*. Here, there is no evidence that appellant knew that James was Black until after his murder. On the contrary, the record indicates that prior to Lane and Anderson's entry into James's motel room, none of them was aware of his race. Thus, even if appellant's use of racial epithets to refer to James after his death indicated that appellant harbored racial animosity in general, there was no evidence indicating that his prejudices played, or even could have played, a role in his complicity for James's murder. Accordingly, the probative value of the evidence here was far more tenuous than it was in *Quartermain*. Nonetheless, when we view the present case in light of the *Quartermain* court's overall analysis of the section 352 issue, we reach the same result here.

Moreover, even if we were to find an abuse of discretion in the admission of the evidence, we still would not find that error to be a basis for reversing appellant's convictions. As the Supreme Court put it in *People v. Coddington, supra*, even if a trial court is held to have abused its discretion in admitting evidence, "reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. [Citations.]" (23 Cal.4th at pp. 587-588.) Given the strength of the overall case against appellant here, we are not persuaded that the admission of tangential evidence of his use of a racial epithet on one occasion was "so prejudicial that it denied [appellant] a fair trial in violation of his right to due process." (*Quartermain, supra*, 16 Cal.4th at p. 629.)

## C. Trial Counsel's Failure to Object to Admission of Appellant's Interview

As already noted, appellant was interviewed at the police station about a week after the murder, and the police did not give appellant any *Miranda* warnings before or during the questioning. Appellant's trial counsel did not object to the playing of a tape recording of the interview for the jury. Before us, appellant argues that the admission of appellant's interview was prejudicial error, and that appellant's trial counsel therefore rendered ineffective assistance in failing to object.

"To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a

14

more favorable result absent counsel's shortcomings. [Citation.] If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.] [Wh]ere the record . . . hints at the existence of some tactical reason for counsel's decision . . . [, or a]t least, the record fails to eliminate that possibility[, the] defendant's claim must fail for purposes of [direct] appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) Thus, as appellant acknowledges, we cannot reverse his conviction on the basis of ineffective assistance of counsel unless the record precludes the possibility that there was a reasonable, informed tactical basis for his trial counsel's failure to object to the admission of his interview. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268; *People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Respondent suggests one possible basis in the record indicating that trial counsel's failure to object was a reasonable tactical choice. As respondent points out, the record is clear that appellant went to the police station voluntarily, and was not arrested or handcuffed prior to his interview. Thus, respondent argues, trial counsel may have concluded that any objection would have lacked merit, because appellant's interview did not qualify as a custodial interrogation triggering the need for *Miranda* warnings. We find merit in this suggestion.

We note, in addition, that our review of the record reveals another potential explanation. Appellant's trial counsel made extensive references to the interview both in his opening statement and in his closing argument. Essentially, he used the statement to enable him to explain appellant's side of the story to the jury without requiring appellant to waive his right against self-incrimination and subject himself to cross-examination. Thus, the record here reveals not one but two possible tactical reasons for counsel's decision not to object to the admission of appellant's interview. Accordingly, we must reject appellant's ineffective assistance of counsel claim.

15

### D. Sentencing Issues

For his murder conviction, appellant received an indeterminate sentence of 25 years to life, with the possibility of parole. For his burglary conviction, appellant was sentenced to the three-year upper term. The trial judge ordered the determinate and indeterminate sentences to be served consecutively, starting with the determinate term.

At the sentencing hearing, the trial judge specifically singled out three aggravating factors that he was relying upon "in particular" in imposing the upper term for the burglary conviction: (1) that appellant's prior convictions as an adult were numerous and quite serious; (2) that appellant was on a grant of felony probation when the current offense was committed; and (3) that appellant's prior performance on probation was unsatisfactory. The judge indicated, however, that he was also relying *all* of the aggravating·factors identified in the probation report, which included the following additional factors: (4) that the crime involved a high degree of callousness in that appellant returned to the location where the victim was murdered; (5) that appellant induced others, including Harrison, to return to the murder scene and commit burglary; (6) that the crime was carried out in a manner that revealed planning; and, (7) that appellant had engaged in violent conduct that revealed him to be a serious danger to society.

During the pendency of this appeal, the United States Supreme Court decided in *Blakely, supra,* __ U.S. __ [124 S.Ct. 2531] that all facts (other than a prior conviction) allowing a criminal defendant's sentence to be increased beyond an otherwise applicable statutory maximum must be proved to a jury beyond a reasonable doubt. We therefore requested supplemental briefs regarding the applicability of *Blakely* to this case.

Appellant's opening supplemental brief argues that both the judge's selection of the aggravated term on the burglary conviction, and the judge's decision to impose consecutive sentences, violated the stricture of *Blakely*, because both decisions were based in part on facts that were not proved to a jury beyond a reasonable doubt. He further contends, citing *Hoffman v. Arave* (9th Cir. 2001) 236 F.3d 523, 541-542, that if this court finds *Blakely* error as to some of the aggravating factors, but not as to others,

16

the case must be remanded for resentencing if even a single invalid factor had a substantial and injurious effect or influence on the court's sentencing decision.

Respondent's supplemental brief argues that appellant's *Blakely* argument was forfeited by his failure to object at his sentencing. We recently rejected the same argument, premised on the same authorities, in an opinion in which the California Supreme Court has granted review. (*People v. Butler* (2004) 122 Cal.App.4th 910, 918-919, review granted Dec. 15, 2004, S129000.) Pending final word from the California Supreme Court, we see no reason either to depart from that holding here, or to reiterate its reasoning. Respondent also argues that *Blakely* does not apply to the imposition of an aggravated term under California's determinate sentencing law. Again, we have rejected this argument previously in other cases, and we shall adhere to that holding here without repeating our reasons.[16]

Alternatively, respondent argues that even if *Blakely* applies, there is no need to reverse, because the judge's choice of the aggravated term was based in part on recidivism-based factors that need not be found by a jury under *Almendarez-Torres v. United States* (1998) 523 U.S. 224 (*Almendarez-Torres*).[17] Again, pending the issuance of the Supreme Court's opinions in *Black* and *Towne*, we adhere to our previously expressed disagreement with respondent's position that the presence of one or more non-*Blakely* aggravating factors entirely insulates a sentence from *Blakely* review.

In our view, when a trial judge's selection of the aggravated term is based in part on factors that *Blakely* requires be decided by a jury, we will apply the "*Chapman* test" (*Chapman v. California* (1967) 386 U.S. 18, 24) for harmless error, which requires us to

---

[16]    This issue is currently pending before the California Supreme Court in *People v. Towne*, review granted July 14, 2004, S125677, and *People v. Black*, review granted July 28, 2004, S126182.

[17]    Appellant recognizes that some of the factors relied on by the judge in selecting the upper term were recidivism-based factors, but contends that the rationale of *Almendarez-Torres* was undercut by *Blakely* and is no longer good law. In light of our conclusion, *post*, that *Blakely* requires resentencing in this case, we need not reach this issue.

determine whether the failure to obtain jury determinations as to the aggravating factors relied upon by the trial court was harmless beyond a reasonable doubt. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 326 [*Chapman* standard applicable to claims of sentencing error under *Apprendi*].) The trial judge's selection of the upper term in this case was based in part on factors that plainly must be decided by a jury under *Blakely*, including the degree of callousness involved in the crime, appellant's inducement of others to become involved, and appellant's having engaged in violent conduct making him a serious danger to society. In the present case, we are unwilling to find that, beyond a reasonable doubt, a jury would have made findings to support these aggravating factors. Thus, those aggravating factors cannot be used to support the trial court's sentencing choice in this case.

This conclusion does not end our analysis, however, because "[w]hen a trial court has given both proper and improper reasons for a sentence choice, a reviewing court will set aside the sentence only if it is reasonably probable that the trial court would have chosen the lesser sentence had it known that some of its reasons were improper." (*People v. Price* (1991) 1 Cal.4th 324, 492.) Further, a single factor in aggravation is sufficient to support imposition of an upper term. (*People v. Osband* (1996) 13 Cal.4th 622, 728.) Here, of the seven aggravating factors identified in the probation report, only one – appellant's having been on felony probation at the time of the offense – falls within the scope (if broadly construed) of the prior conviction exception recognized in *Blakely*, *supra*, 124 S.Ct. at p. 2536. (See also *Apprendi v. New Jersey* (2000) 530 U.S. 466, 488, 490 (*Apprendi*); *Almendarez-Torres*, *supra*, 523 U.S. 224.) True, two of the other factors (numerousness and seriousness of prior convictions; unsatisfactory nature of performance on probation) are recidivism-related, but they also include potentially subjective elements

18

that, at least under the circumstances of this case,[18] take them far enough beyond the bare "fact of the prior conviction" (*Blakely, supra*, 124 S.Ct. at p. 2536; *Apprendi, supra*, 530 U.S. at p. 488) so as to bring them within the province of the jury under *Blakely*.

Because so many of the aggravating factors in the probation report, including two out of the three upon which the trial judge particularly relied, were improperly considered under *Blakely*, we cannot conclude on the record in this case that it is not reasonably probable that the judge would have chosen a lesser sentence if he had considered only the one valid aggravating factor we have identified. Accordingly, we must remand for resentencing on the burglary count.

Finally, respondent argues that even if *Blakely* applies to the trial judge's selection of the aggravated term on the burglary count, it does not apply to the trial judge's decision to make the sentences on the other counts consecutive rather than concurrent. Appellant acknowledges that the weight of authority supports respondent's position on this issue. We concur with all of the other Courts of Appeal that have weighed in on the issue so far, that *Blakely* does not apply to the trial court's determination to impose consecutive rather than concurrent sentences.[19]  (See, e.g., *People v. White* (2004) 124 Cal.App.4th 1417, 1441, petn. for review pending, petn. filed Jan. 18, 2005; *People v. Dalby* (2004) 123 Cal.App.4th 1083, 1102-1103, petn. for review pending, petn. filed Dec. 9, 2004; *People v. Jaffe* (2004) 122 Cal.App.4th 1559, 1588-1589, petn. for review pending, petn. filed Nov. 19, 2004.)  Accordingly, upon resentencing the trial judge will

---

[18]     Appellant concedes that the fact of his prior convictions falls within the *Apprendi* exception, but not that their numerousness or seriousness does so.  In fact, it appears from the probation report that appellant was convicted of felonies in two earlier cases: in 1997 for receiving stolen property and possession of a controlled substance, and in 1999 for possession of a controlled substance.  This record does not permit us to conclude beyond a reasonable doubt that a jury would have found appellant's prior felony convictions to have been either numerous or of increasing seriousness.

[19]     This issue is currently pending before the California Supreme Court in *People v. Black, supra*, review granted July 28, 2004, S126182, as well as a number of other cases.

19

remain free to order that the indeterminate sentence for felony murder be served consecutively to the determinate sentence for burglary.

## DISPOSITION

The matter is remanded for resentencing on the burglary conviction pursuant to *Blakely*, *supra*, 542 U.S. ___. In all other respects, the judgment is affirmed.

_____
Ruvolo, J.

We concur:


_____
Kline, P.J.


_____
Haerle, J.

*People v. Gorman*, A102310

# EXHIBIT B



Filed 12/21/05     Opinion following grant of rehearing

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

RECEIVED

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

DEC 2 2 2005

#### FIRST APPELLATE DISTRICT

First District
APPELLATE Project

#### DIVISION TWO

FILED
COURT OF APPEAL - FIRST APPELLATE DIVISION

DEC 2 1 2005

DIANA HERBERT, CLERK

By _____ DEPUTY CLERK

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL THOMAS GORMAN,

    Defendant and Appellant.

A102310

(Humboldt County
Super. Ct. No. CR011617CS)

    Appellant Michael Thomas Gorman was convicted by a jury of felony murder and burglary. On this appeal,[1] appellant argues: (1) that the jury instructions on felony murder did not adequately advise the jury of the need for a causal connection between the felony and the killing; (2) that the trial judge abused his discretion in admitting evidence that appellant used a racial slur to refer to the victim after his death; (3) that appellant's trial counsel's failure to object to the admission of appellant's pretrial statement to the police constituted ineffective assistance of counsel; and (4) that in selecting the upper

[1]    This is the second proceeding in this court in connection with appellant's appeal. In an unpublished opinion, we earlier rejected most of appellant's contentions, except we agreed with appellant's sentencing argument, and remanded for resentencing. (*People v. Gorman* (Jan. 27, 2005) A102310 (*Gorman I*).) A petition to the California Supreme Court was subsequently granted, and on September 7, 2005, an order was issued by the Supreme Court transferring the matter to this court with directions to vacate our prior decision, and to reconsider the cause in light of *People v. Black* (2005) 35 Cal.4th 1238 (*Black*) (Cal. Rules of Court, rule 29.3(d)). We then issued an unpublished opinion on October 25, 2005, following *Black*. (*People v. Gorman* (Oct. 25, 2005) A102310 (*Gorman II*).) Appellant then filed a petition for rehearing on October 27, 2005, which we granted (Order, Kline, P.J. (Nov. 28, 2005)).

