IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MICHAEL THOMAS GORMAN,      )    No. C 07-2883 SBA (PR)
                              )
          Petitioner,     )    **ORDER DENYING PETITION FOR**
                              )    **WRIT OF HABEAS CORPUS**
   v.                  )
                              )
IVAN D. CLAY, Warden,       )
                              )
         Respondent.    )
_____ )

## INTRODUCTION

This matter is now before the Court for consideration of Petitioner's pro se amended petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2002 conviction in Humboldt County Superior Court. Respondent Ivan Clay, Warden of the Sierra Conservation Center, opposes the petition. Although given the opportunity to do so, Petitioner has not filed a traverse. For the reasons discussed below, the petition is DENIED as to all claims.

## BACKGROUND

### I.   Case History

On December 29, 2002, a jury in Humboldt County Superior Court convicted Petitioner of murder (Cal. Penal Code § 187 [count 1]) and second degree burglary (Cal. Penal Code §§ 459, 460(b) [count 2]). On January 10, 2003, the trial court sentenced Petitioner to state prison for a term of twenty-five years to life for the murder, and a consecutive term of three years for the burglary.

On appeal, the California Court of Appeal affirmed the conviction in an unpublished opinion on January 27, 2005, but remanded to the trial court for re-sentencing after finding error under Blakely v. Washington, 542 U.S. 296 (2004). The California Supreme Court vacated that opinion, and eventually the California Court of Appealed affirmed both the conviction and the sentence in an

1   unpublished opinion on December 4, 2007.[1]  The California Supreme Court thereafter denied a

2   petition for review.

3          The instant petition was filed on June 4, 2007, and was assigned to Judge Martin J. Jenkins.

4   On July 30, 2007, Judge Jenkins granted Petitioner's motion for a stay while Petitioner exhausted a

5   fourth claim in the state courts.  On March 20, 2008, Petitioner filed an amended petition and a

6   motion to reopen the case on the grounds that the claim had been exhausted.  Judge Jenkins

7   reopened the case and ordered Respondent to show cause on March 31, 2008.  After the case was

8   reassigned to the undersigned, the Court issued a second order to show cause on November 3, 2008.

9   After receiving extensions of time, Respondent filed an answer and memorandum of points and

10  authorities on June 1, 2009, and lodged a number of exhibits.  Petitioner did not file a traverse.

11  **II.    Statement of Facts**

12         The following facts are taken from the opinion of the California Court of Appeal.

13
        On April 2, 2001,[2] defendant and his friend Rachael Lane paid a visit to a man
14      they knew named Shawn Harrison who occasionally sold methamphetamine.
        Troy Russell, Harrison's former brother-n-law, was also visiting Harrison at
15      the time.  Harrison told his visitors that, earlier that day, he had sold some
        methamphetamine to a man (later identified as Bruce James) who was staying
16      at a nearby motel; he added that the man appeared to have a lot of cash and
        was interested in obtaining the services of a prostitute.  Russell and Harrison
17      had committed robberies together before, and the group discussed the idea of
        taking James's money from him.  Russell was not interested in the idea, but
18      defendant asked Harrison for James's room number at the motel.  According
        to Rachael Lane, the discussion about "ripping [James] off" was just a joke,
19      and was not serious.  Russell testified that he never heard defendant use the
        word "rob."
20
        Later that evening, around 7:00 or 8:00 p.m., defendant and Rachael Lane
21      went to the apartment of Amber Ladue, where they encountered Rachael
        Lane's brother, Michael Lane,[3] and his girlfriend, Florence Laurel Anderson,
22

23      _____

24         [1]In the interim, the California Court of Appeal issued two opinions affirming the conviction
    and sentence pursuant to the California Supreme Court's decision in People v. Black, 35 Cal. 4th 1238
25  (2005).  The United States Supreme Court reversed the decision in Black, and thus the California Court
    of Appeal vacated each of these two opinions, before issuing its final affirmance on December 4, 2007.
26

27         [2]All further references to dates are to the year 2001 unless otherwise specified.

28         [3]Michael Lane was also a friend of defendant's and was the actual perpetrator of the murder of
    which both he and defendant were convicted.  He was also a principal witness for the prosecution at
    defendant's trial.  For simplicity and clarity, we refer to Michael Lane as Lane and to Rachael Lane by

                                            2

who was a friend of Ladue's. Ladue lived not far from the motel where James was staying. Lane and Anderson were staying with their friend Gordon Combs in another apartment in the same building, and sometimes borrowed Ladue's apartment so they could have some privacy. Lane and Anderson asked defendant and Rachael Lane if they had any drugs,[4] and defendant responded by suggesting that they could obtain cash from James, either by fraudulently proposing to get drugs for him and keeping the money, or by offering him Anderson's services as a prostitute.