1

term on the burglary count and directing that appellant's sentences be served consecutively, the trial judge inappropriately relied on aggravating factors not found by a jury, in violation of *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*). We reject all of these contentions, and affirm the judgment.

## FACTS AND PROCEDURAL BACKGROUND

On April 2, 2001,[2] appellant and his friend Rachael Lane paid a visit to a man they knew named Shawn Harrison who occasionally sold methamphetamine. Troy Russell, Harrison's former brother-in-law, was also visiting Harrison at the time. Harrison told his visitors that, earlier that day, he had sold some methamphetamine to a man (later identified as Bruce James) who was staying at a nearby motel; he added that the man appeared to have a lot of cash and was interested in obtaining the services of a prostitute. Russell and Harrison had committed robberies together before, and the group discussed the idea of taking James's money from him. Russell was not interested in the idea, but appellant asked Harrison for James's room number at the motel. According to Rachael Lane, the discussion about "ripping [James] off" was just a joke, and was not serious. Russell testified that he never heard appellant use the word "rob."

Later that evening, around 7:00 or 8:00 p.m., appellant and Rachael Lane went to the apartment of Amber Ladue, where they encountered Rachael Lane's brother, Michael Lane[3], and his girlfriend, Florence Laurel Anderson, who was a friend of Ladue's. Ladue lived not far from the motel where James was staying. Lane and Anderson were staying with their friend Gordon Combs in another apartment in the same building, and sometimes borrowed Ladue's apartment so they could have some privacy. Lane and Anderson asked appellant and Rachael Lane if they had any drugs,[4] and appellant

---

[2]      All further references to dates are to the year 2001 unless otherwise specified.

[3]      Michael Lane was also a friend of appellant's and was the actual perpetrator of the murder of which both he and appellant were convicted. He was also a principal witness for the prosecution at appellant's trial. For simplicity and clarity, we refer to Michael Lane as Lane, and to Rachael Lane by her full name.

[4]      Appellant, Rachael Lane, Russell, Lane, Anderson, Ladue, and Combs were all methamphetamine users at the time of these events.

responded by suggesting that they could obtain cash from James, either by fraudulently proposing to get drugs for him and keeping the money, or by offering him Anderson's services as a prostitute.

Lane did not want to feign a drug deal with James. Anderson was willing to act (or at least pose[5]) as a prostitute to get James's money, but Lane did not want her to do so. Nonetheless, Anderson and Lane agreed with appellant that the three of them would go to the motel, that Anderson would offer James her services as a prostitute, and that appellant would receive a share of whatever money Anderson and Lane could obtain from James, or of the drugs they would buy with it. Lane denied that they discussed robbing James.

Before going to the motel, either Lane or Anderson asked Ladue for a knife with which to protect themselves, and told Ladue that appellant was "sending them [Anderson

---

[5]   There was a conflict in the evidence as to whether Anderson had previously worked as a prostitute, and as to whether the plan was that she would really offer her services as such to James, or merely pretend to be willing to do so. Lane testified at trial that Anderson fairly frequently sold her services for drugs or for money to buy drugs, and that he had accompanied her, for her protection, on a few prior occasions when she had conducted such a transaction with a stranger. He had told the police at one point during their investigation that Anderson never worked as a prostitute while she was involved with him, but he testified at trial that this statement was true only in the sense that Anderson prostituted herself solely to obtain drugs (or money for drugs), and not as a regular occupation. In any event, there is substantial evidence in the record that Lane and Anderson gained entry to James's motel room by suggesting to him—whether truthfully or not—that Anderson was available as a prostitute. Appellant does not argue otherwise on this appeal.

3

and Lane] on a mission." Appellant was there when they did so, but did not say anything. Ladue gave Lane a knife, and then went to sleep.[6]

Lane, Anderson, and appellant then walked together to the motel where James was staying. Lane and Anderson knocked on the door of James's room, telling him that "Shawn sent me," while appellant (as he had told Lane he planned to do) entered the room next door to James's in order to visit his friend Kelly Eyerley. It is undisputed that appellant was not in James's room during the ensuing events, and was not present when Lane killed James.

Lane testified as follows regarding the ensuing events. James appeared to be drunk when he came to the door to let him and Anderson into the room.[7] Lane and Anderson were surprised and upset to learn that James was Black, a piece of information that Harrison had not shared with appellant. Lane did not like or trust Black people, because his grandmother had been raped by a couple of Black men when she was young. Nonetheless, Anderson proceeded to offer James her sexual services for money. James accepted, but was unwilling to allow Lane to remain in the room to protect Anderson during the activity, so Lane went into the bathroom in order to remain nearby. Shortly thereafter, Lane heard Anderson scream, and emerged from the bathroom to see James beating her. Lane then "freaked out," and stabbed James at least five times, killing him.

---

[6]    There was a conflict in the testimony regarding whether Ladue was in her apartment when appellant, Lane, and Anderson discussed their plan. Lane testified that she arrived just as they were leaving. Ladue testified that she was in the apartment asleep, and they woke her up to ask for the knife.

Ladue was, generally speaking, a problematic witness. She suffered from a number of mental disorders, for which she was taking numerous medications at the time she testified against appellant. She acknowledged that her recollection of the relevant events was hazy, and that she was "having problems keeping things straight" in her testimony. For example, although she testified at appellant's trial that she gave the knife to Lane, she admitted that when she testified at Lane and Anderson's trial, she had not remembered whether she gave it to Lane or Anderson. Ladue was originally charged as an accessory after the fact in connection with James's murder, but agreed to testify against Lane, Anderson, and appellant in exchange for immunity.

[7]    This testimony was corroborated by a forensic analysis showing that James had a blood-alcohol level of .26 percent when he died.

4

Lane and Anderson then left the motel without taking the only money they saw in James's room, which amounted to only $20. Anderson took James's cigarettes and lighter.

According to Ladue, appellant returned to Ladue's apartment alone, some 20 minutes after he had left for the motel.[8] Ladue testified that appellant told her he was worried that something had gone wrong, because Lane and Anderson had not yet returned. Shortly thereafter, Lane and Anderson arrived, awakening Rachael Lane, who had been asleep on Ladue's couch. Both Lane and Anderson were very upset, and Anderson was crying. Lane had a large knife, which he hid under a sofa cushion; he told appellant that he had killed James. Appellant appeared to Lane to be shocked upon hearing this, but he nonetheless asked where James's money was; Lane replied that he did not know.

Upon hearing that James had been killed, appellant called Harrison, at Lane's request, and asked him to come and see him. Appellant and Lane had an argument about whether they should return to the motel room. Rachael Lane testified that it might have been appellant who wanted to do so, but she was not sure. According to Lane, however, he was the one who persuaded appellant to go back.[9] Lane and Anderson were angry because they believed that appellant had set them up by telling them incorrectly that James had a lot of money, and by not telling them that he was Black.

Ultimately, Lane, Anderson, and appellant returned to the motel, accompanied by Harrison. Lane entered James's room by climbing in the bathroom window, and then

---

[8]     Lane also testified that he and Anderson returned to Ladue's separately from appellant. Rachael Lane testified that appellant, Lane, and Anderson all returned to Ladue's apartment together, but she also testified (as did Lane) that she had fallen asleep, and awoke again when they arrived.

[9]     Lane told the police shortly after James's death that it was appellant who had insisted they return to the motel, claiming James had $500 or $600 in his possession. In his trial testimony, however, Lane contended that he had been lying when he said this, in an effort to blame someone else for James's death. As discussed *post*, appellant told the police he had gone back to the motel at Lane's insistence because he was afraid of Lane at that point.

5

opened the door to let in the others. Lane went through James's pockets and belongings and took his necklace, shoes, and wallet, and a small sum in cash. Appellant did not take anything, but according to Lane, he helped Lane flip over the mattress, and either took James's credit card or accepted it from Lane.[10]

Later, in the early hours of the morning on April 3, Lane and Anderson went to Combs's apartment. Lane testified that he told Combs a version of the events that was consistent with his trial testimony, but he also admitted he might have told Combs (untruthfully, according to Lane's trial testimony) that they had gone to the motel to rob James. According to Combs, Lane not only told him that he had just killed a man at the motel, but also averred that he and Anderson had gone there to rob the man by having Anderson pose as a prostitute. Lane also told Combs that he had remarked to Anderson on the way to the motel that if things got out of hand, he might have to stab the intended robbery victim.

Ladue testified that around noon on April 3, she awoke and found Lane cleaning her knife, which he then wrapped in newspaper. Lane testified that he told Ladue that he had killed a man at the motel with Ladue's knife. Ladue testified that Lane also told her he had gone to the motel to rob the man. Ladue drove Lane and Anderson to a jetty or pier, where Lane threw the knife into the ocean, and then to a remote area in the woods, where Lane and Anderson burned their clothes.

James's body was discovered in his room by the motel housekeeper shortly after 10:00 a.m. on April 3. He had been stabbed four times in the back and once in the elbow, and had bled to death. His room had been ransacked, and there were signs of a forced entry through the bathroom window.

---

[10]   Lane's testimony was inconsistent regarding how, or even whether, appellant obtained James's credit card. Russell testified that appellant told him he had the card, but Russell never actually saw appellant with it. Russell did see Harrison with the credit card, however; Harrison was holding it when he told Russell that he and appellant had bought gas for Russell's truck, which Harrison had borrowed to give appellant a ride. The prosecution introduced evidence that the credit card had been used to buy gas at a nearby gas station on the morning after James's death.

6

A day or two later, Russell encountered appellant again. By then, word of the killing at the motel had circulated in the area, and appellant appeared to Russell to be worried about what had happened. Russell testified that appellant told him he had gone to the motel with Lane and Anderson, but had gone into the room next door to visit Eyerley. Russell said appellant told him that he had heard sounds of a "loud ruckus" from the next room, and that Lane had ended up stabbing the victim during a struggle. Russell interpreted what appellant said as indicating that Lane and Anderson had robbed the victim, but appellant did not actually use the word "rob." Appellant complained to Russell that Lane and Anderson had only given him (or him and Harrison) a credit card and a small sum of money (about $20), and that he believed they were "holding out on him." Russell also testified that appellant and Harrison made racially derogatory remarks about the victim, referring to him as "just another dead nigger, porch monkey, dead cricket, something like that."[11]

On April 10, about a week after James was killed, a police detective interviewed Lane and Anderson, and learned from them that appellant had been involved in the events leading up to the killing. The police spoke with appellant's family and asked them to have appellant to call them. On April 11, appellant voluntarily went to the police station to be interviewed. Appellant was not given any *Miranda*[12] warnings prior to the interview. A tape recording of the interview was played to the jury at appellant's trial. Appellant's trial counsel did not object to the admission of the tape recording.

In his interview with the police, appellant initially told a story about the events that the police told him they knew was not true. The police then told appellant that Lane and Anderson had been arrested, and had told them appellant was not in the room when James was killed. Appellant then acknowledged that he had told Lane and Anderson about Harrison's report that James had a lot of money and wanted a prostitute. He also

---

[11]    Russell acknowledged at trial that he did not like appellant. Russell had an extensive criminal record and had been granted immunity for as many as 30 uncharged robberies in exchange for his testimony. Lane testified he had never heard appellant use the word "nigger."

[12]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

admitted that he had proposed to Lane and Anderson that they obtain James's money—either by promising to buy drugs with it and not returning, or by stealing it while Anderson distracted James with sex—and give appellant a share of the proceeds. He acknowledged going to the motel with Lane and Anderson, and spending a short time in Eyerley's room before returning to Ladue's apartment. He said he had not heard anything from James's room except a little bang on the wall, and that he had told Eyerley that Lane and Anderson were going to get James's money by pretending they would use it to buy drugs for him.

Appellant also acknowledged in the interview that after finding out that Lane had stabbed James, he went back to the motel with Lane at Lane's insistence; he averred that he was afraid Lane would stab him if he refused. Appellant explained that he called Harrison to accompany them to the motel, and that when they got there, he knocked on James's door but received no response. He said Lane and Anderson then went in through the window and let him and Harrison in through the door. Appellant contended he had only watched while Lane, Anderson, and Harrison rummaged through James's belongings and took his money, shoes, and jacket. Appellant vehemently denied having had any intent that the group would obtain James's money by any means other than pretending to use it to buy drugs for James.

Appellant, Lane, and Anderson were charged with murder and burglary. Appellant's trial was severed from that of Lane and Anderson,[13] and did not begin until October 22, 2002. In an amended information, appellant was charged with felony murder (Pen. Code, § 187, subd. (a)[14]) and second degree burglary (§§ 459; 460, subd. (b)). On December 9, 2002, the jury found appellant guilty on both counts.

On January 24, 2003, appellant was sentenced to an indeterminate term of 25 years to life on the murder conviction, and the upper term of three years on the burglary

---

[13]    Lane and Anderson were tried jointly, and both had been convicted by the time appellant's trial began. Their convictions were affirmed by Division Five of this court in separate unpublished opinions. (*People v. Lane* (Dec. 1, 2003, A099502); *People v. Anderson* (Dec. 19, 2003, A099476).)