Lane did not want to feign a drug deal with James. Anderson was willing to act (or at least pose)[5] as a prostitute to get James's money, but Lane did not want her to do so. Nonetheless, Anderson and Lane agreed with defendant that the three of them would go to the motel, that Anderson would offer James her services as a prostitute, and that defendant would receive a share of whatever money Anderson and Lane could obtain from James, or of the drugs they would buy with it. Lane denied that they discussed robbing James.

Before going to the motel, either Lane or Anderson asked Ladue for a knife with which to protect themselves, and told Ladue that defendant was "sending them [Anderson and Lane] on a mission." Defendant was there when they did so, but did not say anything. Ladue gave Lane a knife, and then went to sleep.[6]

Lane, Anderson, and defendant then walked together to the motel where

her full name.

[4]Defendant, Rachael Lane, Russell, Lane, Anderson, Ladue and Combs were all methamphetamine users at the time of these events.

[5]There was a conflict in the evidence as to whether Anderson had previously worked as a prostitute, and as to whether the plan was that she would really offer her services as such to James, or merely pretend to be willing to do so. Lane testified at trial that Anderson fairly frequently sold her services for drugs or for money to buy drugs, and that he had accompanied her, for her protection, on a few prior occasions when she had conducted such a transaction with a stranger. He had told the police at one point during their investigation that Anderson never worked as a prostitute while she was involved with him, but he testified at trial that this statement was true only in the sense that Anderson prostituted herself solely to obtain drugs (or money for drugs), and not as a regular occupation. In any event, there is substantial evidence in the record that Lane and Anderson gained entry to James's motel room by suggesting to him – whether truthfully or not – that Anderson was available as a prostitute. Defendant does not argue otherwise on his appeal.

[6]There was a conflict in the testimony regarding whether Ladue was in her apartment when defendant, Lane, and Anderson discussed their plan. Lane testified that she arrived just as they were leaving. Ladue testified that she was in the apartment asleep, and they woke her up to ask for the knife.

Ladue was, generally speaking, a problematic witness. She suffered from a number of mental disorders, for which she was taking numerous medications at the time she testified against defendant. She acknowledged that her recollection of the relevant events was hazy, and that she was "having problems keeping things straight" in her testimony. For example, although she testified at defendant's trial that she gave the knife to Lane, she admitted that when she testified at Lane and Anderson's trial, she had not remembered whether she gave it to Lane or Anderson. Ladue was originally charged as an accessory after the fact in connection with James's murder, but agreed to testify against Lane, Anderson, and defendant in exchange for immunity.

3

James was staying. Lane and Anderson knocked on the door of James's room, telling him that "Shawn sent me," while defendant (as he had told Lane he planned to do) entered the room next door to James's in order to visit his friend Kelly Eyerley. It is undisputed that defendant was not in James's room during the ensuing events, and was not present when Lane killed James.

Lane testified as follows regarding the ensuing events. James appeared to be drunk when he came to the door to let him and Anderson into the room.[7] Lane and Anderson were surprised and upset to learn that James was Black, a piece of information that Harrison hd not shared with defendant. Lane did not like or trust Black people, because his grandmother had been raped by a couple of Black men when she was young. Nonetheless, Anderson proceeded to offer James her sexual services for money. James accepted, but was unwilling to allow Lane to remain in the room to protect Anderson during the activity, so Lane went into the bathroom in order to remain nearby. Shortly thereafter, Lane heard Anderson scream, and emerged from the bathroom to see James beating her. Lane then "freaked out," and stabbed James at least five times, killing him. Lane and Anderson then left the motel without taking the only money they saw in James's room, which amounted to only $20. Anderson took James's cigarettes and lighter.

According to Ladue, defendant returned to Ladue's apartment alone, some 20 minutes after he had left for the motel.[8] Ladue testified that defendant told her he was worried that something had gone wrong, because Lane and Anderson had not yet returned. Shortly thereafter, Lane and Anderson arrived, awakening Rachael Lane, who had been asleep on Ladue's couch. Both Lane and Anderson were very upset, and Anderson was crying. Lane had a large knife, which he hid under a sofa cushion. He told defendant that he had killed James. Defendant appeared to be shocked upon hearing this, but he nonetheless asked where James's money was; Lane replied that he did not know.