[14]    All further unspecified references to statutes are to the Penal Code.

8

conviction, to be served consecutively to the indeterminate term. This timely appeal followed.

## DISCUSSION

### A. Jury Instructions on Felony Murder

With respect to the murder charge against appellant, the jury was instructed, based on CALJIC No. 8.27, that "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental." In his opening brief on appeal, appellant argued that this instruction was erroneous because neither it nor any of the court's other instructions informed the jury that the killing had to be in furtherance of a common design or scheme on the part of appellant and the actual killer (i.e., Lane).

During the pendency of the appeal, however, the California Supreme Court decided *People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*), which "clarif[ied] a nonkiller's liability for a killing 'committed in the perpetration' of an inherently dangerous felony under Penal Code section 189's felony-murder rule. [Citation.]" (*Id.* at p. 193, fn. omitted.) In so doing, the court rejected the argument that liability for felony murder requires that the killing be in furtherance of a common design. Rather, the court held that "[t]he causal relationship [required by the felony-murder rule] is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit." (*Ibid.*) Thus, although the felony-murder rule does not make a nonkiller liable for "homicidal acts that are completely unrelated to the felony for which the parties have combined" (*id.* at p. 201), neither does "the felony-murder rule . . . require proof that the homicidal act furthered or facilitated the felony[; it requires] only that a logical nexus exist between the

9

two." (*Id.* at p. 203.) The court therefore rejected the contention that the jury instructions on felony murder given in *Cavitt* were "deficient merely because the 'in furtherance' phrasing was omitted." (*Ibid.*)

In keeping with this analysis, the court held that CALJIC No. 8.27, the source of the felony-murder instruction given in *Cavitt* as well as in the present case, "adequately apprise[s] the jury of the need for a logical nexus between the felonies and the homicide in this case. To convict, the jury necessarily found that 'the killing occurred during the commission or attempted commission of robbery or burglary' by 'one of several persons engaged in the commission' of those crimes. The first of these described a temporal connection between the crimes; the second described the logical nexus." (*Cavitt, supra,* 33 Cal.4th at p. 203, italics omitted.)

After the issuance of the Supreme Court's opinion in *Cavitt*, we requested supplemental briefs regarding its impact on the present case. In his supplemental briefs, appellant argues that, even under *Cavitt*, his felony-murder conviction was based on insufficient jury instructions. Specifically, he contends that the jury could have found that Lane's admitted racial animus toward James broke the causal link between the parties' shared plan to steal James's money and Lane's murder of James, and that the jury instructions did not adequately inform the jury that such a causal link was necessary. (See *Cavitt, supra,* 33 Cal.4th at pp. 210-212 (Werdegar, J., conc.) [concurring in result on basis of harmless error, but suggesting that felony-murder instructions be clarified "to clearly explain that murder complicity under the felony-murder rule requires not only a temporal relationship between commission of the felony and the killer's fatal act, but also a logical or causal one"]; *id.* at p. 213 (Chin, J., conc. [agreeing that existing instruction is adequate, but suggesting that courts should more clearly inform the jury of the need for a logical connection between the killing and the underlying felony].)

In *Cavitt*, however, the Supreme Court rejected a very similar contention that the causal link needed for felony murder was broken by the animus harbored toward the victim by the person whom the defendants *claimed* was the actual killer. Concededly, there is a factual difference between *Cavitt* and this case, in that here it is undisputed that

appellant was *not* the actual killer. This difference has no bearing, however, on the degree of causal connection between the killing and the predicate felony.

As appellant's supplemental reply brief acknowledges, even if we were to hold that the felony-murder instructions given in this case were ambiguous, and might have been interpreted by the jury so as to be legally erroneous, we would still be obligated to inquire "whether there is a reasonable likelihood that the jury . . . applied the challenged instruction[s] in a way" that violated appellant's constitutional rights. (*Boyde v. California* (1990) 494 U.S. 370, 380.) On the record in this case, we find no such likelihood.

There was strong evidence of a causal connection, "beyond mere coincidence of time and place" (*Cavitt, supra*, 33 Cal.4th at p. 213 (Chin, J., conc.)), between the robbery or burglary[15] that appellant helped to plan, and the killing of James – who was the target of that felony – during the course of that crime. Among other facts supporting this connection, perhaps the most telling is that appellant was present when Lane borrowed Ladue's knife to take with him to the motel, and raised no objection to his doing so. The overall record simply does not permit us to discern a reasonable likelihood that the jury found James was killed solely because of Lane's racial animus, rather than because of any causal connection with the robbery or burglary, but nonetheless was misled by the instructions into finding appellant guilty of felony murder.

### B. Admission of Evidence of Appellant's Use of Racial Slurs

As already noted, Russell testified that after James was murdered, appellant used a highly inflammatory racial slur to refer to James. Appellant's trial counsel objected to

---

[15]    There is some ambiguity in the record as to whether the plan in which appellant participated was that Lane and Anderson would rob James, or that they would gain entry to his motel room through the offer (real or feigned) of Anderson's services, and then steal his money without the use of force or fear. Even the latter plan contemplated acts constituting burglary, however (see *People v. Nguyen* (1995) 40 Cal.App.4th 28, 30, 35 [entry into homes with owners' consent, with intent to steal property by giving worthless check in exchange for it, constituted burglary]), and thus constituted a factually sufficient basis for the jury's verdict of felony murder if the requisite causal connection was shown. Appellant does not argue otherwise.

11

the admission of this evidence as more prejudicial than probative under Evidence Code section 352.[16] The trial judge was unwilling to instruct the witness to use another term in relating what appellant had said to him.  The prosecutor argued, in effect, that appellant's overall admission to Russell was relevant to show appellant's guilt, and that his identification of the victim by race bolstered this by demonstrating that appellant was aware of the victim's identity.  The trial judge agreed that because the statement was made in the context of a larger conversation in which appellant admitted to Russell that he had helped set up the robbery, it was relevant to the felony murder charge.  He also reasoned that in the overall context of the case, appellant's isolated statement was unlikely to cause the jurors to have such a strong emotional reaction that they would not be able to decide the case fairly.  Accordingly, he rejected appellant's section 352 argument.

Appellant now argues that this ruling was in error.  He acknowledges that the applicable standard of review is abuse of discretion.  (See, e.g., *People v. Coddington* (2000) 23 Cal.4th 529, 587, overruled on other grounds, *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Quartermain* (1997) 16 Cal.4th 600, 628 (*Quartermain*).  He urges, however, that in this case the challenged evidence was so inflammatory, and so nearly irrelevant, that this standard was met, and that the error was so prejudicial as to require reversal.

Appellant relies primarily on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*).  In that case, the defendant was accused of nonviolent sexual offenses involving licking and fondling an incapacitated woman and a former consensual sexual partner.  Under section 1108, which allows evidence of prior sex offenses in prosecutions for sex crimes, the trial court admitted evidence of a violent sexual offense committed by the defendant 23 years earlier.  The Court of Appeal reversed, holding that the evidence should have been excluded under section 352 because its extremely inflammatory nature outweighed its marginal relevance.  (*Id.* at pp. 737-742.)

---

[16]    All references to statutes in this section of our opinion are to the Evidence Code.

In *Harris*, the court discussed five factors to be considered in weighing probative value against prejudicial effect under section 352, and found that all but one of them weighed heavily against admission. The challenged evidence was "inflammatory *in the extreme*" (*Harris, supra*, 60 Cal.App.4th at p. 738, italics in original); was likely to confuse the jury (*id.* at pp. 738-739); was very remote in time (23 years earlier) (*id.* at p. 739); and lacked any significant probative value on a disputed issue (*id.* at pp. 739-741). The only factor favoring admission was that the presentation of the evidence did not occupy much time. (*Id.* at pp. 739, 741.)

We find *Harris* distinguishable. In the present case, the challenged evidence, though certainly unfavorable, was nowhere near as inflammatory as the graphic testimony of the defendant's prior victim that was involved in *Harris*. It was not likely to confuse the jury, was closely connected in both time and substance to the crimes of which appellant was accused, and required even less time to present than the evidence at issue in *Harris*. Admittedly, its probative value was fairly negligible, even as part of the overall context of appellant's admissions to Russell, because the latter were essentially cumulative of Lane's extensive eyewitness testimony, as well as appellant's own statements to the police and the testimony of the other witnesses. Nonetheless, we are not persuaded that the section 352 calculus employed by *Harris* yields the same result in the present case.

More to the point is *Quartermain, supra*, 16 Cal.4th 600, on which respondent relies. In that case, the Supreme Court rejected a capital defendant's argument that the trial court erred in not excluding evidence of his use of racial epithets to refer to the murder victim during his interviews with police. (*Id.* at pp. 627-629.) The court reasoned that "the racial epithets were not so inflammatory that their probative value was substantially outweighed by their potential for undue prejudice," and that "[w]hile offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant," especially where "the racial epithets were only a small portion of the evidence," and "the prosecutor did not argue that [the] defendant should be convicted because he was a racist." (*Id.* at p. 628.)

13

There is one significant difference between this case and *Quartermain*. Here, there is no evidence that appellant knew that James was Black until after his murder. On the contrary, the record indicates that prior to Lane and Anderson's entry into James's motel room, none of them was aware of his race. Thus, even if appellant's use of racial epithets to refer to James after his death indicated that appellant harbored racial animosity in general, there was no evidence indicating that his prejudices played, or even could have played, a role in his complicity for James's murder. Accordingly, the probative value of the evidence here was far more tenuous than it was in *Quartermain*. Nonetheless, when we view the present case in light of the *Quartermain* court's overall analysis of the section 352 issue, we reach the same result here.

Moreover, even if we were to find an abuse of discretion in the admission of the evidence, we still would not find that error to be a basis for reversing appellant's convictions. As the Supreme Court put it in *People v. Coddington*, *supra*, even if a trial court is held to have abused its discretion in admitting evidence, "reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. [Citations.]" (23 Cal.4th at pp. 587-588.) Given the strength of the overall case against appellant here, we are not persuaded that the admission of tangential evidence of his use of a racial epithet on one occasion was "so prejudicial that it denied [appellant] a fair trial in violation of his right to due process." (*Quartermain*, *supra*, 16 Cal.4th at p. 629.)

### C. Trial Counsel's Failure to Object to Admission of Appellant's Interview

As already noted, appellant was interviewed at the police station about a week after the murder, and the police did not give appellant any *Miranda* warnings before or during the questioning. Appellant's trial counsel did not object to the playing of a tape recording of the interview for the jury. Before us, appellant argues that the admission of appellant's interview was prejudicial error, and that appellant's trial counsel therefore rendered ineffective assistance in failing to object.

"To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a

14

more favorable result absent counsel's shortcomings. [Citation.] If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.] [Wh]ere the record . . . hints at the existence of some tactical reason for counsel's decision . . . [, or a]t least, the record fails to eliminate that possibility[, the] defendant's claim must fail for purposes of [direct] appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) Thus, as appellant acknowledges, we cannot reverse his conviction on the basis of ineffective assistance of counsel unless the record precludes the possibility that there was a reasonable, informed tactical basis for his trial counsel's failure to object to the admission of his interview. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268; *People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Respondent suggests one possible basis in the record indicating that trial counsel's failure to object was a reasonable tactical choice. As respondent points out, the record is clear that appellant went to the police station voluntarily, and was not arrested or handcuffed prior to his interview. Thus, respondent argues, trial counsel may have concluded that any objection would have lacked merit, because appellant's interview did not qualify as a custodial interrogation triggering the need for *Miranda* warnings. We find merit in this suggestion.

We note, in addition, that our review of the record reveals another potential explanation. Appellant's trial counsel made extensive references to the interview both in his opening statement and in his closing argument. Essentially, he used the statement to enable him to explain appellant's side of the story to the jury without requiring appellant to waive his right against self-incrimination and subject himself to cross-examination. Thus, the record here reveals not one but two possible tactical reasons for counsel's decision not to object to the admission of appellant's interview. Accordingly, we must reject appellant's ineffective assistance of counsel claim.

15

## D. Sentencing Issues

For his murder conviction, appellant received an indeterminate sentence of 25 years to life, with the possibility of parole. For his burglary conviction, appellant was sentenced to the three-year upper term. The trial judge ordered the determinate and indeterminate sentences to be served consecutively, starting with the determinate term.

At the sentencing hearing, the trial judge specifically singled out three aggravating factors that he was relying upon "in particular" in imposing the upper term for the burglary conviction: (1) that appellant's prior convictions as an adult were numerous and quite serious; (2) that appellant was on a grant of felony probation when the current offense was committed; and (3) that appellant's prior performance on probation was unsatisfactory. The judge indicated, however, that he was also relying *all* of the aggravating factors identified in the probation report, which included the following additional factors: (4) that the crime involved a high degree of callousness in that appellant returned to the location where the victim was murdered; (5) that appellant induced others, including Harrison, to return to the murder scene and commit burglary; (6) that the crime was carried out in a manner that revealed planning; and, (7) that appellant had engaged in violent conduct that revealed him to be a serious danger to society.