Upon hearing that James had been killed, defendant called Harrison, at Lane's request, and asked him to come and see him. Defendant and Lane had an argument about whether they should return to the motel room. Rachael Lane testified that it might have been defendant who wanted to do so, but she was not sure. According to Lane, however, he was the one who persuaded defendant to go back.[9] Lane and Anderson were angry because they believed that defendant had set them up by telling them incorrectly that James had a lot of money, and by not telling them that he was Black.

---

[7]This testimony was corroborated by a forensic analysis showing that James had a blood-alcohol level of .26 percent when he died.

[8]Lane also testified that he and Anderson returned to Ladue's separately from defendant. Rachael Lane testified that defendant, Lane and Anderson all returned to Ladue's apartment together, but she also testified (as did Lane) that she had fallen asleep, and awoke when they arrived.

[9]Lane told the police shortly after James's death that it was defendant who had insisted they return to the motel, claiming James had $500 or $600 in his possession. In his trial testimony, however, Lane contended that he had been lying when he said this, in an effort to blame someone else for James's death. As discussed *post*, defendant told the police he had gone back to the motel at Lane's insistence because he was afraid of Lane at that point.

Ultimately, Lane, Anderson, and defendant returned to the motel, accompanied by Harrison. Lane entered James's room by climbing in the bathroom window, and then opened the door to let in the others. Lane went through James's pockets and belongings and took his necklace, shoes, wallet, and a small sum in cash. Defendant did not take anything, but according to Lane, he helped Lane flip over the mattress, and either took James's credit card or accepted it from Lane.[10]

Later, in the early hours of the morning on April 3, Lane and Anderson went to Combs's apartment. Lane testified that he told Combs a version of the events that was consistent with his trial testimony, but he also admitted he might have told Combs (untruthfully, according to Lane's trial testimony) that they had gone to the motel to rob James. According to Combs, Lane not only told him that he had just killed a man at the motel, but also averred that he and Anderson had gone there to rob the man by having Anderson pose as a prostitute. Lane also told Combs that he had remarked to Anderson on the way to the motel that if things got out of hand, he might have to stab the intended robbery victim.

Ladue testified that around noon on April 3, she awoke and found Lane cleaning her knife, which he then wrapped in newspaper. Lane testified that he told Ladue that he had killed a man at the motel with Ladue's knife. Ladue testified that Lane also told her he had gone to the motel to rob the man. Ladue drove Lane and Anderson to a jetty or pier, where Lane threw the knife into the ocean, and then to a remote area in the woods, where Lane and Anderson burned their clothes.

James's body was discovered in his room by the motel housekeeper shortly after 10:00 a.m. on April 3. He had been stabbed four times in the back and once in the elbow, and had bled to death. His room had been ransacked, and there were signs of a forced entry through the bathroom window.

A day or two later, Russell encountered defendant again. By then, word of the killing at the motel had circulated in the area, and defendant appeared to Russell to be worried about what had happened. Russell testified that defendant told him he had gone to the motel with Lane and Anderson, but had gone into the room next door to visit Eyerley. Russell said defendant told him that he had heard sounds of a "loud ruckus" from the next room, and that Lane had ended up stabbing the victim during a struggle. Russell interpreted what defendant said as indicating that Lane and Anderson had robbed the victim, but defendant did not actually use the word "rob." Defendant complained to Russell that Lane and Anderson had only given him (or him and Harrison) a credit card and a small sum of money (about $20), and that he believed they were "holding out on him." Russell also testified that defendant and Harrison made racially derogatory remarks about the victim, referring to him as "just

---

[10]Lane's testimony was inconsistent regarding how, or even whether, defendant obtained James's credit card. Russell testified that defendant told him he had the card, but Russell never actually saw defendant with it. Russell did see Harrison with the credit card, however; Harrison was holding it when he told Russell that he and defendant had bought gas for Russell's truck, which Harrison had borrowed to give defendant a ride. The prosecution introduced evidence that the credit card had been used to buy gas at a nearby gas station on the morning after James's death.

another dead nigger, porch monkey, dead cricket, something like that."[11]

On April 10, about a week after James was killed, a police detective interviewed Lane and Anderson, and learned from them that defendant had been involved in the events leading up to the killing. The police spoke with defendant's family and asked them to have defendant call them. On April 11, defendant voluntarily went to the police station to be interviewed. Defendant was not given any Miranda[12] warnings prior to the interview. A tape recording of the interview was played to the jury at defendant's trial. Defendant's trial counsel did not object to the admission of the tape recording.