During the pendency of this appeal, the United States Supreme Court decided in *Blakely, supra,* 542 U.S. 296 that all facts (other than a prior conviction) allowing a criminal defendant's sentence to be increased beyond an otherwise applicable statutory maximum must be proved to a jury beyond a reasonable doubt. We therefore requested supplemental briefs regarding the applicability of *Blakely* to this case. Ultimately we agreed with appellant's *Blakely* argument, and remanded for resentencing. (*Gorman I, supra.*)

As previously noted, a petition to the California Supreme Court was subsequently granted, and on September 7, 2005, an order was issued by the Supreme Court transferring the matter to this court with directions to vacate our prior decision, and to

16

reconsider the cause in light of *People v. Black* (2005) 35 Cal.4th 1238 (*Black*) (Cal. Rules of Court, rule 29.3(d)).

In *Black*, the Supreme Court held that "the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law does not implicate a defendant's Sixth Amendment right to a jury trial." (*Black, supra*, 35 Cal.4th at p. 1244.)  In reaching this conclusion, the *Black* court expressly stated that, under California's sentencing system, "the upper term is the 'statutory maximum' and a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the principles set forth in *Apprendi* [*v. New Jersey* (2000) 530 U.S. 466], *Blakely*, and [*United States v.*] *Booker* [(2005) 543 U.S 220]." (*Black, supra*, 35 Cal.4th at p. 1254.)

*Black* is binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)  Therefore, we reject appellant's contention that his upper, consecutive term sentence violates *Blakely*.

## DISPOSITION

Our prior decision in *Gorman II* is hereby vacated.  The judgment and sentence of the trial court are affirmed.

_____
Ruvolo, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.

*People v. Gorman*, A102310

EXHIBIT C



**COPY**

Filed 12/4/07 Opinion filed after remand

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

RECEIVED

DEC 0 4 2007

FIRST DISTRICT APPELLATE PROJECT

### FIRST APPELLATE DISTRICT

### DIVISION TWO

**FILED**

DEC - 4 2007

Court of Appeal - First App. Dist.
DIANA HERBERT
By _____
DEPUTY

THE PEOPLE,

    Plaintiff and Respondent,

v.

MICHAEL THOMAS GORMAN,

    Defendant and Appellant.

A102310

(Humboldt County
Super. Ct. No. CR011617CS)

Defendant Michael Thomas Gorman was convicted by a jury of felony murder and burglary. On appeal, he argues: (1) that the jury instructions on felony murder did not adequately advise the jury of the need for a causal connection between the felony and the killing; (2) that the trial judge abused his discretion in admitting evidence that defendant used a racial slur to refer to the victim after his death; (3) that defendant's trial counsel's failure to object to the admission of defendant's pretrial statement to the police constituted ineffective assistance of counsel; and (4) that in selecting the upper term on the burglary count and directing that defendant's sentences be served consecutively, the trial judge inappropriately relied on aggravating factors not found by a jury, in violation of *Blakely v. Washington* (2004) 542 U.S. 296 (*Blakely*).

This is defendant's third appeal. On January 27, 2005, we filed an opinion in which we agreed with defendant that imposition of the aggravated term for the burglary violated *Blakely*. (*People v. Gorman* (Jan. 27, 2005, A102310) [nonpub. opn.] (*Gorman I*).) The California Supreme Court vacated our opinion and ordered us to reconsider that issue in light of *People v. Black* (2005) 35 Cal.4th 1238 (*Black I*). On

1

December 21, 2005, we filed an opinion in which we concluded that, under *Black I*, there
was no *Blakely* error, and we affirmed the judgment. (*People v. Gorman* (Dec. 21, 2005,
A102310) [nonpub. opn.] (*Gorman II*).)

In *Cunningham v. California* (2007)549 U.S. ___ [127 S.Ct. 856] (*Cunningham*),
the United States Supreme Court held that *Black I* was an erroneous application of
*Blakely*. We granted defendant's motion to recall our remittitur in *Gorman II*—which the
Attorney General did not oppose—in order that we could again examine the *Blakely* issue
in light of *Cunningham*. The parties were given the opportunity to file additional briefing
on the issue.

On July 19, 2007, our Supreme Court issued decisions in *People v. Black* (2007)
41 Cal.4th 799 (*Black II*), and *People v. Sandoval* (2007) 41 Cal.4th 825 (*Sandoval*). We
provided the parties another opportunity to file letter briefs discussing the impact of these
decisions to this appeal, which we have received and reviewed. We now affirm.

## FACTS AND PROCEDURAL BACKGROUND

On April 2, 2001,[1] defendant and his friend Rachael Lane paid a visit to a man
they knew named Shawn Harrison who occasionally sold methamphetamine. Troy
Russell, Harrison's former brother-in-law, was also visiting Harrison at the time.
Harrison told his visitors that, earlier that day, he had sold some methamphetamine to a
man (later identified as Bruce James) who was staying at a nearby motel; he added that
the man appeared to have a lot of cash and was interested in obtaining the services of a
prostitute. Russell and Harrison had committed robberies together before, and the group
discussed the idea of taking James's money from him. Russell was not interested in the
idea, but defendant asked Harrison for James's room number at the motel. According to
Rachael Lane, the discussion about "ripping [James] off" was just a joke, and was not
serious. Russell testified that he never heard defendant use the word "rob."

Later that evening, around 7:00 or 8:00 p.m., defendant and Rachael Lane went to
the apartment of Amber Ladue, where they encountered Rachael Lane's brother, Michael

---

[1] All further references to dates are to the year 2001 unless otherwise specified.

2

Lane[2], and his girlfriend, Florence Laurel Anderson, who was a friend of Ladue's. Ladue lived not far from the motel where James was staying. Lane and Anderson were staying with their friend Gordon Combs in another apartment in the same building, and sometimes borrowed Ladue's apartment so they could have some privacy. Lane and Anderson asked defendant and Rachael Lane if they had any drugs,[3] and defendant responded by suggesting that they could obtain cash from James, either by fraudulently proposing to get drugs for him and keeping the money, or by offering him Anderson's services as a prostitute.

Lane did not want to feign a drug deal with James. Anderson was willing to act (or at least pose[4]) as a prostitute to get James's money, but Lane did not want her to do so. Nonetheless, Anderson and Lane agreed with defendant that the three of them would go to the motel, that Anderson would offer James her services as a prostitute, and that defendant would receive a share of whatever money Anderson and Lane could obtain from James, or of the drugs they would buy with it. Lane denied that they discussed robbing James.

---

[2] Michael Lane was also a friend of defendant's and was the actual perpetrator of the murder of which both he and defendant were convicted. He was also a principal witness for the prosecution at defendant's trial. For simplicity and clarity, we refer to Michael Lane as Lane, and to Rachael Lane by her full name.

[3] Defendant, Rachael Lane, Russell, Lane, Anderson, Ladue, and Combs were all methamphetamine users at the time of these events.

[4] There was a conflict in the evidence as to whether Anderson had previously worked as a prostitute, and as to whether the plan was that she would really offer her services as such to James, or merely pretend to be willing to do so. Lane testified at trial that Anderson fairly frequently sold her services for drugs or for money to buy drugs, and that he had accompanied her, for her protection, on a few prior occasions when she had conducted such a transaction with a stranger. He had told the police at one point during their investigation that Anderson never worked as a prostitute while she was involved with him, but he testified at trial that this statement was true only in the sense that Anderson prostituted herself solely to obtain drugs (or money for drugs), and not as a regular occupation. In any event, there is substantial evidence in the record that Lane and Anderson gained entry to James's motel room by suggesting to him—whether truthfully or not—that Anderson was available as a prostitute. Defendant does not argue otherwise on this appeal.

3

Before going to the motel, either Lane or Anderson asked Ladue for a knife with which to protect themselves, and told Ladue that defendant was "sending them [Anderson and Lane] on a mission." Defendant was there when they did so, but did not say anything. Ladue gave Lane a knife, and then went to sleep.[5]

Lane, Anderson, and defendant then walked together to the motel where James was staying. Lane and Anderson knocked on the door of James's room, telling him that "Shawn sent me," while defendant (as he had told Lane he planned to do) entered the room next door to James's in order to visit his friend Kelly Eyerley. It is undisputed that defendant was not in James's room during the ensuing events, and was not present when Lane killed James.

Lane testified as follows regarding the ensuing events. James appeared to be drunk when he came to the door to let him and Anderson into the room.[6] Lane and Anderson were surprised and upset to learn that James was Black, a piece of information that Harrison had not shared with defendant. Lane did not like or trust Black people, because his grandmother had been raped by a couple of Black men when she was young. Nonetheless, Anderson proceeded to offer James her sexual services for money. James accepted, but was unwilling to allow Lane to remain in the room to protect Anderson during the activity, so Lane went into the bathroom in order to remain nearby. Shortly

---

[5] There was a conflict in the testimony regarding whether Ladue was in her apartment when defendant, Lane, and Anderson discussed their plan. Lane testified that she arrived just as they were leaving. Ladue testified that she was in the apartment asleep, and they woke her up to ask for the knife.

Ladue was, generally speaking, a problematic witness. She suffered from a number of mental disorders, for which she was taking numerous medications at the time she testified against defendant. She acknowledged that her recollection of the relevant events was hazy, and that she was "having problems keeping things straight" in her testimony. For example, although she testified at defendant's trial that she gave the knife to Lane, she admitted that when she testified at Lane and Anderson's trial, she had not remembered whether she gave it to Lane or Anderson. Ladue was originally charged as an accessory after the fact in connection with James's murder, but agreed to testify against Lane, Anderson, and defendant in exchange for immunity.

[6] This testimony was corroborated by a forensic analysis showing that James had a blood-alcohol level of .26 percent when he died.

4

thereafter, Lane heard Anderson scream, and emerged from the bathroom to see James beating her. Lane then "freaked out," and stabbed James at least five times, killing him. Lane and Anderson then left the motel without taking the only money they saw in James's room, which amounted to only $20. Anderson took James's cigarettes and lighter.

According to Ladue, defendant returned to Ladue's apartment alone, some 20 minutes after he had left for the motel.[7] Ladue testified that defendant told her he was worried that something had gone wrong, because Lane and Anderson had not yet returned. Shortly thereafter, Lane and Anderson arrived, awakening Rachael Lane, who had been asleep on Ladue's couch. Both Lane and Anderson were very upset, and Anderson was crying. Lane had a large knife, which he hid under a sofa cushion; he told defendant that he had killed James. Defendant appeared to Lane to be shocked upon hearing this, but he nonetheless asked where James's money was; Lane replied that he did not know.

Upon hearing that James had been killed, defendant called Harrison, at Lane's request, and asked him to come and see him. Defendant and Lane had an argument about whether they should return to the motel room. Rachael Lane testified that it might have been defendant who wanted to do so, but she was not sure. According to Lane, however, he was the one who persuaded defendant to go back.[8] Lane and Anderson were angry because they believed that defendant had set them up by telling them incorrectly that James had a lot of money, and by not telling them that he was Black.

_____

[7] Lane also testified that he and Anderson returned to Ladue's separately from defendant. Rachael Lane testified that defendant, Lane, and Anderson all returned to Ladue's apartment together, but she also testified (as did Lane) that she had fallen asleep, and awoke again when they arrived.

[8] Lane told the police shortly after James's death that it was defendant who had insisted they return to the motel, claiming James had $500 or $600 in his possession. In his trial testimony, however, Lane contended that he had been lying when he said this, in an effort to blame someone else for James's death. As discussed *post*, defendant told the police he had gone back to the motel at Lane's insistence because he was afraid of Lane at that point.

5

Ultimately, Lane, Anderson, and defendant returned to the motel, accompanied by Harrison. Lane entered James's room by climbing in the bathroom window, and then opened the door to let in the others. Lane went through James's pockets and belongings and took his necklace, shoes, wallet, and a small sum in cash. Defendant did not take anything, but according to Lane, he helped Lane flip over the mattress, and either took James's credit card or accepted it from Lane.[9]

Later, in the early hours of the morning on April 3, Lane and Anderson went to Combs's apartment. Lane testified that he told Combs a version of the events that was consistent with his trial testimony, but he also admitted he might have told Combs (untruthfully, according to Lane's trial testimony) that they had gone to the motel to rob James. According to Combs, Lane not only told him that he had just killed a man at the motel, but also averred that he and Anderson had gone there to rob the man by having Anderson pose as a prostitute. Lane also told Combs that he had remarked to Anderson on the way to the motel that if things got out of hand, he might have to stab the intended robbery victim.

Ladue testified that around noon on April 3, she awoke and found Lane cleaning her knife, which he then wrapped in newspaper. Lane testified that he told Ladue that he had killed a man at the motel with Ladue's knife. Ladue testified that Lane also told her he had gone to the motel to rob the man. Ladue drove Lane and Anderson to a jetty or pier, where Lane threw the knife into the ocean, and then to a remote area in the woods, where Lane and Anderson burned their clothes.