In his interview with the police, defendant initially told a story about the events that the police told him they knew was not true. The police then told defendant that Lane and Anderson had been arrested, and had told them defendant was not in the room when James was killed. Defendant then acknowledged that he had told Lane and Anderson about Harrison's report that James had a lot of money and wanted a prostitute. He also admitted that he had proposed to Lane and Anderson that they obtain James's money-either by promising to buy drugs with it and not returning, or by stealing it while Anderson distracted James with sex-and give defendant a share of the proceeds. He acknowledged going to the motel with Lane and Anderson, and spending a short time in Eyerley's room before returning to Ladue's apartment. He said he had not heard anything from James's room except a little bang on the wall, and that he had told Eyerley that Lane and Anderson were going to get James's money by pretending they would use it to buy drugs for him.

Defendant also acknowledged in the interview that after finding out that Lane had stabbed James, he went back to the motel with Lane at Lane's insistence; he averred that he was afraid Lane would stab him if he refused. Defendant explained that he called Harrison to accompany them to the motel, and that when they got there, he knocked on James's door but received no response. He said Lane and Anderson then went in through the window and let him and Harrison in through the door. Defendant contended he had only watched while Lane, Anderson, and Harrison rummaged through James's belongings and took his money, shoes, and jacket. Defendant vehemently denied having had any intent that the group would obtain James's money by any means other than pretending to use it to buy drugs for James.

Defendant, Lane, and Anderson were charged with murder and burglary. Defendant's trial was severed from that of Lane and Anderson,[13] and did not begin until October 22, 2002. In an amended information, defendant was charged with felony murder (Pen. Code, § 187, subd. (a)[]) and second degree burglary (§§ 459, 460, subd. (b)). On December 9, 2002, the jury found defendant guilty on both counts.

(Amend. Pet. Ex. C at 2-9 (footnotes in original).)

---

[11]Russell acknowledged at trial that he did not like defendant. Russell had an extensive criminal record and had been granted immunity for as many as 30 uncharged robberies in exchange for his testimony. Lane testified he had never heard defendant use the word "nigger."

[12]Miranda v. Arizona, 384 U.S. 436 (1966).

[13]Lane and Anderson were tried jointly, and both had been convicted by the time defendant's trial began. Their convictions were affirmed by Division Five of this court in separate unpublished opinions. (People v. Lane (Dec. 1, 2003, A099502); People v. Anderson (Dec. 19, 2003, A099476).)

**DISCUSSION**

# I. Legal Standard

### A. Standard of Review for State Court Decisions

Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim advanced, rather than denying the claim on the basis of a procedural or other rule precluding state court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004). It is error for a federal court to review de novo a claim that was adjudicated on the merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

### 1. Section 2254(d)(1)

Challenges to purely legal questions resolved by a state court are reviewed under § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim adjudicated on the merits in state court only if the state court adjudication resulted in a decision that was "contrary to" or "involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States." Williams (Terry) v. Taylor, 529 U.S. 362, 402-04, 409 (2000). While the "contrary to" and "unreasonable application" clauses have independent meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

7

### a. Clearly Established Federal Law

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "Section 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." Id. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003). If there is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal law. See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established'" by the Supreme Court. Williams, 529 U.S. at 391. There are, however, areas in which the Supreme Court has not established a clear or consistent path for courts to follow in determining whether a particular event violates a constitutional right; in such an area, it may be that only the general principle can be regarded as "clearly established." Andrade, 538 U.S. at 64-65. When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework. See id. at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established." Clark v. Murphy, 331 F.3d 1062, 1070-71 (9th Cir.), cert. denied, 540 U.S. 968 (2003); Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 1999).

### b. "Contrary to"

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413. A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a

prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." Williams, 529 U.S. at 406. Such a case should be analyzed under the "unreasonable application" prong of § 2254(d). See Weighall v. Middle, 215 F.3d 1058, 1062 (9th Cir. 2000).

### c.    "Unreasonable Application"

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 412-13. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; accord Middleton v. McNeil, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway. Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it. Holland v. Jackson, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable standard is not a clear error standard. Andrade, 538 U.S. at 75-76 (rejecting Van Tran's use of "clear error" standard); Clark, 331 F.3d at 1067-69 (acknowledging the overruling of Van Tran on this point). After Andrade,

> [t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the "objectively unreasonable" standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them.

Id. In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result. Nunes v. Mueller, 350 F.3d 1045, 1054 (9th Cir. 2003).