James's body was discovered in his room by the motel housekeeper shortly after 10:00 a.m. on April 3. He had been stabbed four times in the back and once in the elbow,

---

[9] Lane's testimony was inconsistent regarding how, or even whether, defendant obtained James's credit card. Russell testified that defendant told him he had the card, but Russell never actually saw defendant with it. Russell did see Harrison with the credit card, however; Harrison was holding it when he told Russell that he and defendant had bought gas for Russell's truck, which Harrison had borrowed to give defendant a ride. The prosecution introduced evidence that the credit card had been used to buy gas at a nearby gas station on the morning after James's death.

6

and had bled to death. His room had been ransacked, and there were signs of a forced entry through the bathroom window.

A day or two later, Russell encountered defendant again. By then, word of the killing at the motel had circulated in the area, and defendant appeared to Russell to be worried about what had happened. Russell testified that defendant told him he had gone to the motel with Lane and Anderson, but had gone into the room next door to visit Eyerley. Russell said defendant told him that he had heard sounds of a "loud ruckus" from the next room, and that Lane had ended up stabbing the victim during a struggle. Russell interpreted what defendant said as indicating that Lane and Anderson had robbed the victim, but defendant did not actually use the word "rob." Defendant complained to Russell that Lane and Anderson had only given him (or him and Harrison) a credit card and a small sum of money (about $20), and that he believed they were "holding out on him." Russell also testified that defendant and Harrison made racially derogatory remarks about the victim, referring to him as "just another dead nigger, porch monkey, dead cricket, something like that."[10]

On April 10, about a week after James was killed, a police detective interviewed Lane and Anderson, and learned from them that defendant had been involved in the events leading up to the killing. The police spoke with defendant's family and asked them to have defendant to call them. On April 11, defendant voluntarily went to the police station to be interviewed. Defendant was not given any *Miranda*[11] warnings prior to the interview. A tape recording of the interview was played to the jury at defendant's trial. Defendant's trial counsel did not object to the admission of the tape recording.

In his interview with the police, defendant initially told a story about the events that the police told him they knew was not true. The police then told defendant that Lane and Anderson had been arrested, and had told them defendant was not in the room when

---

[10] Russell acknowledged at trial that he did not like defendant. Russell had an extensive criminal record and had been granted immunity for as many as 30 uncharged robberies in exchange for his testimony. Lane testified he had never heard defendant use the word "nigger."

[11] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

James was killed. Defendant then acknowledged that he had told Lane and Anderson about Harrison's report that James had a lot of money and wanted a prostitute. He also admitted that he had proposed to Lane and Anderson that they obtain James's money— either by promising to buy drugs with it and not returning, or by stealing it while Anderson distracted James with sex—and give defendant a share of the proceeds. He acknowledged going to the motel with Lane and Anderson, and spending a short time in Eyerley's room before returning to Ladue's apartment. He said he had not heard anything from James's room except a little bang on the wall, and that he had told Eyerley that Lane and Anderson were going to get James's money by pretending they would use it to buy drugs for him.

Defendant also acknowledged in the interview that after finding out that Lane had stabbed James, he went back to the motel with Lane at Lane's insistence; he averred that he was afraid Lane would stab him if he refused. Defendant explained that he called Harrison to accompany them to the motel, and that when they got there, he knocked on James's door but received no response. He said Lane and Anderson then went in through the window and let him and Harrison in through the door. Defendant contended he had only watched while Lane, Anderson, and Harrison rummaged through James's belongings and took his money, shoes, and jacket. Defendant vehemently denied having had any intent that the group would obtain James's money by any means other than pretending to use it to buy drugs for James.

Defendant, Lane, and Anderson were charged with murder and burglary. Defendant's trial was severed from that of Lane and Anderson,[12] and did not begin until October 22, 2002. In an amended information, defendant was charged with felony

---

[12] Lane and Anderson were tried jointly, and both had been convicted by the time defendant's trial began. Their convictions were affirmed by Division Five of this court in separate unpublished opinions. (*People v. Lane* (Dec. 1, 2003, A099502); *People v. Anderson* (Dec. 19, 2003, A099476).)

8

murder (Pen. Code, § 187, subd. (a)[13]) and second degree burglary (§§ 459, 460, subd. (b)).  On December 9, 2002, the jury found defendant guilty on both counts.

On January 24, 2003, defendant was sentenced to an indeterminate term of 25 years to life on the murder conviction, and the upper term of three years on the burglary conviction, to be served consecutively to the indeterminate term.  This timely appeal followed.

## DISCUSSION

### A. Jury Instructions on Felony Murder

With respect to the murder charge against defendant, the jury was instructed, based on CALJIC No. 8.27, that "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental."  In his opening brief on appeal, defendant argued that this instruction was erroneous because neither it nor any of the court's other instructions informed the jury that the killing had to be in furtherance of a common design or scheme on the part of defendant and the actual killer (i.e., Lane).

During the pendency of the appeal, however, the California Supreme Court decided *People v. Cavitt* (2004) 33 Cal.4th 187 (*Cavitt*), which "clarif[ied] a nonkiller's liability for a killing 'committed in the perpetration' of an inherently dangerous felony under Penal Code section 189's felony-murder rule. [Citation.]" (*Id.* at p. 193, fn. omitted.)  In so doing, the court rejected the argument that liability for felony murder requires that the killing be in furtherance of a common design.  Rather, the court held that "[t]he causal relationship [required by the felony-murder rule] is established by proof of a

---

[13]  All further statutory references are to the Penal Code unless otherwise indicated.

9

logical nexus, beyond mere coincidence of time and place, between the homicidal act and
the underlying felony the nonkiller committed or attempted to commit." (*Ibid.*) Thus,
although the felony-murder rule does not make a nonkiller liable for "homicidal acts that
are completely unrelated to the felony for which the parties have combined" (*id.* at
p. 201), neither does "the felony-murder rule . . . require proof that the homicidal act
furthered or facilitated the felony[; it requires] only that a logical nexus exist between the
two." (*Id.* at p. 203.) The court therefore rejected the contention that the jury instructions
on felony murder given in *Cavitt* were "deficient merely because the 'in furtherance'
phrasing was omitted." (*Ibid.*)

In keeping with this analysis, the court held that CALJIC No. 8.27, the source of
the felony-murder instruction given in *Cavitt* as well as in the present case, "adequately
apprise[s] the jury of the need for a logical nexus between the felonies and the homicide
in this case. To convict, the jury necessarily found that 'the killing occurred during the
commission or attempted commission of robbery or burglary' by 'one of several persons
engaged in the commission' of those crimes. The first of these described a temporal
connection between the crimes; the second described the logical nexus." (*Cavitt, supra*,
33 Cal.4th at p. 203, italics omitted.)

After the issuance of the Supreme Court's opinion in *Cavitt*, we requested
supplemental briefs regarding its impact on the present case. In his supplemental briefs,
defendant argues that, even under *Cavitt*, his felony-murder conviction was based on
insufficient jury instructions. Specifically, he contends that the jury could have found
that Lane's admitted racial animus toward James broke the causal link between the
parties' shared plan to steal James's money and Lane's murder of James, and that the jury
instructions did not adequately inform the jury that such a causal link was necessary.
(See *Cavitt, supra*, 33 Cal.4th at pp. 210-212 (conc. opn. of Werdegar, J.) [concurring in
result on basis of harmless error, but suggesting that felony-murder instructions be
clarified "to clearly explain that murder complicity under the felony-murder rule requires
not only a temporal relationship between commission of the felony and the killer's fatal
act, but also a logical or causal one"]; *id.* at p. 213 (conc. opn. of Chin, J. [agreeing that

10

existing instruction is adequate, but suggesting that courts should more clearly inform the jury of the need for a logical connection between the killing and the underlying felony].)

In *Cavitt*, however, the Supreme Court rejected a very similar contention that the causal link needed for felony murder was broken by the animus harbored toward the victim by the person whom the defendants *claimed* was the actual killer. Concededly, there is a factual difference between *Cavitt* and this case, in that here it is undisputed that defendant was *not* the actual killer. This difference has no bearing, however, on the degree of causal connection between the killing and the predicate felony.

As defendant's supplemental reply brief acknowledges, even if we were to hold that the felony-murder instructions given in this case were ambiguous, and might have been interpreted by the jury so as to be legally erroneous, we would still be obligated to inquire "whether there is a reasonable likelihood that the jury . . . applied the challenged instruction[s] in a way" that violated defendant's constitutional rights. (*Boyde v. California* (1990) 494 U.S. 370, 380.) On the record in this case, we find no such likelihood.

There was strong evidence of a causal connection, "beyond mere coincidence of time and place" (*Cavitt, supra,* 33 Cal.4th at p. 213 (conc. opn. of Chin, J.)), between the robbery or burglary[14] that defendant helped to plan, and the killing of James— who was the target of that felony— during the course of that crime. Among other facts supporting this connection, perhaps the most telling is that defendant was present when Lane borrowed Ladue's knife to take with him to the motel, and raised no objection to his doing so. The overall record simply does not permit us to discern a reasonable likelihood

---

[14] There is some ambiguity in the record as to whether the plan in which defendant participated was that Lane and Anderson would rob James, or that they would gain entry to his motel room through the offer (real or feigned) of Anderson's services, and then steal his money without the use of force or fear. Even the latter plan contemplated acts constituting burglary, however (see *People v. Nguyen* (1995) 40 Cal.App.4th 28, 30, 35 [entry into homes with owners' consent, with intent to steal property by giving worthless check in exchange for it, constituted burglary]), and thus constituted a factually sufficient basis for the jury's verdict of felony murder if the requisite causal connection was shown. Defendant does not argue otherwise.

that the jury found James was killed solely because of Lane's racial animus, rather than because of any causal connection with the robbery or burglary, but nonetheless was misled by the instructions into finding defendant guilty of felony murder.

## B. Admission of Evidence of Defendant's Use of Racial Slurs

As already noted, Russell testified that after James was murdered, defendant used a highly inflammatory racial slur to refer to James. Defendant's trial counsel objected to the admission of this evidence as more prejudicial than probative under Evidence Code section 352.[15] The trial judge was unwilling to instruct the witness to use another term in relating what defendant had said to him. The prosecutor argued, in effect, that defendant's overall admission to Russell was relevant to show defendant's guilt, and that his identification of the victim by race bolstered this by demonstrating that defendant was aware of the victim's identity. The trial judge agreed that because the statement was made in the context of a larger conversation in which defendant admitted to Russell that he had helped set up the robbery, it was relevant to the felony murder charge. He also reasoned that in the overall context of the case, defendant's isolated statement was unlikely to cause the jurors to have such a strong emotional reaction that they would not be able to decide the case fairly. Accordingly, he rejected defendant's section 352 argument.

Defendant now argues that this ruling was in error. He acknowledges that the applicable standard of review is abuse of discretion. (See, e.g., *People v. Coddington* (2000) 23 Cal.4th 529, 587, overruled on other grounds, *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Quartermain* (1997) 16 Cal.4th 600, 628 (*Quartermain*).) He urges, however, that in this case the challenged evidence was so inflammatory, and so nearly irrelevant, that this standard was met, and that the error was so prejudicial as to require reversal.

Defendant relies primarily on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*). In that case, the defendant was accused of nonviolent sexual offenses involving

---

[15] All references to statutes in part (B) of the Discussion section of our opinion are to the Evidence Code.

licking and fondling an incapacitated woman and a former consensual sexual partner. Under section 1108, which allows evidence of prior sex offenses in prosecutions for sex crimes, the trial court admitted evidence of a violent sexual offense committed by the defendant 23 years earlier. The Court of Appeal reversed, holding that the evidence should have been excluded under section 352 because its extremely inflammatory nature outweighed its marginal relevance. (*Id.* at pp. 737-742.)

In *Harris*, the court discussed five factors to be considered in weighing probative value against prejudicial effect under section 352, and found that all but one of them weighed heavily against admission. The challenged evidence was "inflammatory *in the extreme*" (*Harris, supra,* 60 Cal.App.4th at p. 738); was likely to confuse the jury (*id.* at pp. 738-739); was very remote in time (23 years earlier) (*id.* at p. 739); and lacked any significant probative value on a disputed issue (*id.* at pp. 739-741). The only factor favoring admission was that the presentation of the evidence did not occupy much time. (*Id.* at pp. 739, 741.)

We find *Harris* distinguishable. In the present case, the challenged evidence, though certainly unfavorable, was nowhere near as inflammatory as the graphic testimony of the defendant's prior victim that was involved in *Harris*. It was not likely to confuse the jury, was closely connected in both time and substance to the crimes of which defendant was accused, and required even less time to present than the evidence at issue in *Harris*. Admittedly, its probative value was fairly negligible, even as part of the overall context of defendant's admissions to Russell, because the latter were essentially cumulative of Lane's extensive eyewitness testimony, as well as defendant's own statements to the police and the testimony of the other witnesses. Nonetheless, we are not persuaded that the section 352 calculus employed by *Harris* yields the same result in the present case.