## 2. Sections 2254(d)(2), 2254(e)(1)

A federal habeas court may grant a writ if it concludes a state court's adjudication of a claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). An unreasonable determination of the facts occurs where a state court fails to consider and weigh highly probative, relevant evidence, central to a petitioner's claim, that was properly presented and made part of the state court record. Taylor v. Maddox, 366 F.3d 992, 1005 (9th Cir. 2004). A district court must presume correct any determination of a factual issue made by a state court unless a petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Section 2254(d)(2) applies to an intrinsic review of a state court's fact-finding process, or situations in which the petitioner challenges a state court's fact-findings based entirely on the state court record, whereas § 2254(e)(1) applies to challenges based on extrinsic evidence, or evidence presented for the first time in federal court. See Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004). In Taylor, the Ninth Circuit established a two-part analysis under §§ 2254(d)(2) and 2254(e)(1). Id. First, federal courts must undertake an "intrinsic review" of a state court's fact-finding process under the "unreasonable determination" clause of § 2254(d)(2). Id. at 1000. The intrinsic review requires federal courts to examine the state court's fact-finding process, not its findings. Id. Once a state court's fact-finding process survives this intrinsic review, the second part of the analysis begins by dressing the state court finding in a presumption of correctness under § 2254(e)(1). Id. According to the AEDPA, this presumption means that the state court's fact-finding may be overturned based on new evidence presented by a petitioner for the first time in federal court only if such new evidence amounts to clear and convincing proof a state court finding is in error. See 28 U.S.C. § 2254(e)(1). "Significantly, the presumption of correctness and the clear-and-convincing standard of proof only come into play once the state court's fact-findings survive any intrinsic challenge; they do not apply to a challenge that is governed by the deference implicit in the 'unreasonable determination' standard of section 2254(d)(2)." Taylor, 366 F.2d at 1000.

When there is no reasoned opinion from the highest state court to consider the Petitioner's

claims, the Court looks to the last reasoned opinion.  See <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 801-06 (1991).  Here, the California Court of Appeal was the highest state court to issue an explained opinion on Petitioner's claims.  (Pet. Exhs. B & C.)

## II.    <u>Exhaustion</u>

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through state collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c); <u>Granberry v. Greer</u>, 481 U.S. 129, 133-34 (1987).  It is undisputed that Petitioner exhausted his state court remedies as to the claims raised in his petition. Specifically, Petitioner exhausted all four of his claims on direct appeal.

## III.    <u>Legal Claims</u>

Petitioner raises four claims: (1) that the jury instruction on aiding and abetting liability for felony murder, pursuant to CALJIC No. 8.27, violated his right to due process; (2) that the admission of evidence of Petitioner's use of racial slurs violated his right to due process; (3) that he received ineffective assistance of counsel because counsel did not object to the admission of his interview with the police; and (4) that the trial court violated his Sixth Amendment rights by imposing the upper term of three years on the burglary charge.

### 1.    <u>Jury Instruction</u>

Petitioner claims that the jury instruction on aider and abettor liability for felony murder violated his right to due process because it did not adequately convey that the state law requirement that there be a logical nexus, beyond mere time and place, between the planned felony and the homicide.  The instruction challenged was issued pursuant to CALJIC No. 8.27:

> If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of robbery or burglary, all persons, who either directly and actively commit the act constituting that crime, or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense, aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.

As noted by the California Supreme Court, while this case was pending on appeal, the

11

California Supreme Court held that felony-murder under California Penal Code section 189 requires "proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony the nonkiller committed or attempted to commit." People v. Cavitt, 33 Cal. 4th 187, 193 (2004). A nonkiller is not liable for "homicidal acts that are completely unrelated to the felony for which the parties have combined," but there need not be "proof that the homicidal act furthered or facilitated the felony, only that a logical nexus exist between the two." Id. at 201-03.

Petitioner claims that CALJIC No. 8.27 violated his right to due process because it did not adequately convey that in order to find Petitioner guilty of felony murder as an aider an abettor, one of the elements the jury had to find was a logical connection between the underlying felony of burglary or robbery and the homicide. The Due Process Clause of the Fourteenth Amendment protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he or she is charged. In re Winship, 397 U.S. 358, 364 (1970).

In Cavitt, the California Supreme Court held that CALJIC No. 8.27 "adequately apprise[s] the jury of the need for a logical nexus between the felonies and the homicide." Id. at 203. The court reasoned that "the jury necessarily found that the 'killing occurred during the commission or attempted commission of robbery or burglary' by 'one of several persons engaged in the commission' of these crimes. The first of these described a temporal connection between the crimes; the second described the logical nexus." Id. Pursuant to Cavitt, the California Court of Appeal also found that CALJIC No. 8.27 properly conveyed the state law requirement that in order to convict Petitioner of felony murder the jury would have to find a logical nexus between the homicide and the underlying felony. (Amend Pet. Ex. C at 10-11.) The reasoning set forth in Cavitt as to why the instruction adequately conveyed the logical nexus requirement constitutes a reasonable basis for the California Court of Appeal to find that the instruction did not violate due process.