More to the point is *Quartermain, supra,* 16 Cal.4th 600, on which respondent relies. In that case, the Supreme Court rejected a capital defendant's argument that the trial court erred in not excluding evidence of his use of racial epithets to refer to the murder victim during his interviews with police. (*Id.* at pp. 627-629.) The court

13

reasoned that "the racial epithets were not so inflammatory that their probative value was substantially outweighed by their potential for undue prejudice," and that "[w]hile offensive, the use of such language by a defendant is regrettably not so unusual as to inevitably bias the jury against the defendant," especially where "the racial epithets were only a small portion of the evidence," and "the prosecutor did not argue that [the] defendant should be convicted because he was a racist." (*Id.* at p. 628.)

There is one significant difference between this case and *Quartermain*. Here, there is no evidence that defendant knew that James was Black until after his murder. On the contrary, the record indicates that prior to Lane and Anderson's entry into James's motel room, none of them was aware of his race. Thus, even if defendant's use of racial epithets to refer to James after his death indicated that defendant harbored racial animosity in general, there was no evidence indicating that his prejudices played, or even could have played, a role in his complicity for James's murder. Accordingly, the probative value of the evidence here was far more tenuous than it was in *Quartermain*. Nonetheless, when we view the present case in light of the *Quartermain* court's overall analysis of the section 352 issue, we reach the same result here.

Moreover, even if we were to find an abuse of discretion in the admission of the evidence, we still would not find that error to be a basis for reversing defendant's convictions. As the Supreme Court put it in *People v. Coddington, supra*, even if a trial court is held to have abused its discretion in admitting evidence, "reversal of the ensuing judgment is appropriate only if the error has resulted in a manifest miscarriage of justice. [Citations.]" (*People v. Coddington, supra,* 23 Cal.4th at pp. 587-588.) Given the strength of the overall case against defendant here, we are not persuaded that the admission of tangential evidence of his use of a racial epithet on one occasion was "so prejudicial that it denied [defendant] a fair trial in violation of his right to due process." (*Quartermain, supra,* 16 Cal.4th at p. 629.)

### C. Trial Counsel's Failure to Object to Admission of Defendant's Interview

As already noted, defendant was interviewed at the police station about a week after the murder, and the police did not give defendant any *Miranda* warnings before or

14

during the questioning. Defendant's trial counsel did not object to the playing of a tape recording of the interview for the jury. Before us, defendant argues that the admission of defendant's interview was prejudicial error, and that defendant's trial counsel therefore rendered ineffective assistance in failing to object.

"To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a more favorable result absent counsel's shortcomings. [Citation.] If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. [Citation.] [Wh]ere the record . . . hints at the existence of some tactical reason for counsel's decision . . . [, or a]t least, the record fails to eliminate that possibility[, the] defendant's claim must fail for purposes of [direct] appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068-1069.) Thus, as defendant acknowledges, we cannot reverse his conviction on the basis of ineffective assistance of counsel unless the record precludes the possibility that there was a reasonable, informed tactical basis for his trial counsel's failure to object to the admission of his interview. (See *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268; *People v. Wilson* (1992) 3 Cal.4th 926, 936.)

Respondent suggests one possible basis in the record indicating that trial counsel's failure to object was a reasonable tactical choice. As respondent points out, the record is clear that defendant went to the police station voluntarily, and was not arrested or handcuffed prior to his interview. Thus, respondent argues, trial counsel may have concluded that any objection would have lacked merit, because defendant's interview did not qualify as a custodial interrogation triggering the need for *Miranda* warnings. We find merit in this suggestion.

We note, in addition, that our review of the record reveals another potential explanation. Defendant's trial counsel made extensive references to the interview both in his opening statement and in his closing argument. Essentially, he used the statement to

15

enable him to explain defendant's side of the story to the jury without requiring defendant to waive his right against self-incrimination and subject himself to cross-examination. Thus, the record here reveals not one but two possible tactical reasons for counsel's decision not to object to the admission of defendant's interview. Accordingly, we must reject defendant's ineffective assistance of counsel claim.

### D. *Blakely-Cunningham* Sentencing

For his murder conviction, defendant received an indeterminate sentence of 25 years to life, with the possibility of parole. For his burglary conviction, defendant was sentenced to the three-year upper term. The trial judge ordered the determinate and indeterminate sentences to be served consecutively, starting with the determinate term.

At the sentencing hearing, the trial judge specifically singled out three aggravating factors that he was relying upon "in particular" in imposing the upper term for the burglary conviction: (1) that defendant's prior convictions as an adult were "numerous and quite serious"; (2) that defendant was on a grant of felony probation when the current offense was committed; and (3) that defendant's prior performance on probation was "unsatisfactory." The judge indicated, however, that he was also relying on *all* of the aggravating factors identified in the probation report, which included the following additional factors: (4) that the crime involved a high degree of callousness in that defendant returned to the location where the victim was murdered; (5) that defendant induced others, including Harrison, to return to the murder scene and commit burglary; (6) that the crime was carried out in a manner that revealed planning; and, (7) that defendant had engaged in violent conduct that revealed him to be a serious danger to society.

At the outset, we reject the Attorney General's claim that any *Blakely* error is waived because defendant failed to object in the trial court. Because of the constitutional implications of the error at issue, we question whether the waiver doctrine applies at all. (See *In re Sheena K.* (2007) 40 Cal.4th 875, 887 & fn. 7 [pure issues of constitutional law not forfeited by failure to object]; *People v. Vera* (1997) 15 Cal.4th 269, 276-277 [claims asserting deprivation of certain fundamental, constitutional rights not forfeited by failure

to object].)  Furthermore, there is a general exception to the rule where an objection would have been futile.  (See *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648 and authority discussed.)  We have no doubt that, at the time of the sentencing hearing in this case, an objection that the jury rather than the trial court must find aggravating facts would have been futile (see § 1170, subd. (b); Cal. Rules of Court, rules 4.409, 4.420, 4.421) because *Blakely* was not decided until after defendant was sentenced.[16]  We thus turn to the merits of the *Blakely* argument.

Defendant claims that the trial court's reliance upon the cited aggravating factors all involved subjective determinations which were required to be made by the jury, and were therefore improper under *Blakely*.  Defendant maintains the determinations that his prior convictions were "numerous and quite serious," that his performance on probation was "unsatisfactory," and that he was on probation at the time the instant offenses were committed, are subjective ones which must be determined by a jury.  The Attorney General maintains that all three factors on which the trial court relied were based on the fact of defendant's prior convictions, and thus involved features of "recidivism" which do not implicate *Blakely*.[17]

In *Cunningham*, the United States Supreme Court summarized California's determinate sentencing law (DSL), and how it fit within the right-to-jury decisions that began with *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*) and culminated with *Blakely*: "Under California's DSL, an upper term sentence may be imposed only when the trial judge finds an aggravating circumstance. . . .  [A]ggravating circumstances depend on facts found discretely and solely by the judge.  In accord with *Blakely*, therefore, the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum.  [Citation.]  Because circumstances in aggravation are found by the judge, not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt [citation], the DSL violates *Apprendi*'s bright-

---

[16] Defendant was sentenced on January 24, 2003; *Blakely* was decided on June 24, 2004.

[17] The Attorney General makes no reference to the four additional factors mentioned by the trial court.  We treat this silence as an implicit concession, with which we agree, that these factors cannot be used here because they involve subjects that must be decided by a jury.

17

line rule: Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' [Citation.]" (*Cunningham, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 868].) "[O]ur decisions from *Apprendi* . . . point to the middle term specified in California's statutes, not the upper term, as the relevant statutory maximum. Because the DSL authorizes the judge, not the jury, to find the facts permitting an upper term sentence, the system cannot withstand measurement against our Sixth Amendment precedent." (*Id.* at p. 871.)

The recent decisions in *Black II* and *Sandoval* have largely mooted the parties' contentions. Following those decisions, our analysis need not be extended.

As *Black II* summarized: "[U]nder the line of high court decisions beginning with *Apprendi* . . . and culminating in *Cunningham*, . . . the constitutional requirement of a jury trial and proof beyond a reasonable doubt applies only to a fact that is 'legally essential to the punishment' (*Blakely, supra*, 542 U.S. at p. 313), that is, to 'any fact that exposes a defendant to a greater potential sentence' than is authorized by the jury's verdict alone (*Cunningham, supra*, 549 U.S. at p. ___ [127 S.Ct. at p. 863]). . . . For this reason, we agree with the Attorney General's contention that as long as a single aggravating circumstance that renders a defendant *eligible* for the upper term sentence has been established in accordance with the requirements of *Apprendi* and its progeny, any additional fact finding engaged in by the trial court in selecting the appropriate sentence . . . does not violate the defendant's right to jury trial," "regardless of whether the facts underlying those circumstances have been found to be true by a jury." "Therefore, if one aggravating circumstance has been established in accordance with the constitutional requirements set forth in *Blakely*, the defendant is not 'legallyentitled' to the middle term sentence, and the upper term sentence is the 'statutory maximum.' " (*Black II, supra*, 41 Cal.4th at pp. 812-813.)

In *Sandoval*, the court held: "The United States Supreme Court has recognized two exceptions to a defendant's Sixth Amendment right to a jury trial on an aggravating fact that renders him or her eligible for a sentence above the statutory maximum. First, a

18

fact admitted by the defendant may be used to increase his or her sentence beyond the maximum authorized by the jury's verdict. (*Blakely, supra*, 542 U.S. at p. 303.) Second, the right to jury trial and the requirement of proof beyond a reasonable doubt do not apply to the aggravating fact of a prior conviction. ([*Blakely,*] at p. 301; *Apprendi, supra*, 530 U.S. at p. 490 . . . .)" (*Sandoval, supra*, 41 Cal.4th at pp. 836-837.)

The second of these exceptions is present here. The record reflects that defendant has at least a dozen felony and misdemeanor convictions. Under *Black II*, any one of those felony convictions made defendant eligible for imposition of an aggravated term. Any additional circumstances in aggravation found by the trial court are without constitutional significance. (*Black II, supra*, 41 Cal.4th at pp. 812-813.) Moreover, the large number of defendant's prior convictions establishes another of the factors in aggravation cited by the trial court, namely, that defendant's priors were "numerous." (*Id.* at pp. 815-816 [defendant with three misdemeanor and two felony convictions].) Accordingly, there was no error in sentencing defendant to an aggravated term for the burglary.

There was also no error in ordering the murder term to be served consecutive to the burglary term. The court in *Black II* reiterated its holding in *Black I* that imposition of consecutive sentences is not governed by *Apprendi, Blakely*, or *Cunningham*. (*Black II, supra*, 41 Cal.4th at pp. 817-818.) Those holdings are binding on us. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### DISPOSITION

Our prior decision in *Gorman II* is hereby vacated. The judgment of conviction is affirmed in all other respects.

_____
Richman, J.

We concur:

_____
Kline, P. J.

_____
Haerle, J.

A102310, *People v. Gorman*

# EXHIBIT D

1          IN THE HUMBOLDT COUNTY SUPERIOR/MUNICIPAL COURT

2                IN AND FOR THE STATE OF CALIFORNIA

3                HON. DALE A. REINHOLTSEN, JUDGE

4

5

6   PEOPLE OF THE STATE OF CALIFORNIA,

7
                              Plaintiff,
8       vs.                                    CASE NO: CR011617CS

9   MICHAEL THOMAS GORMAN,

10
                              Defendant.
11   _____/

12

13                    R E P O R T E R ' S

14                    T R A N S C R I P T

15                            O F

16                 P R O C E E D I N G S
                         *   *   *
17

18        JANUARY 8, 2003  -  PAGES 1755-1777

19        JANUARY 24, 2003  -  PAGES 1778 - 1793
                         *   *   *
20

21

22

23

24                 A P P E A R A N C E S

25   FOR THE PEOPLE:                FOR THE DEFENDANT:

26   TERRY R. FARMER                GLENN BROWN
     DISTRICT ATTORNEY              CONFLICT COUNSEL
27   825 Fifth Street               931 Third Street
     Eureka, CA 95501               Eureka, CA  95501
28   BY:  ROB WADE                  BY:  EDDIE SCHROCK
     Deputy District Attorney       Deputy Conflict Counsel

                 KATHY COLLINGS, CSR #7938

1775

1           IN THE HUMBOLDT COUNTY SUPERIOR/MUNICIPAL COURT

2               IN AND FOR THE STATE OF CALIFORNIA

3                 HON. DALE A. REINHOLTSEN, JUDGE

4

5

6   PEOPLE OF THE STATE OF CALIFORNIA,

7                               Plaintiff,

8       vs.                              CASE NO: CR011617CS

9   MICHAEL THOMAS GORMAN,

10                              Defendant.

11   _____/

12

13                   R E P O R T E R ' S

14                   T R A N S C R I P T

15                         O F

16               P R O C E E D I N G S

17                       *   *   *

18           WEDNESDAY, JANUARY 8, 2003

19                       *   *   *

20

21

22

23

24           A P P E A R A N C E S

25   FOR THE PEOPLE:              FOR THE DEFENDANT:

26   TERRY R. FARMER              GLENN BROWN
     DISTRICT ATTORNEY            CONFLICT COUNSEL
27   825 Fifth Street             931 Third Street
     Eureka, CA 95501             Eureka, CA   95501
28   BY:   ROB WADE               BY:   EDDIE SCHROCK
     Deputy District Attorney     Deputy Conflict Counsel

KATHY COLLINGS, CSR #7938

1776

1      WEDNESDAY, JANUARY 8, 2003

2                        .   .   .