The California Court of Appeal went on to conclude that even if the instruction were ambiguous, there was no "reasonable likelihood" that the jury applied the instruction in an unconstitutional manner. (Id. at 11-12 (citing Boyde v. California, 494 U.S. 370, 380 (1990).) If an

instruction is ambiguous, the due process inquiry is not how reasonable jurors could or would have understood the instruction as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury has applied the challenged instruction in a way that violates the Constitution. See Estelle, 502 U.S. at 72 & n.4; Boyde, 494 U.S. at 380. As correctly explained by the Court of Appeal:

> There was strong evidence of a causal connection, "beyond mere coincidence of time and place" (Cavitt, supra, 33 Cal.4th at p. 213 (conc. opn. of Chin, J.)), between the robbery or burglary [] that defendant helped to plan, and the killing of James-who was the target of that felony-during the course of that crime. Among other facts supporting this connection, perhaps the most telling is that defendant was present when Lane borrowed Ladue's knife to take with him to the motel, and raised no objection to his doing so. The overall record simply does not permit us to discern a reasonable likelihood that the jury found James was killed solely because of Lane's racial animus, rather than because of any causal connection with the robbery or burglary, but nonetheless was misled by the instructions into finding defendant guilty of felony murder.

(Amend. Pet. Ex. C at 11-12 (footnote omitted).) In addition to citing the correct federal standard from Boyde, the California Court of Appeal reasonably applied that standard to the evidence in finding that there was a causal connection between the homicide and the underlying felony. Consequently, there state court's rejection of Petitioner's claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to habeas relief on this claim.

### 2. Admission of Evidence

Petitioner claims that the trial court violated his right to due process by admitting evidence of his use of racial slurs to refer to the victim. Petitioner refers to the testimony by Troy Russell that after James was murdered, Petitioner referred to James as "just another dead nigger, porch monkey, dead cricket, something like that." (Pet. Ex. C at 7.) At trial, the defense moved to exclude the evidence as more prejudicial than probative, but the trial court denied the motion because the statement was made during a conversation in which Petitioner admitted to Russell that he had helped set up the robbery and showed that Petitioner knew who the victim was. (Id. at 12.) The trial court also found that Petitioner's isolated statement of racial slurs was not so prejudicial as to prevent the jury from being able to decide the case fairly. (Id.) Petitioner argued on appeal, as he does here, that the evidence was irrelevant and highly prejudicial. The California Court of Appeal found the admission of the evidence proper and, in any event, harmless because it of the overall strength of the

13

case against Petitioner. (Id. at 14.)

The United States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009). Absent such a ruling from the United States Supreme Court, a federal habeas court cannot find the state court's ruling was an "unreasonable application" of "clearly established federal law" under 28 U.S.C. § 2254(d)(1). Id. (citing Carey v. Musladin, 549 U.S. 70, 77 (2006)). Under Holley, therefore, this Court cannot grant habeas relief under § 2254(d)(1) on Petitioner's claim that the admission of irrelevant and overly prejudicial evidence violated his right to due process. See id. at 1101 n.2 (finding that although trial court's admission of irrelevant and prejudicial evidence violated due process under Ninth Circuit precedent, such admission was not contrary to, or an unreasonable application of, "clearly established Federal law" under § 2254(d)(1) and therefore not grounds for granting federal habeas relief).

Moreover, even if federal habeas relief were available on this grounds, the admission of the evidence in this case did not violate due process. The due process inquiry is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995). Only if there are no permissible inferences that the jury may draw from the evidence can its admission violate due process. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Petitioner's statement about the victim was relevant because it showed that Petitioner knew the victim's race, and was present in the room, during the second burglary after the victim was dead. The prejudicial impact of the words Petitioner chose to impart this admission was reduced by the fact that it was a single isolated statement in the context of the overall evidence at trial. Thus, the jury could draw a permissible inference from the evidence, and the state court could reasonably conclude that its admission did not violate Petitioner's right to due process.

Consequently, Petitioner is not entitled to habeas relief on this claim.