3           THE COURT:  Calling the matter of People versus

4  Michael Gorman, file CR011617C.  Mr. Gorman is present

5  represented by Mr. Schrock, Mr. Wade representing the

6  People, time set for sentencing in this matter.  Parties

7  ready to proceed?

8           MR. SCHROCK:  No, your Honor.  I am filing a

9  motion tomorrow, and I didn't actually start to work on the

10  body of it until I had the report of the probation officer.

11  So I would imagine Mr. Wade's going to want some time to

12  review that.

13           I had originally been informed by my client that

14  he wanted a couple of weeks before he was sent to the

15  Department of Corrections.  His mother is here today.  I

16  informed him that I think we should delay his sentencing.  I

17  guess two weeks would be probably a safe amount of time, so

18  I could file the motion tomorrow, and that would be my

19  request at this time.

20           THE COURT:  Mr. Gorman, is that acceptable to you?

21           THE DEFENDANT:  Yeah.

22           THE COURT:  Mr. Wade?

23           MR. WADE:  Submitted.

24           THE COURT:  All right.  Is the motion something

25  that Mr. Wade has to respond to?  Do you think there is

26  going to be argument?

27           MR. SCHROCK:  I don't know if he will respond to

28  it.  It is an eighth amendment motion.  I don't know if he

1777

1  will want to respond or not.

2         THE COURT:  Okay.  We could do it Wednesday the

3  22nd, Friday the 24th or Monday the 27th.

4         MR. SCHROCK:  Whatever is convenient for the

5  Court.

6         THE COURT:  Mr. Wade.

7         MR. WADE:  I believe any of the dates would be

8  fine, your Honor.

9         THE COURT:  All right.  We will continue the

10  matter for sentencing to Friday, January 24th at 2:00.

11         There is one thing I was going to ask you about.

12  The probation report, the credits they are talking about, I

13  would be interested in at the time of sentencing somebody

14  explaining to me the conduct credit calculation.

15         MR. WADE:  We will take that up.

16         THE COURT:  All right.  Thank you.

17                        .   .   .

18

19

20

21

22

23

24

25

26

27

28

1778

1        IN THE HUMBOLDT COUNTY SUPERIOR/MUNICIPAL COURT

2             IN AND FOR THE STATE OF CALIFORNIA

3             HON. DALE A. REINHOLTSEN, JUDGE

4

5

6   PEOPLE OF THE STATE OF CALIFORNIA,

7                          Plaintiff,

8      vs.                          CASE NO: CR011617CS

9   MICHAEL THOMAS GORMAN,

10

11                          Defendant.
                                        /

12

13                  R E P O R T E R ' S

14                  T R A N S C R I P T

15                        O F

16                P R O C E E D I N G S

17                     *   *   *

18             FRIDAY, JANUARY 24, 2003

19                     *   *   *

20

21

22

23

24             A P P E A R A N C E S

25  FOR THE PEOPLE:              FOR THE DEFENDANT:

26  TERRY R. FARMER              GLENN BROWN
    DISTRICT ATTORNEY            CONFLICT COUNSEL
27  825 Fifth Street             931 Third Street
    Eureka, CA 95501             Eureka, CA  95501
28  BY:  ROB WADE                BY:  EDDIE SCHROCK
    Deputy District Attorney     Deputy Conflict Counsel

KATHY COLLINGS, CSR #7938

1779

1          FRIDAY, JANUARY 24, 2003

2                          .   .   .

3          THE COURT:  All right.  Call the matter of People

4   versus Michael Gorman.  Mr. Gorman is present represented by

5   Mr. Schrock; Mr. Wade representing the People.  This is

6   presently scheduled for sentencing.  Are the parties ready

7   to proceed?

8          MR. SCHROCK:  Yes, your Honor.

9          MR. WADE:  Yes, your Honor.

10         THE COURT:  All right.  Then for the record I have

11  reviewed the report of the probation officer filed on

12  December 31st, 2002.  And also I have reviewed the

13  defendant's motion to strike the murder conviction that was

14  filed on January 10, 2003.  Any legal cause why sentence

15  should not now be pronounced?

16         MR. SCHROCK:  No, your Honor.

17         THE COURT:  Arraignment for judgment waived?

18         MR. SCHROCK:  It is.

19         THE COURT:  All right.  Mr. Schrock.

20         MR. SCHROCK:  The comments I would have at this

21  juncture are with respect to Mr. Saul's recommendation that

22  the sentences run consecutively.  I believe it is quite

23  clear that the focus of the enterprise was Mr. James's

24  money.  The evidence established that the burglary was

25  accomplished to get the money.  That wasn't acquired -- or

26  try to locate property that wasn't acquired during the

27  robbery, so I would ask the Court run those sentences

28  concurrently.  If the Court is not inclined to grant my

1780

1  motion --

2         THE COURT:  Mr. Wade.

3         MR. WADE:  In response to that, your Honor, I -- I

4  would note first of all that these two crimes were separate.

5  There was a robbery and killing of the victim.  In this case

6  Mr. Gorman, Mr. Lane and Ms. Anderson went down to the

7  motel, got into the room, Mr. Gorman went next door and Lane

8  and Anderson got into the room, killed the victim, took some

9  things, arguably, left.  Mr. Gorman went back up with them

10  to the Ladue apartment and then they went back on a separate

11  instance with the door locked, broke in through the back

12  window and came in again.  That is a separate crime and

13  separate second degree burglary.

14         I just note -- first of all, I think that it is

15  appropriate that the sentence be consecutive because that is

16  a separate crime that was independently committed.  It

17  wasn't part of just the ongoing situation such as Penal Code

18  Section 6542 addresses.  And just also to note that both

19  Mr. Lane and Ms. Anderson who were previously convicted in a

20  separate trial concerning these charges, that that second

21  degree burglary was run consecutively with regards to each

22  of them.

23         THE COURT:  Anything else on the motion to strike

24  the murder conviction?

25         MR. SCHROCK:  Submitted on the pleadings.

26         THE COURT:  Okay.  Mr. Wade.

27         MR. WADE:  Your Honor, I -- I read this.  I don't

28  think that the People need to respond other than to say

1  under the circumstances this is not a situation of -- one of
2  the things that Mr. Schrock talked about is that Mr. Gorman
3  was not present when the defendant was killed, was not the
4  principal in this crime, and was unarmed.  The Court should
5  nevertheless impose the aggravated term.

6          Mr. Gorman, in my opinion, was very clearly a
7  principal in this case.  Mr. Gorman is the person who set
8  this in motion.  Mr. Gorman is the person who talked with
9  Troy Russell and Shawn Harrison, and was present when Shawn
10 Harrison asked Troy Russell, "Do you want to go rob this
11 fellow?"

12         Mr. Russell said he didn't want to do that.
13 Mr. Gorman showed lots of interest, got the exact location,
14 description of the fellow, went and talked to Lane and
15 Anderson about that, told him Shawn Harrison sold the person
16 drugs as Mr. Lane stated in his statements to law
17 enforcement, and we got from him when he testified here.

18         They used Shawn Harrison's name to get into the
19 room.  The only way they could have gotten that -- even
20 though the victim was apparently still baffled at who Shawn
21 Harrison was, being woken up as he was, but nevertheless
22 Mr. Gorman is the person who set the entire robbery in
23 motion, went and got a knife along with Lane and Anderson
24 from Ms. Ladue.  He told Ms. Ladue he was sending Lane and
25 Anderson on a mission.  And with all of those things, he is
26 clearly a principal in this case.  This is not cruel and
27 unusual punishment.  This is a person who set up a robbery
28 and a person was murdered during the course of that robbery,

1  and Mr. Gorman is appropriately convicted of this.

2          It is not a tangential situation in terms of he
3  barely knew what was going on.

4          It is not a person who was sitting out in the car
5  maybe driving and not fully understanding exactly what is
6  happening.  Mr. Gorman was intermittently involved in the
7  planning of this.  In terms of locating Lane and Anderson to
8  do this, locating someone to get them into the room as a
9  hooker.  He was directly connected with obtaining the
10 weapon.  He was directly involved with going down to the
11 motel room and standing by while the other two went into the
12 victim's room, and then he was directly involved in bringing
13 them back.  When they came back and they said they didn't
14 have this six hundred dollars or whatever that Mr. Gorman
15 had been led to expect the victim had, he was directly
16 involved in taking them back and getting them all to go back
17 to the motel room.

18         So under the circumstances, we don't believe that
19 there is any argument under the eighth amendment that this
20 is cruel and unusual punishment.  I understand Mr. Schrock's
21 argument in terms of what the present governor is doing, and
22 there have been but two people paroled.  But that is a
23 situation that I think stands to be changed and could be
24 changed at any time, certainly before Mr. Gorman is even
25 eligible for parole.  I think that -- and I think that that
26 is something that will very clearly come up.  But under the
27 law at this point, the governor is exercising authority that
28 was given to him by the voters to review parole decisions,

1783

1   and rightly or wrongly, the present governor has made those
2   types of decisions.  But I don't know that that is in any
3   way predictive of where Mr. Gorman will be at the time he
4   becomes eligible for parole.

5       THE COURT:  Okay.  All right.  A couple of
6   housekeeping items first.  I will not -- we are all quite
7   familiar with everything involved here, and I will not spend
8   a lot of time.  I think I need to do some basic things.
9   First I did neglected to indicate that I had looked at the
10  -- Mr. Wade referred to the newspaper article.  I read the
11  Points and Authorities which included a newspaper article
12  from the San Francisco Chronical dated Tuesday, December
13  17th, 2002.

14      Also there was a letter from Ms. --

15      MR. SCHROCK:  Teague.

16      THE COURT:  Ms. Teague who is Mr. Gorman's mother
17  dated January 10th which I read also.

18      One other thing, I recall that there was a motion
19  to amend the information to specify the prosecution's theory
20  of murder which was specified that it was felony-murder, and
21  I think that I took that under submission.  I don't know
22  that I ruled on it, but I would grant the motion under Penal
23  Code Section 1009.  It is within the Court's discretion to
24  grant the motion to amend the information to reflect the
25  specific theory upon which the People were pursuing rather
26  than have the general 187 type allegation.  For the record,
27  I would grant that motion.

28      The motion that is filed on behalf of Mr. Gorman

1   to strike the murder conviction and the ultimate remedy

2   sought is that the murder conviction should be stricken, and

3   substituted a conviction of first degree robbery, and

4   essentially sentence Mr. Gorman to the aggravated term for

5   that offense.

6          I think the law seems to contemplate sort of an

7   analysis at the sentencing level as well as the appellate

8   court level.  That seems to be set forth in People versus

9   Dillon 34 Cal.3rd 441 starting at 477.  That case refers to

10  in re Lynch, 8 Cal.3rd 410.  And you start out with the

11  proposition, as I understand it, that you have a separation

12  of powers, and that the legislature is the body of

13  government which is designed or has the power to define what

14  crimes are, and also to define what the punishment is.  And

15  then the Courts by applying the constitutional prohibition

16  for -- concerning prohibition against cruel and unusual

17  punishment is a check and balance on the punishment that is

18  imposed.

19         And if the punishment is grossly disproportionate

20  to the offense for which it is being imposed then the Courts

21  in the past have -- some Courts in the past have stricken

22  the sentence or modified the punishment, and those sorts of

23  cases are discussed in Lynch, People versus Dillon and cases

24  thereafter.

25         The Dillon case which is the Supreme Court case

26  suggests the Court should undergo an analysis considering

27  both the nature of the offense and the offender in

28  determining whether a sentence is cruel and unusual

1   punishment.  And, obviously, the sentence you are talking
2   about here is a sentence of twenty-five years to life for
3   murder based on the felony-murder theory.  And I will just
4   sort of briefly go through the analysis I went through at
5   least in my own mind which is not that much different than
6   the analysis in the probation report.  It will not be
7   necessarily duplicative.  But in looking at the nature of
8   the offense and with all deference to Mr. Gorman's position
9   at the time of trial, I think the evidence and reasonable
10  inferences that could be drawn from that evidence supports a
11  conclusion that Mr. Gorman was, in fact, the leader of this
12  group.