### 3    Ineffective Assistance of Counsel

Petitioner claims that counsel was ineffective because he failed to object to the admission of

14

his statement to the police on the grounds that he was deprived of his rights under <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). Approximately one week after the murder, Petitioner voluntarily went to the police station to be interviewed, and was not given <u>Miranda</u> warnings. (Resp't. Ex.19 at 282-86, 342-43.) A recording of the interview was played for the jury without objection from defense counsel. (<u>Id.</u> at 284-336.) During the interview, Petitioner initially lied by saying that the extent of his involvement ended when he informed Lane about the victim wanting to buy drugs. (<u>Id.</u> at 288-91.) Later, petitioner admitted to suggesting to Lane that they steal the victim's money and possibly find him a prostitute. (<u>Id.</u> at 294-97.)

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel. <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. <u>Id.</u> In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under professional norms. <u>Id.</u> at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Id.</u> at 694. Where the defendant is challenging his conviction, the appropriate question in determining prejudice is "'whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt.'" <u>Luna v. Cambra</u>, 306 F.3d 954, 961 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at 695). A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies. <u>Strickland</u>, 466 U.S. at 697; <u>Williams v. Calderon</u>, 52 F.3d 1465, 1470, n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

The California Court of Appeal found that it was reasonable for counsel not to object to the

admission of Petitioner's interview on because an objection on <u>Miranda</u> grounds would have been without merit. (Amend. Pet. Ex. B at 15.)[14] Trial counsel cannot have been ineffective for failing to make a meritless objection. <u>See</u> <u>Juan H. v. Allen</u>, 408 F.3d 1262, 1273 (9th Cir. 2005); <u>Rupe v. Wood</u>, 93 F.3d 1434, 1445 (9th Cir. 1996).

The California Court of Appeal reasoned that a <u>Miranda</u> objection would be meritless because Petitioner was not in custody during the interview, and thus the <u>Miranda</u> warnings were not required. <u>Miranda</u> protections are triggered "'only where there has been such a restriction on a person's freedom as to render him 'in custody.'" <u>Stansbury v. California</u>, 511 U.S. 318, 322 (1994) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. at 495); Maryland v. Shatzer, --- S.Ct. ---, 2010 WL 624042 at *9 (Feb. 24, 2010). "[I]n custody" means "'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." <u>California v. Beheler</u>, 463 U.S. 1121, 1125 (1983) (quoting <u>Oregon v. Mathiason</u>, 429 U.S. 492, 495 (1977)). It requires that "a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave," as judged by the totality of the circumstances. <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995). Petitioner was not under arrest, handcuffed, restrained or threatened during the interview, and he went to the police station and spoke to the police voluntarily. (Amend. Pet. Ex. B at 15.) Under these circumstances, the state court reasonably concluded that the interrogation was not custodial and that the <u>Miranda</u> warnings were not required. Therefore, counsel acted reasonably in not making what would have been a meritless objection to admitting Petitioner's interview into evidence.

The California Court of Appeal also found that the record supported tactical reasons for not objecting to the admission of the interview. Specifically, trial counsel used Petitioner's statements in the interview to present his side of the story to the jury without having to call Petitioner to testify at trial. (<u>Id.</u>) By not testifying, Petitioner did not have to waive his right against self-incrimination and was not subject to cross examination about, among other things, his "numerous" and "serious" prior convictions. (Amend. Pet. Ex. C at 19.) Moreover, there was going to be other evidence coming in at trial anyway that Petitioner had participated in the crimes and admitted to doing so.

---

[14]Petitioner's Exhibit B is the California Court of Appeal opinion on Petitioner's first appeal, dated January 27, 2005, which is the opinion that denies Petitioner's ineffective assistance of counsel.

Under such circumstances, even if a meritorious <u>Miranda</u> objection could be made, counsel could reasonably decide to opt for the tactical advantages of not objecting to admitting the interview into evidence.

For the foregoing reasons, trial counsel's failure to object to the admission of the interview with Petitioner did not violate Petitioner's constitutional right to the effective assistance of counsel. The state court's denial of this claim was neither contrary to nor an unreasonable application of federal law, and Petitioner is not entitled to habeas relief on this claim.

### 4. <u>Sentence</u>

Petitioner claims that by imposing the upper term of three years for the burglary conviction, the trial court violated his Sixth Amendment right to trial by jury as set out in <u>Cunningham v. California</u>, 549 U.S. 270 (2007). The trial court based its imposition of the upper term upon finding numerous aggravating factors and no mitigating factors under California Rule of Court, rule 4.42. The trial court relied on three factors "in particular:" that Petitioner had "numerous" and "quite serious" prior convictions as an adult; that Petitioner was on felony probation when he committed the crimes; and that his prior performance on probation was unsatisfactory. (Resp't. Ex. 12 at 1788-89 (citing Cal. Rule of Court, rules 4.42(b)(2),(b)(4); 4.21.5(b).) Petitioner claims that this sentence violates his Sixth and Fourteenth Amendment rights to a jury because the aggravating circumstances were found by the trial judge and not the jury.