13          The evidence supports a conclusion, and this goes
14  under the nature of the offense allegation.  It supports a
15  conclusion that Mr. Gorman and Ms. Lane ran into
16  Mr. Harrison.  They learned of the presence of the victim in
17  the motel and perhaps the victim's willingness or desire to
18  purchase drugs and or sex, the information that he had a lot
19  of money.  You could infer from the evidence that Mr. Gorman
20  was unsuccessful in convincing Mr. Harrison or Mr. Russell
21  to participate in attempting to obtain money from the
22  victim, so the next source was Lane and Anderson.  One can
23  infer from the evidence that Mr. Gorman was present,
24  discussed this with Mr. Lane and Ms. Anderson, was present
25  when Mr. Lane got a knife to take with him, was present when
26  they went down to the location of the motel, went into the
27  next room and waited while Lane and Anderson went into the
28  room and this act occurred.

1    Something happened and Mr. Gorman then went back

2   to Ms. Ladue's apartment, made statements to Ms. Ladue

3   concerning that something must have gone wrong, and it

4   shouldn't have taken this long, was there when Lane and

5   Anderson came back.  And there was a discussion of the

6   fellow having been killed, and then he went back to the

7   motel and essentially participated in ransacking the room

8   and further searching the room in which the victim was

9   laying dead.

10    The explanation that Mr. Gorman -- that was

11   presented on behalf of Mr. Gorman in terms of why he went

12   back to me does not -- the evidence to me doesn't support

13   that.  The problem I have with that version of the incident

14   is the testimony concerning the number of times that

15   Mr. Gorman attempted to call Mr. Russell or Mr. Harrison

16   after it was learned there was no money there.  And all of

17   the sudden Mr. Harrison shows up and Mr. Harrison

18   accompanies them back to the motel room, and Mr. Harrison

19   was present when one or all of the people went through the

20   room, went through the body -- his body looking for money.

21    It seems to me all of that evidence suggests --

22   the inferences I draw from the evidence at least -- that

23   Mr. Gorman, in fact, was the planner of this operation.  I

24   could be wrong.  I obviously wasn't there.  I don't know

25   what was inside people's heads.  That is the impression I

26   had, having heard the trial twice, that Mr. Gorman was, in

27   fact, the person who orchestrated the whole procedure.  I

28   don't necessarily think Mr. Gorman thought Mr. Lane was

1  going to for whatever reason kill Mr. -- the victim, but I
2  do think the felony-murder rule is designed to prohibit
3  exactly this activity where people get together, cook up a
4  plot to do whatever they are going to do, and they do it and
5  somebody gets killed when it is certainly reasonably
6  foreseeable for that to happen.

7        And in this case where you are going to a motel
8  room where a stranger resides, where you are going to
9  attempt to in some form or another take that person's money
10 and one of the participants arms themselves with a knife and
11 goes there, it is not -- it should not be too unforeseeable
12 to anybody that is participating in something like that,
13 that somebody could get hurt and it did happen in this case.
14 Somebody got hurt.

15        So it seems to me in terms of the nature of the
16 offense that this is exactly the type of offense the
17 felony-murder rule was designed to impose criminal
18 culpability for the type of offense in which someone
19 orchestrates an event, the event is inherently dangerous, it
20 is clearly foreseeable somebody could be hurt and/or killed,
21 and it happens so in terms of the nature of the offense.
22 And Mr. Gorman's role in the offense seems to me it is
23 distinguishable from a lot of the cases where you have a
24 seventeen-year-old kid, a high school honor student who
25 happens to get involved with a group of people and somebody
26 gets killed.  That is not what we have here.

27        The second aspect of the analysis is looking at
28 the offender, and the offender in this case being

1    Mr. Gorman.  Some of the factors that the Supreme Court said
2    to look at is the age, prior criminality, personal
3    characteristics, state of mind.  In this case, at the time
4    of the offense, Mr. Gorman was twenty-seven, Mr. Lane was
5    nineteen.  Prior criminality is set forth in the probation
6    officer's report.  But we have a history of criminality
7    going back to February of 1995.  We have multiple offenses,
8    most of them involving misdemeanor drug offenses, but we do
9    also have October of '96 Mr. Gorman was placed on supervised
10   probation for misdemeanor receiving stolen property.
11   December of '96 he is placed on felony probation for
12   receiving property, 11377(a.)  In January of '98, he is
13   placed on supervised probation for again receiving stolen
14   property, a misdemeanor.  March of '99, felony 11377(a,) and
15   that doesn't list all of the offenses.  We have misdemeanors
16   on which he was placed on supervised probation, two prior
17   felony convictions, a history of not being successful on
18   probation, and then the state of mind with which Mr. Gorman
19   operated in this matter.
20          Again I could be wrong, but it seems to me
21   Mr. Gorman was the person who sought out, learned of the
22   opportunity, decided to take advantage of it.  When he could
23   not prevail on Mr. Harrison and Mr. Russell to perform the
24   task, prevailed on Mr. Lane and Ms. Anderson.  And, frankly,
25   did not participate, sort of stood on the sidelines waiting
26   for the job to be done and get his share of the take.
27          So for all of those reasons, it just seems to me
28   that the analysis that is required under People versus

1  Dillon and In Re Lynch when it is applied to this case that

2  imposition of the maximum the sentence that could be imposed

3  for felony-murder is not cruel and unusual punishment in

4  this case because of the nature of the crime, the nature of

5  the offense and nature of the offender.

6          I will not duplicate all of that discussion, but I

7  think that that analysis, going back to the room, seeking

8  out Mr. Harrison to go back, the separate offense, going

9  back to -- going to the motel room and looking for the money

10 and/or other personal property that is apparently missed by

11 Mr. Lane the first time around suggestions that these are

12 separate events and should be sentenced consecutively.

13         So in this matter, I will follow the

14 recommendation of the probation officer, find that

15 Mr. Gorman is not eligible for probation in this matter,

16 further find that pursuant to the factors that are set forth

17 in aggravation and mitigation for the second degree burglary

18 that the aggravating factors outweigh any mitigating factors

19 so that the upper term for the burglary should be imposed.

20 Those factors in particular that I am relying on,

21 4.42(b)(2), defendant's prior convictions as an adult are

22 numerous and quite serious.  4.42(b)(4), defendant's on a

23 grant of felony probation when the present offense is

24 committed.  4.21.5(b), defendant's prior performance on

25 probation was unsatisfactory.  So for all of the reasons, I

26 think the upper term for violation of second degree

27 burglary, 459, should be imposed.

28         So in this matter, Mr. Gorman, I will follow the

1    recommendation of the probation department for the violation

2    of Section 187 subdivision A of the Penal Code, first degree

3    murder, based on a theory of felony-murder, you will be

4    sentenced to the California Department of Corrections for a

5    period of twenty-five years to life with the possibility of

6    parole.  For the crime of violation of 187 subdivision A of

7    the Penal Code as stated in Count One, you will further be

8    committed to the California Department of Corrections for a

9    term of three years for the crime of violation of 459

10   subdivision B of the Penal Code, second degree burglary, as

11   stated in Count Two.  That commitment shall be consecutive

12   and shall be served prior to Count One for a total prison

13   term of three years plus twenty-five years to life with a

14   possibility of parole.

15            Pursuant to 1202.4(b), there will be a restitution

16   fine in the amount of ten thousand dollars payable to and at

17   the direction of the California Department of Corrections

18   pursuant to 1202.4 subdivision F subdivision 2 you will be

19   required to pay restitution in an amount to be determined to

20   the victims listed in the probation officer's report Lotoya

21   L-O-T-O-Y-A Bliss, Bruce Bliss and Cory Bliss in care of the

22   restitution fund, California Victim Compensation, Government

23   Claims Boards, P.O. Box 3063, Sacramento, California,

24   payable through the California Department of Corrections.

25   The California Department of Corrections shall initiate

26   provisions set forth in 13959 of the California Government

27   Code in and when applicable.

28            I would also advise you that the period of parole

 1 | in this matter, Mr. Gorman, is life parole.  Should you be
 2 | released on parole from the California Department of
 3 | Corrections you would be on life parole which could be
 4 | terminated upon review after seven years, and that is
 5 | pursuant to Penal Code Section 3000(b)(2), 3000.1
 6 | subdivision B.

 7 |        The one question I have subject to comments from
 8 | counsel would be credits.  I am not clear the calculation of
 9 | credits that Mr. Saul -- my calculation is as of today's
10 | date Mr. Gorman has 654 actual days.

11 |        MR. WADE:  I would defer to the Court.  I know
12 | that is greater than Mr. Saul's.

13 |        THE COURT:  He started out at 638 through January
14 | 8.  We add the time from then to now, that is 16 days.  So I
15 | get the 654 actual.  What I am not clear on is the conduct
16 | credits they arrived at.

17 |        MR. SCHROCK:  We believe he should receive full
18 | conduct credits for the first sentence.  He will serve the
19 | violation of Section 459.

20 |        MR. WADE:  I don't disagree with that.

21 |        THE COURT:  I think so too.  That is what we will
22 | do.  And if the Department of Corrections says we are wrong,
23 | they can tell us.

24 |        As to Count Two, three year sentence, upper term,
25 | for the second degree burglary, Mr. Gorman will be afforded
26 | 654 actual days.  And 326 4019 days for a total of 980 days
27 | credit against the three year term for the second degree
28 | burglary which is to be served prior to Mr. Gorman serving

1792

1  the sentence of twenty-five years to life for the murder

2  conviction.

3         Mr. Gorman, you will be remanded to the custody of

4  the Humboldt County Correctional Facility for delivery to

5  the appropriate center at the California Department of

6  Corrections to serve that sentence.  I guess I didn't say it

7  for the record.  I will deny the motion to strike the murder

8  conviction.

9         MR. SCHROCK:  Okay.  Mr. Gorman -- if it is

10  agreeable with staff to wait for his sentencing minutes,

11  that would be helpful for him when he arrives at CDC.

12         THE COURT:  I want to advise you of your right to

13  appeal, Mr. Gorman, which you certainly have.  You have a

14  right to appeal from the sentencing judgment.  If you wish

15  to appeal, you must file written notice of appeal with the

16  clerk of the court within sixty days of today's date.  If

17  you appeal, you are unable to hire an attorney, the

18  appellate court will appoint an attorney to represent you

19  free of charge.  You have a right to free transcript and

20  record of the necessary proceedings of the court.

21         Do you understand your rights to appeal,

22  Mr. Gorman?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  It has to be filed within 60 days.

25         MR. SCHROCK:  I would indicate for the record as I

26  indicated for my client, I had the notice of appeal all

27  ready to go at the office.  He has indicated that he will

28  appeal the matter, and due to my haste to get over here

1793

1  after getting out of courtroom five, I left it there.  So I

2  want to make that clear on the record, and I will have my

3  investigator run it up to Mr. Gorman tomorrow and have him

4  sign it and have it filed.

5          THE COURT:  Okay.  Thank you.

6                              .    .    .

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1                              REPORTER'S CERTIFICATE

2

3   State of California)

4                      )ss.

5   County of Humboldt )

6

7          I, KATHY COLLINGS, a Certified Shorthand Reporter,

8   State of California, do hereby certify that I am the

9   Reporter who reported the above and foregoing proceedings in

10  the matter of People v. Gorman at the time and place therein

11  mentioned previously; that I reported the same fully and

12  correctly; that the forgoing pages listed below constitute a

13  full, true, complete and correct transcription of my

14  shorthand notes taken at said time and place; and that said

15  pages are a full, true, complete and correct statement of

16  the proceedings then and there had.

17

18            DATE                        PAGES

19      November 13, 2002            234   -   338
        November 14, 2002            339   -   444
20      November 15, 2002            445   -   515-6
        November 25, 2002            989   -   1087
21      November 26, 2002            1088  -   1193
        November 27, 2002            1194  -   1280
22      December 9, 2002             1758  -   1774
        January 8, 2003              1775  -   1777
23      January 24, 2003             1778  -   1793

24        DATED this 19th day of March 2003.

25

26                              _____
                                KATHY COLLINGS, CSR 7938
27

28

KATHY COLLINGS, CSR #7938

1                    REPORTER'S CERTIFICATE

2

3   State of California)

4                    )ss.

5   County of Humboldt )

6

7          I, KATHY COLLINGS, a Certified Shorthand Reporter,

8   State of California, do hereby certify that I am the

9   Reporter who reported the above and foregoing proceedings in

10  the matter of People v. Gorman at the time and place therein

11  mentioned previously; that I reported the same fully and

12  correctly; that the forgoing pages listed below constitute a

13  full, true, complete and correct transcription of my

14  shorthand notes taken at said time and place; and that said

15  pages are a full, true, complete and correct statement of

16  the proceedings then and there had.

17

18              DATE                        PAGES

19      November 13, 2002              234   -   338
        November 14, 2002              339   -   444
20      November 15, 2002              445   -   515-6
        November 25, 2002              989   -   1087
21      November 26, 2002              1088  -   1193
        November 27, 2002              1194  -   1280
22      December 9, 2002               1758  -   1774
        January 8, 2003                1775  -   1777
23      January 24, 2003               1778  -   1793

24          DATED this 19th day of March 2003.

25

26

                         KATHY COLLINGS, CSR 7938
27

28

KATHY COLLINGS, CSR #7938