In <u>Apprendi v.New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court held that any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. <u>Id.</u> at 488-90. In <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), the Supreme Court explained that "the statutory maximum for <u>Apprendi</u> purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." <u>Id.</u> at 303. This meant that the "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum." <u>Cunningham</u>, 549 U.S. at 273. In <u>Cunningham</u>, the Supreme Court, citing <u>Apprendi</u> and <u>Blakely</u>, held that California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent that it contravenes "<u>Apprendi's</u> bright-line rule: Except for a prior conviction, 'any fact that increases the

17

penalty for a crime beyond the statutory maximum must be submitted to a jury, and proven beyond a reasonable doubt.'" Id. (quoting Apprendi, 530 U.S. at 490).

There is no constitutional error in this case because of the prior conviction exception to the general rule in Apprendi, which provides that the fact of a prior conviction need not be pleaded in an indictment or proved to a jury beyond a reasonable doubt. Butler, 538 F.3d at 643 (citing Apprendi, 530 U.S at 490, and Almendarez-Torres v. United States, 523 U.S. 224, 244 (1998)). "[O]ur reexamination of our cases in this area, and of the history upon which they rely confirms" that the right to a jury applies to all sentencing factors, "[o]ther than the fact of a prior conviction." Apprendi, 530 U.S. at 490. The Ninth Circuit has recognized that "the Supreme Court has not overruled the Almendarez-Torres exception for prior convictions" and therefore the "obligation to apply the Almendarez-Torres exception [remains] unless and until it is rejected by the Supreme Court." Butler, 528 F.3d at 643-44.

Here, Petitioner was sentenced to the upper term of three years based on several aggravating factors – one of which is that he had numerous serious prior convictions. Petitioner has "at least a dozen felony and misdemeanor convictions." (Amend. Pet. Ex. C at 19.) Petitioner's prior convictions clearly fall into the "prior conviction" exception from Almendarez-Torres and Apprendi. As such, Petitioner was not entitled to a jury determination of that aggravating circumstance. Therefore, consistent with the Sixth Amendment, Petitioner's prior convictions could be considered by the trial court in imposing the upper term sentence on his burglary conviction without a jury determination beyond a reasonable doubt.

The fact that the trial court also found additional aggravating circumstances – such as Petitioner's being on parole at the time of the offense and his poor performance on parole in the past – does not alter this conclusion. "[U]nder California law, only one aggravating factor is necessary to set the upper term as the maximum sentence." Butler, 528 F.3d at 641. "[I]f at least one of the aggravating factors on which the judge relied in sentencing [petitioner] was established in a manner consistent with the Sixth Amendment, [petitioner's] sentence does not violate the Constitution." Id. at 643. The trial court could, consistent with the Sixth Amendment, rely on Petitioner's prior convictions to increase the sentence without a jury determination beyond a reasonable doubt.

1    Consequently, Petitioner's sentence is constitutional irrespective of "[a]ny additional factfinding"

2    with respect to additional aggravating circumstances.  Id. [15]

3        Petitioner is not entitled to habeas relief on this claim.

4                                  **CONCLUSION**

5        For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.  The Clerk of

6    the Court shall enter judgment and close the file.

7        IT IS SO ORDERED.

8    DATED: 2/8/10

9                                SAUNDRA BROWN ARMSTRONG
                                      United States District Judge

---

[15]As there was no error, the court need not reach respondent's additional argument that any error was harmless.

1

2   UNITED STATES DISTRICT COURT
    FOR THE
3   NORTHERN DISTRICT OF CALIFORNIA

4

5   GORMAN et al,
                                        Case Number: CV07-02883 SBA
6               Plaintiff,
                                        **CERTIFICATE OF SERVICE**
7       v.

8   KRAMER et al,

9               Defendant.
    _____/

10

11  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.

12
    That on March 8, 2010, I SERVED a true and correct copy(ies) of the attached, by placing said
13  copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
14  located in the Clerk's office.

15

16

17  Michael Thomas Gorman Prisoner Id T80924
    Sierra Conservation Center
18  5150 O'Byrnes Ferry Road
    Jamestown, CA 95327
19
    Dated: March 8, 2010
20
                                        Richard W. Wieking, Clerk
21                                      By: LISA R CLARK, Deputy Clerk

22

23

24

25

26

27

28